IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No.: 7:21-cv-00169-D

| | |
|---|---|
| ELIZABETH KARANIK, CHARLOTTE KARANIK, by her parents and next friends, JOHN KARANIK and wife, KIMBERLY KARANIK, and NATALIE PRESSLEY, <br><br>      Plaintiffs, <br><br>   v. <br><br> CAPE FEAR ACADEMY, INC., <br><br>      Defendant. | **Memorandum in Support of Defendant's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Amended Complaint for Failure to State a Claim** |

Pursuant to Local Civil Rules 7.1(e) and 7.2(a), Defendant Cape Fear Academy, Inc. ("Cape Fear") respectfully submits this Memorandum in Support of its Fed. R. Civ. P. 12(b)(6) Motion to Dismiss Amended Complaint for Failure to State a Claim. For the reasons below, Plaintiffs' amended complaint should be dismissed with prejudice.

### Statement of the Case

On October 6, 2021, Plaintiffs filed a complaint pseudonymously against Cape Fear. (Dkt. 1). Because Plaintiffs violated Fed. R. Civ. P. 10(a) by proceeding pseudonymously without the Court's permission, Cape Fear filed a Fed. R. Civ. P. 41(b) motion to dismiss on December 3, 2021. (Dkt. 18). That same day, Cape Fear separately moved to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). (Dkt. 16). On December 27, 2021, Plaintiffs amended their complaint. (Dkt. 20). The amended complaint mooted Cape Fear's initial Rule 12(b)(6) motion because it was aimed at the original complaint. *Jenkins v. CACH LLC*, No. 5:11-CV-00579, 2012 WL 1673156, at *2 (E.D.N.C. Feb. 27, 2012). And the amended complaint used Plaintiffs' real names, which mooted Cape Fear's Rule 41(b) motion to dismiss.

In the amended complaint, Plaintiffs seek relief on eight grounds: (1) Title IX discrimination as to Natalie Pressley; (2) Title IX retaliation as to Elizabeth and Charlotte Karanik; (3) negligent infliction of emotional distress as to Elizabeth Karanik; (4) intentional infliction of emotional distress as to Elizabeth Karanik; (5) breach of contract and violation of the implied covenant of good faith and fair dealing as to Elizabeth Karanik; (6) breach of contract and violation of the implied covenant of good faith and fair dealing as to Charlotte Karanik; (7) negligent infliction of emotional distress as to Charlotte Karanik; and (8) intentional infliction of emotional distress as to Charlotte Karanik. (Dkt. 20 at pgs. 54-80). Although the amended complaint has more words and some reworked allegations,[1] it still fails to state a claim. Accordingly, Cape Fear respectfully moves this Court to dismiss the amended complaint.

## Summary of Allegations

Cape Fear is a private PreK-12 school in Wilmington, North Carolina. Plaintiffs are former Cape Fear students. Plaintiffs Natalie Pressley and Elizabeth Karanik were seniors in 2020-21. (Dkt. 20 at ¶¶ 1, 3). Plaintiff Charlotte Karanik was a sophomore. (*Id.* at ¶ 2). Pressley alleges that she suffered "sexual harassment, unwelcome conduct and bullying, on the basis of her sex" during the 2020-21 academic year. (*Id.* at ¶ 61). That conduct allegedly included teasing, inappropriate jokes, expressions of contempt towards women, improper gender stereotyping, and insensitive statements during classroom discussions. (*Id.* at ¶¶ 63-64, 69, 78). Pressley does not claim that Cape Fear employees engaged in this behavior. Rather, she claims it was committed by some male high schoolers. (*Id.* at ¶ 60).

---

[1] For example, in the original complaint Plaintiffs claimed that both Elizabeth Karanik (a/k/a "Jane Doe") and Natalie Pressley (a/k/a "Jane Roe") experienced Title IX discrimination. (Dkt. 1 at ¶¶ 136-162). In the amended complaint, however, Plaintiffs only claim that Pressley experienced Title IX discrimination. (Dkt. 20 at ¶¶ 209-242).

4863-9057-4345, v. 4

Pressley asserts that she first reported her classmates' alleged behavior to a teacher and guidance counselor. (*Id.* at ¶¶ 66, 69, 99-100). The teacher and guidance counselor attempted to address Pressley's concerns in several ways, but their attempts were unsatisfactory to Pressley. (*Id.* at ¶¶ 78, 84, 87, 96-97, 214, 217). According to the amended complaint, Elizabeth Karanik and others learned of the alleged harassment experienced by Pressley. (*Id.* at ¶ 98). Elizabeth Karanik, Pressley, and others allegedly discussed their concerns with a guidance counselor. (*Id.* at ¶ 99). It is claimed that the guidance counselor left them with the impression that she lacked the authority to address the accusations, so she referred them to the Dean of Students. (*Id.* at ¶ 100). The Dean of Students allegedly met with the students, expressed concern, and assured an investigation. (*Id.* at ¶¶ 103-04).

It is claimed that days later, Cape Fear announced its 2021 commencement ceremony speakers. Some of the alleged harassers were slated to speak. (*Id.* at ¶ 107). Upset by this news, Pressley, Elizabeth Karanik, and others prepared a petition using the Cape Fear logo. (*Id.* at ¶¶ 115-16, 165, 196). Elizabeth Karanik posted the petition to Change.org. (*Id.* at ¶ 117). The petition named the male students and urged Cape Fear to cancel their commencement speaking roles. (*Id.*) According to the amended complaint, Cape Fear officials were threatened with lawsuits and demanded the petition's removal. (*Id.* at ¶ 120). The petition was removed, and Elizabeth Karanik claims Cape Fear began retaliating against her. (*Id.* at ¶ 120-21).

More specifically, Elizabeth Karanik alleges she was brought before Cape Fear's Honor Council for publishing "material intended to harm or slander another person" in violation of the Student Handbook. (*Id.* at ¶¶ 135,142). It is claimed that the student-led Honor Council recommended against punishing Elizabeth Karanik. (*Id.* at ¶ 161). Elizabeth Karanik alleges a Cape Fear official subsequently asked her to apologize to those named in the petition. (*Id.* at ¶

165). The Cape Fear official allegedly stated that Elizabeth Karanik would be unable to attend Cape Fear's "Salute to Seniors" and the 2021 commencement ceremony unless she apologized. (*Id.* at ¶ 174). Elizabeth Karanik chose not to apologize and, therefore, she did not attend the events. (*Id.* at ¶¶ 177, 181).

Plaintiffs further allege that, after a series of communications between Cape Fear officials and Elizabeth Karanik's parents, Cape Fear decided on June 4, 2021 that Charlotte Karanik would not be permitted to attend the school for the 2021-22 academic year. (*Id.* at ¶¶ 135-36, 140-42, 196). Cape Fear stated that it was exercising its "sole discretion" under the enrollment contract to cancel Charlotte Karanik's enrollment because her parents' actions "impede[d] a constructive relationship or otherwise materially interfere[d] with [Cape Fear's] accomplishment of its mission." (*Id.* at ¶ 196). Plaintiffs claim that Cape Fear's exercise of its "sole discretion" to disenroll Charlotte Karanik forced her to attend a public school. (*Id.* at ¶ 206). It is further alleged that by exercising its contractually-granted "sole discretion" to disenroll Charlotte Karanik, Cape Fear caused her to suffer "daily" anxiety and depression and damaged her college prospects. (*Id.* at ¶¶ 207, 208).

Although Cape Fear is a private school, Plaintiffs claim it became subject to Title IX when it received a Paycheck Protection Program ("PPP") loan in 2020. (*Id.* at ¶ 10). Plaintiffs allege that Cape Fear violated Title IX by discriminating against Pressley because of her sex and by retaliating against Elizabeth and Charlotte Karanik. (*Id.* at ¶¶ 209-256). Plaintiffs further allege that Cape Fear intentionally and negligently inflicted emotional distress and also breached contracts with Elizabeth and Charlotte Karanik. (*Id.* at ¶¶ 257-326). Even accepting Plaintiffs allegations as true, the amended complaint fails to state a claim and should be dismissed.

4863-9057-4345, v. 4

## The Rule 12(b)(6) Standard

A Rule 12(b)(6) motion to dismiss challenges a complaint's legal sufficiency. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). At the motion to dismiss stage, the Court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint will only survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). When ruling on a motion to dismiss, a court need not accept a complaint's "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (cleaned up). When deciding a motion to dismiss, a court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

## Discussion

### I.    The Title IX discrimination claim should be dismissed.

The Court should dismiss Pressley's Title IX discrimination claim (Dkt. 20 at ¶¶ 209-242). for two reasons. First, Cape Fear was not subject to Title IX because it did not receive "federal financial assistance" as that term has been defined for Title IX purposes. Second, even if Cape Fear were subject to Title IX, the complaint fails to sufficiently allege that Cape Fear was deliberately indifferent to sexual harassment that was so severe, pervasive, and objectively offensive that it deprived Pressley of educational opportunities or benefits.

### A.  Cape Fear was not subject to Title IX because it did not receive "federal financial assistance."

Pressley's Title IX discrimination claim fails as a matter of law because Cape Fear was not subject to Title IX during the 2020-21 academic year. Title IX applies to schools that receive

Case 7:21-cv-00169-D   Document 23   Filed 01/10/22   Page 5 of 31
4863-9057-4345, v. 4

"[f]ederal financial assistance." 20 U.S.C. § 1681(a); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 695 n.17 (1979). The amended complaint alleges that Cape Fear's 2020 PPP loan was "federal financial assistance." (Dkt. 20, at ¶ 10). That is incorrect. Although Cape Fear received a PPP loan, that loan was not "federal financial assistance." That is so because the PPP loan was issued by a private lender—not the U.S. government—under a Small Business Administration (SBA) "guaranty," and Title IX's definition of "federal financial assistance" excludes "a contract of insurance or guaranty." *See* 20 U.S.C. § 1682; *see also* 34 C.F.R. § 106.2(g)(5). As a result, Pressley cannot maintain a Title IX discrimination claim against Cape Fear because the claim hinges on a PPP loan that does not constitute "federal financial assistance."

    **1. A "contract of insurance or guaranty" does not constitute "federal financial assistance" for Title IX purposes.**

Title IX of the Education Amendments of 1972, codified at 20 U.S.C. § 1681 *et seq.*, states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving [f]ederal financial assistance." 20 U.S.C. § 1681(a). As its terms make clear, Title IX is not a free-floating law of general applicability. Rather, it only applies to schools that receive "federal financial assistance." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The receipt of "federal financial assistance" is, therefore, an essential element of a Title IX claim. *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 686 (4th Cir. 2018). Thus, a plaintiff cannot maintain a Title IX claim against an entity that does not receive "federal financial assistance."[2] *See, e.g.*, *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n of Illinois*, 134 F. Supp. 2d 965, 972

---

[2] At first blush, it may appear that the Court lacks subject matter jurisdiction over a Title IX complaint against an entity that does not receive "federal financial assistance." But under the *Arbaugh* rule, the lack of "federal financial assistance" should be treated as a failure to state a claim rather than a subject matter jurisdiction defect. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514-15 (2006).

4863-9057-4345, v. 4

(N.D. Ill. 2001) (dismissing Title IX claim because the defendant was "not a 'program or activity receiving federal financial assistance'"); *Buckley v. Archdiocese of Rockville Ctr.*, 992 F. Supp. 586, 590 (E.D.N.Y. 1998) (same); *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421 (4th Cir. 2005) (affirming dismissal of Title VI claim and stating that plaintiff failed to "allege facts showing that REI received federal financial assistance" because "market contracts between federal contractors and the government do not constitute such assistance").

"Federal financial assistance" is a defined term for Title IX purposes, and its meaning can be found in two places—the statute and its implementing regulations. Turning first to the statute. While 20 U.S.C. § 1681 announces what Title IX prohibits, § 1682 details its enforcement. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 514-15 (1982). Section 1682 authorizes the promulgation of regulations designed to "effectuate the provisions of section 1681." 20 U.S.C. § 1682. And it permits Title IX to be enforced by agencies that provide "[f]ederal financial assistance…by way of grant, loan, or contract *other than a contract of insurance or guaranty*." 20 U.S.C. § 1682 (emphasis added).[3] Based on that language, courts have recognized that when Congress drafted Title IX it excluded "contracts of insurance or guaranty" from the definition of "federal financial assistance." *See, e.g.*, *Moore v. Sun Bank of N. Florida, N.A.*, 923 F.2d 1423, 1425-27 (11th Cir. 1991) (explaining that § 504 of the Rehabilitation Act, unlike Title IX, does not contain a statutory carveout for "contract of insurance and guaranty"). The same language regarding "contracts of insurance or guaranty" is found in Title VI of the Civil Rights Act of 1964.[4]

---

[3] By its terms, Title IX can be enforced only by the U.S. government. In 1979, however, the Supreme Court created a private right of action. *See Jackson*, 544 U.S. at 173 (discussing the history behind the Title IX private right of action). Initially, the judicially created private right of action was limited to claims of intentional sex discrimination by an educational institution. *Id.* The Court has since expanded it to include deliberate indifference to a teacher's sexual harassment of a student, deliberate indifference to student-on-student harassment, and retaliation against a Title IX complainant. *Id.* at 173, 176.

[4] Title VI precedent is highly persuasive in Title IX cases because "Title IX was patterned after Title VI." *Cannon*, 441 U.S. at 696; *see also Litman v. George Mason Univ.*, 92 F. App'x 41, 42 (4th Cir. 2004) (per curiam) (recognizing that "Title VI and Title IX are to be interpreted in the same manner").

*See* 42 U.S.C. § 2000d-1. And courts interpreting Title VI's language have concluded that it "excludes from coverage a federal 'contract of insurance or guaranty.'" *United States v. Baylor Med. Ctr.*, 736 F.2d 1039, 1048 (5th Cir. 1984); *see also Moore*, 923 F.2d at 1427 (explaining that "Congress in 1964 (Title VI), in 1972 (Title IX), and in 1975 (Age) enacted statutes prohibiting discrimination in programs receiving federal financial assistance and each time expressly excluded contracts of insurance and guaranty"); *Butler v. Capitol Fed. Sav.*, 904 F. Supp. 1230, 1233 (D. Kan. 1995) ("Title VI specifically exempts a contract of insurance from the definition of 'federal financial assistance.'").[5]

Title IX's implementing regulations similarly state that "federal financial assistance" does not include "a contract of insurance or guaranty." 34 C.F.R. § 106.2(g)(5). As contemplated by 20 U.S.C. § 1682, the Department of Health, Education, and Welfare ("HEW") proposed regulations to implement Title IX. *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 287 (2d Cir. 2004). The regulations were submitted to Congress, which permitted them to take effect in 1975. *Id.* When HEW subsequently split into the Department of Education and the Department of Health and Human Services, the Department of Education assumed responsibility for enforcing Title IX. *Id.* The governing regulations can now be found in 34 C.F.R. Part 106.[6] *Id.* Those regulations define the phrase "federal financial assistance" for Title IX purposes to mean:

> (1) A grant or loan of Federal financial assistance, including funds made available for:
>     (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

---

[5] The U.S. Department of Justice's *Title VI Manual* similarly explains that: "Title VI specifically states that it does not apply to 'Federal financial assistance...extended by way of a contract of insurance or guaranty.'" *U.S. Dep't of Justice, Title IX Manual*, at §V, 10, available at https://www.justice.gov/crt/book/file/1364106/download (last visited Dec. 2, 2021).

[6] The Title IX regulations are entitled to a "particularly high" degree of deference under *Chevron U.S.A., Inc. v Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See McCormick*, 370 F.3d at 288; *see also Preston v. Commw. of Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 n.2 (4th Cir. 1994) (noting prior deference to the Title IX regulations).

(ii) Scholarships, loans, grants, wages or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, *except a contract of insurance or guaranty*.

34 C.F.R. § 106.2(g) (emphasis added). For today's purposes, § 106.2(g)(5) is particularly important because it states that "a contract of insurance or guaranty" is not "federal financial assistance."

Although the Fourth Circuit has not addressed the meaning of "federal financial assistance," there is helpful precedent from the Sixth and Eleventh Circuits. There is also a decision from the Eastern District of North Carolina that speaks to the issue. First up is the Sixth Circuit's decision in *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275 (6th Cir. 1996). There, the plaintiff claimed she was fired in violation of § 504 of the Rehabilitation Act. *Gallagher*, 89 F.3d at 276. The plaintiff argued that her former employer was subject to § 504 because it received "federal financial assistance" by making federally insured loans and receiving interest subsidies. *Id.* at 277. The Sixth Circuit rejected that argument because § 504's regulations—like Title XI's regulations—"clearly exclude contracts of insurance or guaranty" from the definition of "federal financial assistance." *Id.*; *see also McCullough v. Branch Banking & Tr. Co., Inc.*, 844 F. Supp. 258, 259 (E.D.N.C. 1993) (Howard, J.) (holding that BB&T was not subject to § 504 because its

4863-9057-4345, v. 4

participation in the SBA's guaranteed loan program "did not qualify as federal financial assistance").

The Eleventh Circuit went the opposite direction of *Gallagher* and *McCullough* when it allowed a § 504 claim based on participation in the SBA guaranteed loan program. *Moore*, 923 F.2d at 1425. *Moore*'s discussion, however, supports Cape Fear's argument that "contracts of insurance or guaranty" are not "federal financial assistance" for Title IX purposes. The plaintiff in *Moore* claimed the bank was subject to § 504 because it received "federal financial assistance" through the SBA guaranteed loan program. *Id*. at 1424-25. Relying on § 504's regulations, the bank claimed the SBA's guaranteed loan program was a "contract of insurance or guaranty" and thus did not qualify as "federal financial assistance." *Id*. at 1425-26. The Eleventh Circuit rejected the bank's argument because § 504's statutory text—unlike its implementing regulations—"does not exclude such contracts of insurance or guaranty from the meaning of [f]ederal financial assistance." *Id*. at 1425. The court distinguished § 504's statutory language from that found in Titles VI and IX because both of those "statutes excluded recipients of federal financial assistance who receive benefits from contracts of insurance or guaranty." *Id*. at 1426. The *Moore* court refused to read the "contract of insurance or guaranty" exclusion into § 504's statutory text and, unlike *Gallagher* and *McCullough*, it disregarded § 504's regulations "with respect to that portion excluding programs receiving federal financial assistance in the form of contracts of insurance or guaranty from section 504 coverage." *Id*. at 1431.[7]

---

[7] Additional support for the proposition that "contracts of insurance or guaranty" fall outside Title IX's definition of "federal financial assistance" can be found in the U.S. Department of Justice's *Title IX Legal Manual* and Professor O'Malley's treatise, *Federal Jury Practice and Instructions*. According to the *Title IX Manual*, "[f]ederal financial assistance does not encompass contracts of guarantee or insurance by the federal government." *U.S. Dep't of Justice, Title IX Manual* at III(A), available at https://www.justice.gov/crt/title-ix#III.%C2%A0%20Scope%20of%20Coverage (last visited Nov. 28, 2021). Similarly, Professor O'Malley has written that in the Title IX context "[f]ederal financial assistance includes grants, loans, or contracts *other than* those of insurance or guaranty." Kevin F. O'Malley, et al., 3C Federal Jury Prac. & Instr. Ch. 177 at Introduction (2021) (emphasis added).

4863-9057-4345, v. 4

What the language of 20 U.S.C. § 1682, 34 C.F.R. § 106.2(g)(5), the case law, and the secondary sources cited above inescapably establish is that "contracts of insurance or guaranty" do not qualify as "federal financial assistance" for Title IX purposes. This dooms Plaintiffs' Title IX discrimination claim because, as explained below, Cape Fear's PPP loan was a "contract of insurance or guaranty."

### 2. Cape Fear's PPP loan was a "contract of insurance or guaranty."

Plaintiffs allege that Cape Fear was subject to Title IX during the 2020-21 academic year because it received "federal financial assistance" via a PPP loan. (Dkt. 20 at ¶ 10). Although Cape Fear received a PPP loan, the PPP loan documents and the nature of the PPP loan program itself demonstrate that the PPP loan was a "contract of insurance or guaranty."

Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to assist businesses harmed by the COVID-19 pandemic. *DV Diamond Club of Flint, LLC v. Small Bus. Admin.*, 960 F.3d 743, 745 (6th Cir. 2020). The CARES Act created the PPP, which temporarily revamped the SBA's longstanding § 7(a) loan program. *Lopez v. Bank of Am., N.A.*, 505 F. Supp. 3d 961, 964 (N.D. Cal. 2020). The § 7(a) program is a "loan *guaranty* program, which is designed to encourage lenders to provide loans to small businesses." *Johnson v. JPMorgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, 149 (S.D.N.Y. 2020) (emphasis added). Under the PPP, the SBA did not loan money to borrowers. Instead, private lenders loaned money to borrowers and the SBA "guaranteed" the loans against default. *Id*. at 155. PPP loans received a 100% guaranty, while traditional § 7(a) loans were guaranteed at lower percentages. *See* SBA First Interim Rule, 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020) (stating that the PPP loan "guarantee percentage is 100 percent"); *see also Daniel T.A. Cotts, PLLC v. Am. Bank, N.A.*, No. 2:20-CV-185, 2021 WL 2196636, at *1 (S.D. Tex. Feb. 9, 2021) (recognizing that the PPP provided a higher

4863-9057-4345, v. 4

percentage guaranty than a typical § 7(a) loan). PPP borrowers could seek forgiveness in some cases. *In re Gateway Radiology Consultants P.A.*, 983 F.3d 1239, 1247 (11th Cir. 2020). The SBA advised PPP lenders of the "guaranty purchase process for SBA to honor its 100% guaranty on a PPP loan." SBA Procedural Notice 5000-812316, SBA Guaranty Purchases and Lender Servicing Responsibilities (July 15, 2021), available at https://www.sba.gov/sites/default/files/2021-07/Procedural%20Notice%205000-812316%20PPP%20Guaranty%20Purchase%20%26%20Charge%20Off%20Servicing%207.15.21-508.pdf (last visited Dec. 2, 2021).

Neither the statute nor Title IX's regulations define "guaranty." So, the Court must determine its plain and ordinary meaning. *In re Constr. Servs., Inc.*, 753 F.3d 124, 128 (4th Cir. 2014). To make that determination, courts routinely look to dictionaries. *Id.* According to *Black's Law Dictionary*, the term "guaranty" means "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance." *Black's Law Dictionary* (11th ed. 2019). The courts have used a substantially similar definition. *See, e.g.*, *Cargill, Inc. v. Buis*, 543 F.2d 584, 587 (7th Cir. 1976) ("A guaranty has been defined as being a collateral promise or undertaking by one person to answer for the payment of some debt or the performance of some duty (in case of default) of another person liable therefor in the first instance.").

These definitions of "guaranty" describe what occurred under the PPP—private lenders loaned money, and the SBA provided a "promise to answer for the payment" in the event of default. Cape Fear's PPP loan documents all show that First Carolina Bank loaned $1,253,949 to Cape Fear, while the SBA provided First Carolina Bank with a 100% guaranty against default.

4863-9057-4345, v. 4

Indeed, the word "guaranty" appears throughout Cape Fear's PPP loan documents.[8]   For example:

1. The SBA Form 1050, Settlement Sheet Instructions state: "Providing this information is required to comply with program requirements; failure to provide it when required may impair the Lender's ability to collect on the SBA loan *guaranty*." (Exhibit 1 at 14) (emphasis added).
2. The Lender Application Form is titled: "Paycheck Protection Program Loan *Guaranty*."  (Exhibit 1 at 19) (emphasis added).
3. The Lender Application Form states that the "purpose of this form is to collect identifying information about the Lender, the Applicant, the loan *guaranty* request, sources and uses of funds, the proposed structure (which includes pricing and the loan term), and compliance with SBA Loan Program Requirements." (Exhibit 1 at 19) (emphasis added).

The word "guaranty" also appears throughout PPP-related documents prepared by the SBA.  For example, the SBA issued a Procedural Notice to PPP lenders, which contained these statements:

1. "The purpose of this Notice is to remind PPP lenders of their servicing responsibilities and to advise PPP Lenders of the *guaranty* purchase process for SBA to honor its 100% *guaranty* on a PPP loan."
2. "A Lender may simultaneously request a *guaranty* purchase and charge-off from SBA when the borrower…."
3. "Lender must use the SBA *guaranty* purchase workflow within the Platform to look up the PPP loan and begin the simplified *guaranty* purchase process."

SBA Procedural Notice 5000-812316, *supra*.

    The information above establishes that Cape Fear's PPP loan was issued by a private lender (First Carolina Bank).  To protect First Carolina Bank from the risk of Cape Fear defaulting, the SBA provided the bank with a 100% "guaranty."  Because "contracts of insurance or guaranty"

---

[8] The documents related to Cape Fear's PPP loan are attached as Exhibits 1 and 2 to this memorandum.  The court may consider those documents when ruling on Cape Fear's motion to dismiss because they are authentic and the PPP loan is integral to the complaint's allegations—indeed, the PPP loan is the lynchpin of Plaintiffs' Title IX case against Cape Fear.  *See Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d 218, 222-23 (4th Cir. 2009) (considering in the 12(b)(6) context express warranties that were not attached to the complaint, but that were authentic and integral to the complaint); *see also Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (explaining that when reviewing a 12(b)(6) motion to dismiss, a court may consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic").

4863-9057-4345, v. 4

are excluded from the definition of "federal financial assistance" for Title IX purposes, Cape Fear did not receive "federal financial assistance" and cannot be sued under Title IX.

Although there is no precedent on the precise question of whether PPP loans constitute Title IX "federal financial assistance," the oft-cited Congressional Research Service has weighed in on the matter. *See generally N.L.R.B. v. SW Gen., Inc.*, 137 S.Ct. 929, 935-36 (2017) (citing a Congressional Research Service report); *Franklin v. Massachusetts*, 505 U.S. 788, 794-95 (1992) (same). It has recognized that PPP loans are "*guaranteed* loans" and that "Title IX…appear[s] to exempt 'contracts of insurance or guaranty' from [its] requirements." Cong. Research Serv., LSB10459, Applicability of Federal Civil Rights Laws to Recipients of CARES Act Loans 2 (May 1, 2020), *available at* https://crsreports.congress.gov/product/pdf/LSB/LSB10459 (last visited Jan. 10, 2022) (cleaned up) (emphasis in original). The Congressional Research Service further explained that because Title IX excludes "contracts of insurance or guaranty," its requirements "may not apply to recipients who only receive PPP loans, meaning that aggrieved individuals might not be able to sue [PPP] recipients" under Title IX as Plaintiffs attempt to do today. *Id.* at 3.[9] Thus, although the "SBA might…be able to enforce [its regulatory nondiscrimination provisions] against [PPP] recipients," private parties (like Plaintiffs) cannot bring Title IX lawsuits against PPP borrowers (like Cape Fear). *Id.* Accordingly, the Title IX discrimination claim fails as a matter of law and should be dismissed.

### 3. It is irrelevant that Cape Fear's PPP loan was later forgiven.

The fact that Cape Fear's PPP loan was forgiven on June 15, 2021[10]—which is after the events described in the amended complaint—is irrelevant to the question of whether Cape Fear's

---

[9] The Congressional Research Service also provided Congress with some advice on how it could change the PPP program or existing laws to make PPP borrowers subject to Title IX. Cong. Research Serv., *supra* at 4. Congress has not taken that advice.
[10] A copy of the forgiveness document is attached as Exhibit 2.

4863-9057-4345, v. 4

PPP loan was a "contract of insurance or guaranty." Under the PPP, borrowers could eventually apply for forgiveness if they met certain conditions. *See* Business Loan Temporary Changes; Paycheck Protection Program—Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act, 86 Fed. Reg. 8283, 8286-87 (Feb. 5, 2021) (listing the PPP forgiveness requirements). Put simply, if the borrower used the money to pay for some things, then the loan could be forgiven. *Id.* If, however, the money was used to pay for other things, then the loan would either be forgiven in part or not at all. *Id.*

The forgiveness process itself further demonstrates that PPP loans were "contracts of insurance or guaranty." After reviewing a borrower's forgiveness application, the private lender requests payment from the SBA. *Id.* at 8288. If the SBA agrees that the loan qualifies for forgiveness, then the SBA remits payment to the lender. *Id.* In essence, forgiveness of an SBA-guaranteed PPP loan works like default on an SBA-guaranteed PPP loan—the guarantor (SBA) reimburses the lender for the amount the lender loaned.

At the end of the day, the SBA did not loan money to Cape Fear. Nor did the SBA issue a grant to Cape Fear. Cape Fear received no money from the SBA. *Not a dime*. In May of 2020, it received money from First Carolina Bank. And First Carolina Bank received a guaranty from the SBA. The SBA later—well after the events alleged in the amended complaint—paid First Carolina Bank the guaranteed amount.[11] That fact in no way alters the reality that the PPP was a "guaranty" loan program.

---

[11] It bears mentioning that even if the act of forgiving the loan constituted "federal financial assistance," that act did not occur until June 15, 2021, which is after Cape Fear's 2020-21 academic year ended. The forgiveness of the loan in June of 2021 could not somehow retroactively constitute "federal financial assistance" for the preceding eleven months during which the harassment allegedly occurred.

4863-9057-4345, v. 4

Congress could have chosen to structure the PPP loan program differently. Take for example, the SBA's COVID Economic Injury Disaster Loan (EIDL) program. Under the EIDL program, borrowers received a loan *directly* from the federal government. *See* SBA COVID EIDL Loans Information as of September 8, 2021, *available at* https://www.sba.gov/sites/default/files/2021-09/COVID-EIDL-FAQs-090821-508.pdf (last visited Jan. 7, 2022); *see also* Cong. Research Serv., *supra* at 2 (explaining the difference between EIDL loans and PPP loans). As the EIDL program proves, Congress knows how to provide direct loans to borrowers. And it presumably knows that directly lending money renders the borrowers recipients of "federal financial assistance" for Title IX purposes. *See* Cong. Research Serv., *supra* at 2-3 (May 1, 2020) (recognizing that "grants and loans under the EIDL program disbursed *directly from SBA* appear to constitute federal financial assistance" for Title IX purposes) (emphasis in original).

With the EIDL loan program, Congress chose the direct loan path. But with the PPP loan program, it chose another path—the contract of guaranty path. It did so purposely. And it took that path presumably aware that "[f]ederal financial assistance does *not* encompass contracts of guarantee or insurance by the federal government." U.S. Dep't of Justice, *Title IX Manual* at III(A), available at https://www.justice.gov/crt/title-ix#III.%C2%A0%20Scope%20of%20Coverage (last visited Jan. 7, 2022) (emphasis added); *see also South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351 (1998) (stating "we assume that Congress is aware of existing law when it passes legislation"). As a result of Congress's decision to take the contract of guaranty path with PPP loans, PPP borrowers—like Cape Fear—were not recipients of "federal financial assistance" for Title IX purposes. *See* Cong. Research Serv., *supra* at 3 (recognizing that Title IX "may not apply to recipients who only receive PPP loans"). If

Congress wanted PPP participants to be bound by Title IX, then it could have structured the PPP program like the EIDL program. Congress decided not to. Regardless of whether the Court agrees with Congress's decision, it must be respected. *See SAS Inst. v. Iancu*, 138 S.Ct. 1348, 1355 (2018) (recognizing that "just as Congress' choice of words is presumed to be deliberate and deserving of judicial respect, so too are its structural choices") (cleaned up). Accordingly, the Court should dismiss Pressley's Title IX claim because Cape Fear did not become subject to Title IX by receiving a PPP loan. To hold otherwise would be to pretend that Congress had structured the PPP loan program as a direct loan program instead of a contract of guaranty program.

**B. Even if Title IX applied to Cape Fear, Pressley's Title IX discrimination claim should be dismissed because it fails to sufficiently allege that Cape Fear was deliberately indifferent to severe, pervasive, and objectively offensive sexual harassment.**

Even if the Court holds that Title IX applied to Cape Fear, Pressley's Title IX discrimination claim should be dismissed because she fails to sufficiently allege that Cape Fear was deliberately indifferent to severe, pervasive, and objectively offensive sexual harassment. Interpreting the language, of Title IX, the Supreme Court has held that "in certain limited circumstances" student-on-student sexual harassment may form the basis of a Title IX claim. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999). To prevail on such a claim, a plaintiff must show:

> (1) they were a student at an educational institution receiving federal funds;
> (2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school;
> (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and
> (4) the school acted with deliberate indifference to the alleged harassment.

4863-9057-4345, v. 4

*Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 263-64 (4th Cir. 2021). The amended complaint's failure to sufficiently allege the first element has been discussed extensively above. And for purposes of the current motion, Cape Fear does not challenge the sufficiency of Pressley's allegations regarding the third element. Pressley, however, has not alleged sufficient facts on the second and fourth elements.

### 1. Pressley has failed to sufficiently allege sexual harassment that was severe, pervasive, and objectively offensive.

To be actionable under Title IX, student-on-student sexual harassment must be so severe, pervasive, and objectively offensive that it deprived the victim of equal access to educational opportunities or benefits. *Davis*, 526 U.S. at 631. This means the harassment must have created "an environment that a reasonable person would find hostile or abusive." *Jennings v. Univ. of N. Carolina*, 482 F.3d 686, 696 (4th Cir. 2007) (cleaned up). What rises to that level depends on the totality of the circumstances, including "expectations, and relationships…, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651.

When considering student-on-student harassment claims, the courts "must bear in mind that schools are unlike the adult workplace," and students may regularly act in ways that would be inappropriate for adults. *Id*. at 651. Thus, conduct like "simple acts of teasing and name-calling," even if based on gender, is not actionable under Title IX. *Id*. at 652. That is so because "students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct." *Id*. at 651. Although such conduct may be "upsetting to the students subjected to it," it is not the type of conduct required to form a Title IX claim. *Id*. at 651-52. Given the unique nature of student behavior and normal peer interactions in schools, the standard for Title IX student-on-student sexual harassment "claims is *far more rigorous* than a claim for teacher-on-student sexual harassment." *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (emphasis added).

18

After all, Title IX was not enacted as a "general civility code" for the nation's schools. *Jennings*, 482 F.3d at 696 (cleaned up). Rather, it was meant to provide relief when "the harassment was frequent, severe, humiliating, or physically threatening." *Id*. If a plaintiff's complaint alleges conduct that does not meet this high standard, then it should be dismissed. *See, e.g.*, *Farmer v. Troy Univ.*, No. 5:17-CV-70-BO, 2017 WL 3594255, at *4 (E.D.N.C. Aug. 21, 2017) (Boyle, J.) (granting motion to dismiss "because plaintiff has not alleged a plausible claim of harassment under Title IX"); *Cash v. Lees-McRae Coll., Inc.*, No. 1:18CV52, 2018 WL 7297876, at *10 (W.D.N.C. Aug. 13, 2018) (dismissing Title IX claim because the "allegations do not demonstrate conduct that is so severe, pervasive, and objectively offensive that it can be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school") (cleaned up).

Here, the amended complaint's allegations fail to rise to the high level of severe, pervasive, and objectively offensive. The amended complaint contains vague, generalized, and conclusory allegations of "teasing," "bullying," "lewd and offensive comments," "misogynistic behavior," "off-color unwelcome comments," and "inappropriate sexual comments" by some male students. (Dkt. 20 at ¶¶ 62, 63, 69, 78). Additionally, Pressley alleges that some male students behaved inappropriately in class discussions about books and movies depicting sexual violence. (*Id*. at ¶¶ 69, 93, 94). The conduct described in the amended complaint pales in comparison to the egregious type of conduct that courts have recognized as severe, pervasive, and objectively offensive. *See, e.g.*, *Doe v. Qually*, No. 5:20-CV-523, 2021 WL 2546456, at *1, *6 (E.D.N.C. Jun. 21, 2021) (finding plaintiff who alleged repeated sexual assaults and threats by a classmate adequately pleaded a Title IX claim); *Woods v. Chapel Hill-Carrboro City Schs.*, No. 1:19CV1018, 2020 WL 3065253, at *5 (M.D.N.C. Jun. 9, 2020) (finding plaintiff sufficiently pleaded a Title IX claim

4863-9057-4345, v. 4

where he alleged repeated genital and anal manipulation by two older children); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 888 F. Supp. 2d 659, 662 (D. Md. 2012) (finding plaintiff adequately pleaded a Title IX claim where he alleged a classmate exposed himself, engaged in inappropriate touching, made threats, and forced the plaintiff to engage in sexual activity).

Indeed, the conduct alleged in the amended complaint is precisely the type of "insults, banter, teasing, …and gender-specific conduct that is upsetting to the students subjected to it," but non-cognizable under Title IX. *Davis*, 526 U.S. at 651-52. Although unfortunate and inappropriate if true, Pressley's allegations amount to little more than "the ordinary tribulations of educational institutions, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." *Doe v. Georgetown Cnty. Sch. Dist.*, No. 2:14-CV-01873, 2015 WL 5923610, at *7 (D.S.C. Oct. 9, 2015) (cleaned up). If the amended complaint's allegations are sufficient to state a Title IX discrimination claim, then schools will be open to the very type of "sweeping liability" that the Supreme Court sought to protect them from by setting such a high bar for student-on-student sexual harassment claims. *Hill*, 797 F.3d at 969. Because Pressley fails to sufficiently allege "harassment that is so severe, pervasive, and objectively offensive that it effectively bar[red] [her] access to an educational opportunity or benefit," *Davis*, 526 U.S. at 633, her Title IX discrimination claim should be dismissed.

## 2. Pressley has not sufficiently alleged that Cape Fear acted with deliberate indifference.

Similarly, Pressley's Title IX claim should be dismissed because the amended complaint fails to sufficiently allege that Cape Fear was deliberately indifferent. Under Title IX, schools are liable for student-on-student harassment only if (1) a school official with the authority to address the alleged harassment has "actual knowledge" of the conduct, *Doe v. Bd. of Educ. of Prince George's Cnty.*, 605 F. App'x 159, 165 (4th Cir. 2015), and (2) after gaining that knowledge the

school acted "with deliberate indifference" that "effectively caused the discrimination" to continue. *Davis*, 526 U.S. at 642-43. This means that a school is not liable for student-on-student harassment "unless its deliberate indifference subjects its students to harassment." *Id*. at 644. Thus, at a minimum the school's "deliberate indifference must…cause students to undergo harassment or make them liable or vulnerable to it." *Id*. at 644-45 (cleaned up).

To successfully plead a student-on-student harassment claim, a "plaintiff at the motion to dismiss stage must allege that the [school's] deliberate indifference to the initial discrimination subjected the plaintiff to further discrimination." *Borkowski v. Baltimore Cnty.*, 492 F. Supp. 3d 454, 491 (D. Md. 2020) (cleaned up). Deliberate indifference is an intentionally "high standard" for plaintiffs to meet. *Davis*, 526 U.S. at 643. It "precludes a finding of deliberate indifference in all but limited circumstances." *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 654 (D. Md. 2013) (cleaned up). And, the Supreme Court has specifically recognized that "there is no reason why courts, on a motion to dismiss…could not identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

A school's response to student-on-student harassment amounts to deliberate indifference only if it is "clearly unreasonable in light of the known circumstances." *Id*. at 648. This standard does not require a school to remedy the discrimination or to purge its school of all actionable peer harassment. *Id*. Nor are school administrators required to "engage in particular disciplinary action." *Id*. Rather, the school is simply required to act "in a manner that is not clearly unreasonable." *Id*. at 649. And being "negligent, lazy, or careless" is not clearly unreasonable. *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1105 (9th Cir. 2020).

Looking to the amended complaint, it fails to sufficiently plead that Cape Fear acted with deliberate indifference for several reasons. First, Pressley does not sufficiently allege that Cape

4863-9057-4345, v. 4

Fear's deliberate indifference effectively "caused" or "subjected" her to any further discrimination. The complaint fails to adequately explain how the conduct of the school caused Pressley to suffer additional harassment. Put another way, Pressley has "fail[ed] to show such alleged deliberate indifference subjected her to any further discrimination." *Borkowski*, 492 F. Supp. 3d at 492 (dismissing Title IX claim).

Second, Pressley spilled a lot of ink (approximately thirteen paragraphs of her Title IX discrimination claim) detailing Cape Fear's alleged failure to follow the Title IX regulations. (*See* Dkt. 20 at ¶¶ 223-233, 238(e), (k), & (o), 241). It is well settled, however, that a school's "alleged failure to comply with the [Title IX] regulations…does not establish the requisite actual notice and deliberate indifference." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291-92 (1998). Thus for purposes of Pressley's Title IX claim, it does not matter whether Cape Fear had a Title IX coordinator (Dkt. 20 at ¶¶ 223, 225), displayed certain language on its website (*Id.* at ¶¶ 224, 226), adopted Title IX grievance procedures (*Id.* at ¶¶ 228-31), or provided Title IX training (*Id.* at ¶¶ 232-33). *See Karasek*, 956 F.3d at 1107 (recognizing that a school's failure to comply with the Title IX regulations generally "does not establish deliberate indifference") (cleaned up); *see also Palmer v. Santa Rosa Cnty. Sch. Bd.*, No. 3:05CV218, 2005 WL 3338724, at *5 (N.D. Fla. Dec. 8, 2005) (holding that the "failure to maintain a Title IX coordinator" and the failure to provide certain Title IX information "does not constitute discrimination under Title IX or permit recovery in damages"). That is so because the Supreme Court has "never held...that the implied private right of action under Title IX allows recovery in damages for violation of those sorts of administrative requirements." *Gebser*, 524 U.S. at 292.

Similarly, a school's failure to follow its own sexual harassment policies "does not prove deliberate indifference under Title IX." *Doe*, 605 F. App'x at 168; *see also I.F. v. Lewisville Indep.*

*Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) ("Even a school district's failure to comply with its regulations does not establish the requisite deliberate indifference.") (cleaned up). It, therefore, is irrelevant for Title IX purposes if, as Pressley claims (Dkt. 20 at ¶¶ 58-59), CFA failed to follow its own policies. *Doe v. Blake Sch.*, 310 F. Supp. 3d 969, 981 (D. Minn. 2018) (stating that there "is no private right of action to enforce grievance procedures and other regulations under Title IX because a school's failure to follow such procedures and regulations does not constitute Title IX discrimination").

Third, the amended complaint reflects Pressley's belief that Cape Fear should have done more to address the alleged harassment. Her claim is not that Cape Fear did nothing, but rather that the "supportive measures" and "counseling" it provided "were not adequate." (Dkt. 20 at ¶¶ 214, 217). In fact, the amended complaint details various things that Cape Fear officials did in response to her claims. (Dkt. 20 at ¶¶ 78, 79, 87, 133). And the actions that were allegedly taken by Cape Fear were not so "clearly unreasonable" as to constitute "deliberate indifference." *Davis*, 526 U.S. at 648. After all, Title IX does not require schools "to remedy the harassment." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167-68 (5th Cir. 2011). It also does not require schools to "purg[e] their schools of actionable peer harassment," nor does it demand "that administrators must engage in particular disciplinary action." *Davis*, 526 U.S. at 648. And a victim of alleged harassment does "not have a Title IX right to make particular remedial demands." *Jauquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 808 (7th Cir. 2021). Title IX does not make it a judge's job to "second-guess[] the disciplinary decisions made by school administrators." *Id.* at 808.

Although Pressley wanted Cape Fear to respond differently to her concerns, the fact that "the school's response...was not as fulsome" as the complainant desired, "will not subject a school

4863-9057-4345, v. 4

to liability under Title IX." *Id*. at 809 (cleaned up); *see also Borkowski*, 492 F. Supp. 3d at 491 (stating "it is not enough to state an institution failed to eliminate student-on-student harassment or that they failed to impose the disciplinary actions a plaintiff seeks"). Because the amended complaint fails to allege sufficient facts to satisfy the "high standard" required for deliberate indifference, *Davis*, 526 U.S. at 643, Pressley's Title IX discrimination claim should be dismissed.

## II.     The Title IX retaliation claim should be dismissed.

The amended complaint alleges Cape Fear committed Title IX retaliation as to Elizabeth and Charlotte Karanik. (Dkt. 20, at ¶¶ 243-256). Like Pressley's Title IX discrimination claim, the retaliation claim should be dismissed because Cape Fear did not receive "federal financial assistance." Even if the Court rejects that argument, it should dismiss the Title IX retaliation claim for two reasons. First, the amended complaint fails to sufficiently allege that Charlotte Karanik engaged in Title IX-protected activity. Second, the amended complaint fails to sufficiently allege that Elizabeth Karanik suffered retaliation *because* of her engagement in Title IX-protected activity.

The Supreme Court has recognized a private right of action for Title IX retaliation. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005). According to *Jackson*, a claim arises "when a funding recipient retaliates against a person *because* [the person] complains of sex discrimination." *Id*. at 174 (emphasis in original). Thus, Title IX retaliation occurs when a plaintiff: (1) "engaged in protected activity under Title IX"; and (2) "as a result of their protected activity[] they suffered an adverse action." *Feminist Maj. Found.*, 911 F.3d at 694. Looking to the first requirement, a plaintiff cannot maintain a Title IX retaliation claim unless she engaged in activity protected by Title IX. *Du Bois v. Bd. of Regents of Univ. of Minn.*, 987 F.3d 1199, 1204 (8th Cir. 2021) (affirming dismissal of Title IX retaliation claim where the plaintiff "had not

4863-9057-4345, v. 4

engaged in a protected activity because she never complained of sex discrimination"). In fact, the *Jackson* Court explained that a retaliation claim could only be brought when a school "retaliates against an individual because he has complained about sex discrimination." *Jackson*, 544 U.S. at 171. A retaliation claim, therefore, cannot be brought by someone who did not herself engage in Title IX-protected activity. *Id.* at 184. And Title IX-protected activity means "actively complaining of or opposing alleged discrimination on the basis of sex." *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 756-57 (M.D. Tenn. 2019).

Here, there is no allegation that Charlotte Karanik submitted a Title IX complaint or otherwise engaged in a protected activity. Instead, the amended complaint vaguely states that she "engaged in a protected activity" and signed the Change.org petition. (Dkt. 20 at ¶¶248, 253). Such conclusory allegations are insufficient to state a Title IX retaliation claim, especially when the petition itself said nothing about sexual harassment or sex-based discrimination. Rather, it was a generalized attack on the character of the male commencement speakers. (*See* Dkt. 20 at ¶117). Thus, the amended complaint fails to sufficiently allege a Title IX retaliation claim as to Charlotte Karanik.

The analysis is slightly different for Elizabeth Karanik because the amended complaint sufficiently alleges that she engaged in Title IX-protected activity by voicing sexual harassment complaints to Cape Fear officials. (Dkt. 20 at ¶¶ 99, 102). But, the amended complaint fails at the next step—it does not sufficiently allege that Elizabeth Karanik suffered an adverse action *because* of her Title IX-protected activity. Instead, what the facts alleged in the amended complaint show is that Elizabeth Karanik suffered an adverse action because she used Cape Fear's logo to publicly post a petition containing derogatory statements about specific male students, and she refused to apologize for her conduct when requested. *See generally Belmont Univ.*, 367 F. Supp. 3d at 760

(rejecting Title IX claim in part because there were other "intervening legitimate reasons" for the school's disciplinary actions against plaintiff). It bears mentioning that the amended complaint does not accuse Cape Fear of retaliating against Natalie Pressley—a student who allegedly made repeated complaints of sexual harassment to Cape Fear officials. The allegations in the amended complaint, even if accepted as true, fail to establish that Cape Fear took adverse action against Elizabeth Karanik because she made a Title IX complaint. Accordingly, the Title IX retaliation claim should be dismissed.

## III. The intentional infliction of emotional distress claims should be dismissed.

The amended complaint brings two state law claims for intentional infliction of emotional distress ("IIED") on behalf of Elizabeth and Charlotte Karanik. (Dkt. 20 at ¶¶ 280-84, 322-326). Both claims suffer from the same flaw and should be dismissed.[12] An IIED claim requires "(1) extreme and outrageous conduct by the defendant, (2) which is intended to cause and does in fact cause, (3) severe emotional distress." *Pardasani v. Rack Room Shoes, Inc.*, 912 F. Supp. 187, 192 (M.D.N.C. 1996) (cleaned up). When a plaintiff brings an IIED claim, it is "for the court to decide in the first instance as a matter of law whether the conduct complained of may reasonably be found to be sufficiently outrageous as to permit recovery." *M.B. v. Chapel Hill-Carrboro City Schs.*, No. 1:20-CV-796, 2021 WL 4412406, at *3 (M.D.N.C. Sept. 27, 2021). If a complaint fails to allege facts sufficient to constitute extreme and outrageous conduct, then the IIED claim should be dismissed. *Bonham v. Wolf Creek Acad.* 767 F. Supp. 2d 558, 572 (W.D.N.C. 2011).

To be "extreme and outrageous," the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

---

[12] If the Court dismisses the Title IX claims, Cape Fear respectfully requests that the Court retain supplemental jurisdiction over the state law claims. *See Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (recognizing that "trial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished").

and utterly intolerable in a civilized community." *Briggs v. Rosenthal*, 73 N.C. App. 672, 677, 327 S.E.2d 308 (1985). This is a steep hill to climb, and it requires more than allegations of "mere insults, indignities, or threats." *Sasser v. City of Whiteville*, No. 7:10-CV-95-D, 2010 WL 4809039, at *2 (E.D.N.C. Nov. 18, 2010) (Dever, J.) (cleaned up); *Polanco v. HSBC Bank, N.A.*, No. 3:17CV466, 2019 WL 2590964, at *5 (W.D.N.C. Jun. 21, 2019 ("In North Carolina, the bar for extreme and outrageous conduct is a stringent one.") (cleaned up). In the exceedingly rare cases "where North Carolina courts have found IIED claims actionable, the conduct has been extremely egregious, and involved sexual advances, obscene language, and inappropriate touching." *Sasser*, 2010 WL 4809039, at *2 (cleaned up).

The amended complaint fails to allege the type of extremely egregious conduct required to maintain an IIED claim. With respect to Elizabeth Karanik, the amended complaint alleges Cape Fear intentionally prohibited her from attending CFA's Salute to Seniors and the commencement ceremony unless she apologized to certain male classmates and also failed to appropriately respond to sexual harassment allegations. (Dkt. 20, at ¶ 283). And with respect to Charlotte Karanik, the amended complaint alleges that Cape Fear intentionally disenrolled her and also failed to appropriately respond to sexual harassment allegations. (*Id.* at ¶ 325). The alleged conduct is not even in the same ballpark as what is required for an IIED claim. *See M.B.*, 2021 WL 4412406, at *4 (stating that claims based on a school's failure to "investigate allegations of sexual assault or harassment…typically do not constitute extreme and outrageous conduct"). Accordingly, the IIED claims should be dismissed.

## IV.     The negligent infliction of emotional distress claims should be dismissed.

Elizabeth and Charlotte Karanik's negligent infliction of emotional distress claims

("NIED") (Dkt. 20 at ¶¶ 257-279, 309-321) also fail to state a claim upon which relief can be granted. The elements of NIED in North Carolina are: "(1) defendants negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiffs severe emotional distress or mental anguish; and (3) the conduct did in fact cause the plaintiff's severe emotional distress." *Bonham*, 767 F. Supp. 2d at 573. An NIED claim must be dismissed "when the material factual allegations charge nothing but intentional acts." *Id*. (cleaned up). This Court has dismissed NIED claims when a complaint alleges "intentional acts—not negligent acts" because "intentional conduct cannot form the basis" of an NIED claim. *Sasser*, 2010 WL 4809039, at *3 (Dever, J.). Likewise for other courts. *See, e.g., Riepe v. Sarstedt, Inc*., No. 5:09-CV-00104, 2010 WL 3326691, at *4 (W.D.N.C. Aug. 23, 2010) ("Without question, basing a claim upon intentional conduct and simply labeling it as negligent is untenable as an attempt to state a cause of action for negligence.").

Today, as in the cases above, Plaintiffs allege intentional conduct throughout their complaint. They then try to repackage that intentional conduct as an NIED claim. Both NIED claims accuse Cape Fear of engaging in "retaliation." (Dkt. 20 at ¶¶ 258-61, 311). Indeed, the NIED claims share the same core allegations as the Title IX retaliation claim. That is problematic because "[r]etaliation is, by definition, an intentional act." *Jackson*, 544 U.S. at 173. And "the law is clear that inherently intentional conduct, such as discrimination, cannot support a claim for negligent infliction of emotional distress." *Barrow v. BB&T Co.*, No. 3:16-CV-675, 2017 WL 3222660, at *6 (W.D.N.C. July 7, 2017) (cleaned up). The way the amended complaint has alleged "negligent infliction of emotional distress has repeatedly been held to be deficient." *Riepe*, 2010 WL 3326691, at *4. Accordingly, the Court should dismiss the NIED claims.

**V.     The breach of contract and implied covenant of good faith and fair dealing claims should be dismissed.**

4863-9057-4345, v. 4

The Court should also dismiss the amended complaint's breach of contract and implied covenant of good faith and fair dealing claims (Dkt. 20, at ¶¶ 285-308). A breach of contract action requires "(1) the existence of a contract between plaintiff and defendant, (2) the specific provisions breached, (3) the facts constituting the breach, and (4) the amount of damages resulting to plaintiff from such breach." *Intersal, Inc. v. Hamilton*, 373 N.C. 89, 108-09, 834 S.E.2d 404 (2019) (cleaned up); *Thompson v. Bass*, 261 N.C. App. 285, 290, 819 S.E.2d 621 (2018) (rejecting breach of contract claim because "[n]owhere does plaintiff allege the specific provisions breached, nor a single fact constituting breach"). Thus, a complaint is "facially implausible" if it "fail[s] to allege specific provisions of the contract that were breached." *Polygenex Int'l, Inc. v. Polyzen, Inc.*, 133 N.C. App. 245, 252, 515 S.E.2d 457 (1999) (affirming dismissal of breach of contract claim).

Every contract in North Carolina contains "an implied covenant of good faith and fair dealing." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299 (1985) (cleaned up). When a plaintiff's claim for breach of the implied covenant turns on the same facts as a breach of contract claim, "the two causes of action are treated as one and the same." *Eye Dialogue LLC v. Party Reflections, Inc.*, 2020 NCBC 54, 2020 WL 4334810, at *8 (N.C. Bus. Ct. 2020). Thus, "when a court rejects a breach of contract claim, it likewise rejects any claim for breach of the covenant of good faith and fair dealing contained in the contract." *Michael Borovsky Goldsmith LLC v. Jewelers Mut. Ins. Co.*, 359 F. Supp. 3d 306, 313 (E.D.N.C. 2019) (Dever, J.). Put another way, "when a court dismisses a breach-of-contract claim, it likewise rejects any claim for breach of the covenant of good faith and fair dealing contained in it." *Abbington SPE, LLC v. U.S. Bank Nat'l Assoc.*, 352 F. Supp. 3d 508, 519 (E.D.N.C. 2016) (Dever, J.).

Here, Elizabeth and Charlotte Karanik have not sufficiently alleged a breach of contract. Although the amended complaint claims that Cape Fear breached its enrollment contracts with

Elizabeth and Charlotte Karanik. (Dkt. 20, at ¶¶ 291, 304), it does not identify a specific provision that Cape Fear allegedly breached. The complaint does not quote the particular contractual language that Plaintiffs believe Cape Fear violated. Nor does it sufficiently identify a contract provision that obligated Cape Fear to do something that it failed to do. With respect to Charlotte Karanik's claim, the amended complaint cites contractual language that confirms Cape Fear had the "sole discretion" to terminate the enrollment contract. (Dkt. 20 at ¶ 196). Nonetheless, the complaint alleges that Cape Fear breached the contract by doing what the contract said it could do—terminating Charlotte's enrollment because, in its "sole discretion," Cape Fear determined that her parents' actions "impede[d] a constructive relationship or otherwise materially interfere[d] with [Cape Fear's] accomplishment of its mission." (*Id.*). Doing what a contract says you can do is not a material breach. And with respect to Elizabeth Karanik's claim, the amended complaint fails to identify any provision of the enrollment contract that Cape Fear violated. Instead, Elizabeth Karanik's breach of contract claim contains generalized allegations of things Cape Fear allegedly failed to do, without pointing to any contractual language that those alleged failures violated. Because the breach of contract claims lack "enough facts to state a claim to relief that is plausible on its face," they should be dismissed. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And, because the implied covenant of good faith and fair dealing allegations involve the same conduct as the breach of contract claims, those claims should be dismissed as well.

## Conclusion

For the reasons above, the Court should dismiss the amended complaint with prejudice under Rule 12(b)(6) because it fails to state a claim upon which relief can be granted.

This, the 10th day of January, 2022.

4863-9057-4345, v. 4

Respectfully submitted,

CRANFILL SUMNER LLP

s/Patrick M. Mincey
PATRICK M. MINCEY
N.C. Bar No. 38372
ZACHARY C. BOLITHO
N.C. Bar No. 51808
STEPHEN J. BELL
N.C. Bar No. 44211
101 N. 3rd Street, Suite 400
Wilmington, NC 28401
Telephone: (910) 777-6000
Facsimile: (910) 777-6111
E-mail:    pmincey@cshlaw.com
            zbolitho@cshlaw.com
            sbell@cshlaw.com
*Counsel for Defendant*

## Certificate of Service

I hereby certify that I electronically filed the foregoing **Memorandum in Support of Defendant's Fed. R. Civ. P. 12(b)(6) Motion to Dismiss for Failure to State a Claim** with the Clerk of Court using the CM/ECF system, which will send notifications to each said party addressed as follows:

Gary K. Shipman
James T. Moore
Shipman & Wright, L.L.P.
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
gshipman@shipmanlaw.com
jmoore@shipmanlaw.com
*Counsel for Plaintiffs*

This, the 10th day of January 2022.

CRANFILL SUMNER LLP

s/ Patrick M. Mincey
PATRICK M. MINCEY
N.C. Bar No. 38372
*Counsel for Defendant*

31