IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO.: 7:21-cv-00169-D

| | |
|---|---|
| ELIZABETH KARANIK, CHARLOTTE KARANIK, by her parents and next friends, JOHN KARANIK and wife, KIMBERLY KARANIK, and NATALIE PRESSLEY, | : : : : : |
| Plaintiffs, | : |
| vs. | : : |
| CAPE FEAR ACADEMY, INC., | : |
| Defendant. | : : : |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT

Pursuant to Local Civil Rules 7.1(f) and 7.2(a), Plaintiffs respectfully submit this Memorandum in Opposition to Defendant Cape Fear Academy, Inc.'s (hereinafter, "CFA" or "Defendant") Motion to Dismiss Plaintiffs' Amended Complaint.

## STATEMENT OF THE CASE

Plaintiffs filed this action against the Defendant on October 6, 2021. (D.E. 1). On December 3, 2021, Defendant filed two separate Motions to Dismiss (D.E. 16 and 18). On December 27, 2021, Plaintiffs filed an Amended Complaint proceeding under their true names, (D.E. 20), which mooted CFA's initial Rule 12(b)(6) Motion. On January 10, 2022, CFA filed a Motion to Dismiss Plaintiffs' Amended Complaint contending that CFA was not subject to Title IX because the Paycheck Protection Program ("PPP") loan it received did not constitute "federal financial assistance," and that Plaintiffs have otherwise failed to state claims for relief. (D.E. 23).

## STATEMENT OF THE FACTS

Plaintiffs' Amended Complaint sets forth the sexual harassment and other unwelcome conduct on the basis of her sex to which the Plaintiff Natalie Pressley ("Natalie") was subjected during the 2020-21 academic year at CFA, where Plaintiffs are former students. Plaintiffs allege that during the 2020-2021 academic year, CFA was a recipient of "federal financial assistance" in the form of a PPP loan, provided for under the CARES Act, and administered by the SBA, in the amount of $1,253,949 in April 2020, which loan was forgiven on June 15, 2021. (D.E. 20, ¶¶10, 222; D.E. 23-2). CFA's PPP application provided that CFA would be receiving "financial assistance," and CFA agreed that it would not discriminate based on categories cited in Title IX (D.E. 20, ¶21). As evident from the current Motion, Plaintiffs allege that CFA did not consider itself a recipient of Federal financial assistances, and therefore, made no efforts to comply with the provisions of Title IX. (*Id.* at ¶24).

Plaintiffs Amended Complaint details the protections afforded to the Plaintiffs and duties imposed upon CFA, not only under Title IX, but under CFA's own policies, incorporated into CFA's enrollment contracts. (*Id.* at ¶¶29, 38, 54-56, 58). Natalie, herself a victim of sexual assault (a fact known by CFA), alleges that during the 2020-21 academic year, she was subjected to sexual harassment, unwelcome conduct and bullying, on the basis of her sex, by male students in her AP Literature Class at CFA, sometimes on a daily basis, but certainly on a weekly basis, that was "so sufficiently and objectively severe, pervasive and/or offensive so as to create an abusive educational environment that a reasonable person would find hostile or abusive" and that deprived Natalie "equal access to educational opportunities or benefits provided by CFA. (*Id.* at ¶¶60-66, 211). Natalie brought her concerns to the attention of those at CFA, which failed to take reasonable measures to protect her. (*Id.* at ¶¶66-76, 78-81, 84-106). This conduct by the male students continued for months and months, class in and class out. (*Id.* at ¶77) After Natalie left class during a particularly

disturbing series of comments by these male students, Natalie, Elizabeth (Natalie's friend) and other CFA students collectively complained and waited for those at CFA to take appropriate action. When the complaining students did not receive any response to their concerns, and after some of these same male students were chosen to speak at CFA's graduation, Natalie and other CFA students, with the full knowledge and encouragement of faculty and staff members at CFA, engaged in what Plaintiffs allege to be protected activity by preparing and posting a petition complaining that these male students did not reflect the values of the Seniors at CFA, and that someone else should be designated to speak. (*Id.* at ¶¶114-18). Within hours the petition was taken down (after those at CFA demanded it) but the very next day, the Amended Complaint details the retaliation to which Elizabeth was subjected, with those at CFA contending that someone had to "take the rap" for the petition. (*Id.* at ¶¶120, 126). Code of conduct charges were brought against Elizabeth arising from her having engaged in protected activity, and she was brought before CFA's Honor Council. Despite the Honor Council's recommendation that no action be taken against her, Elizabeth was informed that unless she apologized in writing to these male students, she would be banned from attending CFA's graduation and related activities. (*Id.* at ¶¶181-82). Elizabeth refused to apologize and therefore, was deprived of one of the most significant moments of her life. CFA's retaliation continued, however, as it thereafter terminated C.K's enrollment contract for the 2021-22 academic year, citing her parents support of Elizabeth. (*Id.* at ¶¶196, 200).

## ARGUMENT

### I. Rule 12(b)(6) Legal Standard.

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a dismissal of a complaint that fails "to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). The Court "must accept as true all well-pleaded allegations and must construe the

factual allegations in the light most favorable to the plaintiff." *See Hall v. Virginia*, 385 F.3d. 421, 427 (4th Cir. 2004). Dismissal may occur only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Flood v. New Hanover Cty.*, 125 F.3d 249, 251 (4th Cir. 1997). Rule 12(b)(6) motions "should be granted only in very limited circumstances," *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989), because "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of the pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As held in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007), the pleading standard of Rule 8 does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.* at 555 (*citing Papasan v. Allain*, 478 U.S. 265, 286 (1986)). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250 (4th Cir. 2009).

## II. CFA received "federal financial assistance," which subjects it to a claim for Title IX discrimination.

CFA's apparent belief that the PPP loan it obtained, which was forgiven, did not constitute "federal financial assistance" thereby subjecting CFA to the provisions of Title IX, consciously ignores the SBA's own Regulations (codified in the Code of Federal Regulations), the SBA's supporting materials, and CFA's own application submission for its PPP loan.

Consequently, CFA goes great lengths to deflect the reality of its decision to voluntarily apply for, accept and enjoy the benefits of forgiveness of a PPP loan, which unquestionably constitutes the receipt of federal financial assistance.

PPP loans are intended to be federal financial assistance made pursuant to the "declared policy of Congress that the Government should aid, counsel, assist and protect, insofar as possible, the interests of small-business concerns in order to preserve free competitive enterprise . . . and to maintain and strengthen the overall economy of the Nation." 15 U.S.C.A. § 631(a).   The SBA itself makes clear on its website that "[t]he Small Business Administration works with different organizations to provide *federal financial assistance* (grants) for certain small businesses." https://www.sba.gov/funding-programs/grants. Similarly, the SBA notes the availability of "COVID-19 Relief Programs," containing "information about COVID-19 *financial assistance programs*," which SBA notes to include the "Paycheck Protection Program." www.sba.gov/funding-programs/loans/covid-19-relief-options.

The CARES Act provides that PPP loans will be forgiven, (15 U.S.C. § 636m) and the SBA would pay the lender the amount forgiven, to the extent the borrower used the funds for certain purposes, including for payroll expenses. *See* 15 U.S.C. § 9005.   The CARES Act granted the SBA emergency rulemaking authority to administer the PPP.   *See* 15 U.S.C. § 9012.  Section 7(a) of the Small Business Act, 15 U.S.C. § 631, *et. seq.* authorizes the SBA to "make loans to any qualified small business concerns . . . either directly or in cooperation with banks or other financial institutions[.]" *Id.* § 636. The 7(a) program is the SBA's primary program for providing *financial assistance* to small businesses. *Pharaohs GC, Inc. v. United States Small Bus. Admin.*, 990 F.3d 217, 224 (2nd Cir. 2021) (emphasis added). "Section 7(a) of the Small Business Act . . . permits extension of *financial assistance* to small businesses when funds are 'not otherwise available on reasonable terms from non-Federal sources.'"

*Lopez v. Bank of Am., N.A.*, 505 F. Supp. 3d 961, 964 (N.D. Cal. 2020) *citing United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 719 n.3, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)). The SBA establishes "general policies … which shall govern the granting and denial of applications for *financial assistance* by the [SBA]." 15 U.S.C. § 631(d) (emphasis added).

The SBA adopted regulations regarding the loan programs that it administers, including PPP loans. First, there can be no debate that CFA is a "recipient." "Recipient means any . . . public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof." 34 C.F.R. § 106.2(i). Next, it is undisputed that the SBA has incorporated Title IX into its Regulations. *See* 13 C.F.R. § 113.100. Similarly, CFA is certainly an "Education institution" under those same SBA Regulations. 13 C.F.R. § 113.105 ("a preschool, a private elementary or secondary school . . . ."). Contrary to CFA's contentions, the SBA Regulations adopting Title IX made clear that any "loan of financial assistance" constitutes "Federal financial assistance." *Id.* CFA suggests what it received is not a "loan," but simply a "guaranty" from SBA. (D.E. 23). Of course, the lender, First Carolina Bank, was the "recipient" of the guaranty, not CFA. Undeniably, CFA received much more than a guarantee; it received Federal financial assistance in the form of the forgiven PPP loan.

The SBA makes clear that an applicant must provide an assurance, "satisfactory to the designated agency official, that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations." 13 C.F.R. § 113.115. The SBA mandates that each recipient shall designate at least one employee to coordinate its efforts and responsibilities under Title IX, including any investigation of any complaint communicated

to such recipient alleging any actions that would be prohibited by these Title IX regulations. The recipient shall notify all its students and employees of the name employee(s) so designated. *Id.* Similarly, the SBA mandates that a recipient adopt and publish grievance procedures providing for "prompt and equitable resolution" of student complaints for conduct prohibited under Title IX. *Id.*

The Regulations contain both "general" and "specific" prohibitions against discrimination on the basis of sex. "[N]o person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic … or other education program … that receives Federal financial assistance." 13 C.F.R. § 113.400. The SBA Regulations contain "Specific prohibitions" that contain prohibitions against, among other things, subjecting any person to "different rules of behavior, sanctions or other treatment" or to "otherwise limit any person in the enjoyment of any right, privilege or opportunity." *Id.*

If the CFR's that control SBA loan programs were not clear enough, the PPP loan application itself, which CFA submitted, expressly provides that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice . . . on the basis of categories cited in 13 C.F.R., Parts 112, 113 and 117 of SBA Regulations." (D.E. 23.2, p.5). CFA has now provided its PPP loan application only after the Plaintiffs brought it to the Court's attention. The PPP *Borrower* Application Form was required by the SBA to be submitted. *See Albino Constr. Co., Inc. v. Wells Fargo Bank, Nat'l Ass'n*, No. CV 21-35, 2021 WL 2529811, at 1 (E.D. Pa. June 17, 2021). CFA's Application also provides that its submission "is required to make a determination regarding eligibility for *financial assistance*." (D.E. 23-2, p. 4). So, when CFA contends that it was not the recipient of Federal financial assistance and subject to the provisions of Title IX, it is simply wrong.

Interestingly, despite Plaintiffs bringing this to the attention of CFA and the Court in their previous briefing and attaching the PPP Application that CFA failed to provide to the Court, CFA ignores the language in its Application and fails to address the issue at all. Instead, as if CFA had not reviewed its own Application, CFA contends that if it was the intent for PPP participants to be bound by Title IX, then the loan program should have been structured differently. (D.E. 23, pp. 16-17). Plaintiffs are perplexed by this contention given the SBA's mandate that CFA acknowledge in its own Application not only that it would be receiving financial assistance, but that it would comply with civil rights laws, including Title IX. It is not surprising, therefore, that CFA provides no authority for its position, nor provide any explanation for its certification in the PPP loan application that CFA would comply with the civil rights laws, including those provided in 13 C.F.R. Part 113. For this reason alone, CFA's argument has no merit.

CFA also ignores what the SBA provided by way of answers to various "FAQ's" regarding PPP loans, including: "What legal requirements will be imposed on my organization as a result of our receipt of this Federal financial assistance?" The SBA makes clear that "[r]eceipt of a loan through any SBA program constitutes Federal financial assistance and carries with it the application of certain nondiscrimination obligations. Any legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, those nondiscrimination obligations will no longer apply." SBA Faith-Based Organizations FAQ (Apr. 3, 2020) https://www.sba.gov/sites/default/files/2020-04/SBA%20Faith-Based%20FAQ%20Final.pdf (last visited Dec. 22, 2021).

Having failed to provide this Court with any authority that it was not the recipient of federal financial assistance, CFA seemingly makes a conscious attempt to divert this Court's attention away from its own PPP Loan Application and the CFR's, and instead, seek to equate

their status as a borrower to that of a participating SBA lender, contending that CFA's PPP loan was a "contract of insurance or guaranty" that does not qualify as "federal financial assistance." Given that those cases do not focus on a borrower's status, nothing about those cases applies to any issue in this case.

In *United States v. Baylor Med. Ctr.*, 736 F.2d 1039, 1048 (5th Cir. 1984), a case cited by CFA, the court interpreted the "contract of insurance or guaranty" exclusion, albeit with respect to Title VI, and opined that "as the legislative history makes abundantly clear, in excluding 'contracts of insurance or guaranty' from Title VI, congress intended to prevent Title VI from reaching individually owned homes financed with federally guaranteed mortgages, or individual bank accounts in a bank with federally guaranteed deposits." "In other words, Congress did not want Title VI to effect a nationwide Fair Housing Act." *Id.* The same interpretation and analysis lead to the courts holding in *Butler v. Capital Fed. Sav.*, 904 F. Supp. 1230 (D. Kan. 1995), another case cited by CFA. "Plaintiffs' only allegation that defendant is a recipient of federal financial assistance is the FSLIC insurance of its deposits." *Id.* "This is insufficient to state a claim under Title VI." *Id.* Clearly, the Fair Housing Act or federally guaranteed deposits, as it relates to lenders, has no bearing or relevance to this case.

In *Gallagher*, another case CFA heavily relies, the Sixth Circuit Court of Appeals, in support of its finding that the defendant (bank) was not a recipient of federal aid, held that "coverage of the Rehabilitation Act does not follow federal aid 'past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement.'" *Gallagher*, 89 F.3d at 278 *citing Hamilton v. Illinois Cent. R.R. Co.*, 894 F. Supp. 1014, 1022 (S.D. Miss. 1995) (emphasis added). In this matter, had Plaintiffs filed a Title IX action against the lender, First Carolina Bank, or, said another

way, if CFA was an SBA lender, only then would the Defendant's argument have merit. Instead, CFA was the recipient of a PPP loan, and therefore, the recipient of Federal financial assistance. As provided in *Gallagher*, given that CFA <u>is</u> the intended recipient of federal aid, it is subject to Title IX. In addition, unlike the cases cited by CFA, CFA students are not "employees" of an SBA lender, as was the case in *Gallagher*. Even where courts have been presented with the question of whether a <u>bank's</u> participation in a SBA guaranteed loan program constitutes federal financial assistance, courts have recognized that institutions/banks are subject to non-discriminatory regulations. *See Moore v. Sun Bank of N. Florida, N.A.*, 923 F.2d 1423 (11th Cir. 1991).

Given the lack of precedent supporting CFA's argument, it throws up a proverbial "hail mary" by citing to the "Congressional Research Service" (D.E. 23, p. 14), which in its own disclaimer, provides that "[i]nformation in a CRS report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role." Cong. Research Serv., LSB10459, p. 5, Applicability of Federal Civil Rights Laws to Recipients of CARES Act Loans 2 (May 1, 2020). Regardless of the disclaimer, the CRS Report is certainly not definitive on whether PPP Loans constitute federal funds.

> But less certain is whether receipt of guaranteed loans under the PPP subjects a recipient to these civil rights requirements... Because recipients of PPP loans receive federal funds from third parties rather than directly from the government, they <u>may not</u> be subject to the same requirements... Thus, the precise reach of these statutory and regulatory civil rights requirements for entities that receive PPP loans, but do not receive EIDL loans or grants, is <u>difficult to predict</u>.

*Id.* at 2-3 (emphasis added).

As set forth above, the SBA, however, pursuant to the CFR's, make clear that recipients of PPP loans, as federal financial assistance, are subject to the civil rights laws, including Title IX. Nevertheless, district courts in other jurisdictions have denied attempts

by defendants to dismiss plaintiff's federal claims at this stage of litigation, as it relates to whether defendant's receipt of assistance qualify as federal assistance, and instead, opine that these matters are better addressed after discovery, when the evidentiary record has been fully developed. *See Fernandez v. Bruno Northfleet, Inc.*, No. 9:21-CV-80609, 2021 WL 4851378, at *4 (S.D. Fla. Oct. 18, 2021); *see also Husbands v. Financial Mgmt. Sol., LLC, et al.*, No. 8:20-CV-03618, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021); *see also Moore v. Sun Bank of North Florida, N.A.*, 923 F. 2d 1423, 1431-32 (11th Cir. 1991); *see also Awah v. Mansfield Kaseman Health Clinic*, No. 8:21-CV-00938-PX, 2021 WL 6197415, at *4 (D. Md. Dec. 30, 2021).

Here, it is undisputed that Plaintiffs allege in their Amended Complaint that CFA was a recipient of Federal financial assistance through the PPP loan CFA obtained from the SBA. (D.E. 20 ¶¶ 10, 16-21). The allegations in the Amended Complaint are sufficient to survive Defendant's motion to dismiss given all factual disputes should be resolved in favor of the Plaintiffs. For these reasons, CFA's motion to dismiss on the basis that it was not a recipient of federal financial assistance must be denied.

## III. Natalie has sufficiently alleged a Title IX discrimination claim.

CFA next contends that Natalie has failed to sufficiently plead that she suffered sexual harassment so severe, pervasive, and objectively offensive that it deprived her of equal access to the educational opportunities or benefits provided by the school. Of course, Natalie has not only pled the facts that form the basis of those claims, but has specifically alleged that the sexual harassment and other unwelcome conduct to which she was subjected interfered "in an effective and material way, with Natalie's access to an equal educational opportunity." (*See e.g.* D.E. 20, ¶¶63, 65-81,88-97, 211, 216, 217, 234).

As in the typical case, harassment can be "indisputably" identified as "sexual harassment" because it often "involve[s] male students harassing female students, ostensibly

because of sexual desire." *Hoffman v. Saginaw Pub. Sch.*, No. 12-10354, 2012 WL 2450805, at *8 (E.D. Mich. June 27, 2012); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). However, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale*, 523 U.S. at 80, 118 S.Ct. 998. "It is not necessary to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students on the basis of sex." *Davis v. Monroe Cty. Bd. Of Educ.*, 526 U.S. 629, 651, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). In situations in which there is no physical exclusion, courts consider whether the harassment "had a concrete, negative effect" on the plaintiff's "ability to receive an education." *Id.* at 654, 119 S.Ct. 1661. Examples of such negative effects include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring therapy or medication. *Id.* at 652. To determine whether alleged harassment is severe or pervasive, the "overall scenario" must be considered. *Abramson v. William Paterson Coll. Of New Jersey*, 260 F.3d 265, 276 (3d Cir. 2001). "When a sexual assault triggers a course of harassment, the total course of events can be considered sexual harassment." *Goodwin v. Pennridge School District*, 389 F.Supp.3d 304 (E.D. Pa. 2019). It does not need to involve rape or sexual intercourse to be found to be severe, pervasive, and objectively offensive. *Prasad v. George Washington Univ.*, 390 F. Supp. 3d 1, 24 (D.D.C. 2019). The D.C. Circuit has ruled that "name-calling" in connection with other behavior can rise to the level of sexual harassment given the context. *Id. citing Cavalier v. Catholic Univ. of Am.*, 306 F.Supp.3d 9, 33-34 (D.D.C. 2018). "Indeed, even where a Title IX plaintiff's academic performance does not appear to have suffered during the alleged sexual harassment but the harassment 'simply created a disparately hostile educational environment relative to her peers,' the issue of whether the harassment deprived the plaintiff of educational opportunities and benefits is one for the trier of fact." *T.B. v. New Kensington-Arnold Sch. Dist..*, No. CV 15-606, 2016 WL

6879569, at *8 (W.D. Pa. Nov. 22, 2016) *citing Doe v. E. Haven Bd. Of Educ.*, 200 Fed. App'x 46, 48 (2d Cir. 2006) (citations omitted). As of August 14, 2020, the United States Department of Education has defined "sex discrimination" as including "*unwelcome conduct* determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to the recipient's education program..." *Posso v. Niagara Univ.*, No. 19-CV-1293-LJV-MJR, 2020 WL 8771334, at *7 (W.D.N.Y. Nov. 2, 2020), <u>report and recommendation adopted,</u> 518 F. Supp. 3d 688 (W.D.N.Y. 2021). The definition of "sexual harassment" therefore includes "unwelcome conduct" on the basis of Natalie's sex, and that is precisely what she has alleged.

In *Doe v. E. Haven Bd. of Educ.*, a fourteen-year-old student was allegedly raped, outside of school operations, by two male classmates. 200 F. App'x 46, 48 (2d Cir. 2006). After the allegations went public and plaintiff returned to school, she was harassed for weeks by other students, which included verbal abuse by being called "a slut, a liar, a bitch, [and] a whore." *Id.* Because of this, plaintiff would skip classes and spend time at school in a private, secluded room, which was provided by the school. *Id.* In that case, the court found that "a reasonable fact-finder could conclude that [the plaintiff] was subjected to a disparately hostile educational environment that deprived her of educational benefits and opportunities." *Id.* "[A] reasonable fact-finder could conclude that [defendant] authorities acted in a clearly unreasonable fashion, where the alleged victim of a rape complained of verbal harassment based on her sex and related to the rape for five weeks before authorities took concrete action to get the perpetrators of the harassment to stop." *Id.*

There can be no meaningful factual distinction here for Natalie, herself the victim of a sexual assault. Natalie was subjected to unwelcome conduct on the basis of her sex when male students in her class "made lewd and offensive comments about women, including stating that women 'invite' rape; made jokes about rape; laughter and jokes when class

content depicted physical and/or sexual violence towards women…." (D.E. 20, ¶69), knowing she was a victim of sexual assault.

Similarly, in *A.T. v. Oley Valley Sch. Dist.*, No. CV 17-4983, 2021 WL 5792695 (E.D. Pa. Dec. 7, 2021), plaintiffs brought an action alleging that plaintiff was harassed and bullied while a student following an alleged rape. The defendant attempted to argue that, with the exception of plaintiff's peers calling her a slut, the incidents complained of by plaintiff were not sexual in nature. *Id.* The court, in its analysis, and at the summary judgment stage, held that despite there being no evidence of many of the more common forms of sexual harassment that courts have found to be severe and pervasive in Title IX cases, including the lack of any physical abuse or threats against plaintiff and the lack of any incidents of groping or stalking plaintiff by any student, the cumulative effect and the "overall scenario" of ostracization by her peers on a regular basis resulted in a "severe and pervasive" situation. *See id.* "The Court again stresses that in determining whether the alleged harassment is "severe or pervasive" the "constellation of surrounding circumstances, expectations and relationships" and "overall scenario" must be considered. *A.T.*, 2021 WL 5792695 at *20 (*quoting Davis,* 526 U.S. at 651; *Abramson*, 260 F.3d at 276). Were a reasonable jury to credit and find O.T.'s testimony to be believable, that jury could find that O.T. suffered from severe or pervasive sexual harassment that ended up depriving her of the educational opportunities or benefits to be provided by OVHS. *Id.*

With respect to a Title IX claim, "[a] plaintiff should have—and must plead—at least some relevant information to make the claims plausible on their face." *Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019). But the plaintiff is not required to prove her case at the motion-to-dismiss stage. *See id.* at 1274 ("A complaint raising a claim of discrimination does not need to conclusively establish a prima facie case of discrimination."). "Further, matters of degree—such as severity and pervasiveness—are often best left to the jury." *Doe v. Sch.*

*Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1311–12 (10th Cir. 2020). "[T]he severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact," *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999); and it is even less suited for dismissal on the pleadings. *Doe v. Sch. Dist. No. 1, Denver, Colorado*, 970 F.3d 1300, 1312 (10th Cir. 2020). "The complaint need not provide details of the time, place, offender, and precise statement for every incident." *Id.* ("Further, the specifics that Ms. Doe provides (being called a dirty slut, being told to kill herself, etc.) support an inference that the harassment was objectively offensive. In our view, Ms. Doe has adequately alleged that her harassment was severe, pervasive, and objectively offensive.").

In this case, Natalie has certainly met this threshold. She has alleged that those at CFA knew she was a victim of sexual assault and had been diagnosed with PTSD. (D.E. 20, ¶¶ 42-43). Natalie has alleged that the sexual harassment and unwelcome conduct to which she was subjected, because of her sex, caused her incredible anxiety (*Id.* at ¶¶43-44, 60-82, 84-97, 112). These male students would then continue the bullying and harassment when Natalie "pushed back" against their unwelcome conduct and behavior (*Id.* at ¶63). This harassment sometimes occurred on a daily basis, but certainly on a weekly basis (*Id.* at ¶¶60-66) and continued for months and months, class in and class out. (*Id.* at ¶77).

Natalie details her emotional and educational struggles, believing CFA would never address her concerns about the conduct of those certain male students. (*Id.* at ¶¶73,75). She was assigned different materials than her classmates, forced to work alone, and missed approximately two (2) weeks of class. (*Id.* at ¶¶78,80). She was subsequently forced to participate in class discussions and readings involving the rape and murder of a 15-year-old girl (*Id.* at ¶91), which further emboldened the male students to make inappropriate and

offensive comments directed towards Natalie (*Id.* at ¶¶93, 94) all the while knowing that Natalie had been a victim of sexual assault. (*Id.* at ¶43).

Applying the above standards to the facts at issue in this case, the "overall scenario" clearly establishes sufficient facts that Natalie was a victim of repeated acts of sexual harassment and unwelcome conduct throughout the 2020-21 academic school year at CFA, and these allegations support the conclusion and inference that the male students' misconduct was severe, pervasive and objectively offensive. Moreover, the Amended Complaint alleges that there were multiple victims/supporters who found the male students' conduct offensive, thereby provoking them to seek an audience with CFA administration to no avail.

Next, the Amended Complaint provides allegations pertaining to deliberate indifference on the part of CFA in its handling of the sexual harassment, and the retaliation by CFA against Plaintiffs for speaking up for themselves. "Deliberate indifference may be found both when the defendant's response to known discrimination is clearly unreasonable in light of the known circumstances, and when remedial action only follows after a lengthy and unjustified delay." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003). "Deliberate indifference is more than a mere reasonableness standard that transforms every school disciplinary decision into a jury question." *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) (internal quotations omitted). However, deliberate indifference will often be a fact-based question, for which bright line rules are ill-suited. *See id.* Furthermore, while deliberate indifference is a high standard that requires more than a showing of mere negligence, *see Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001), "half-hearted investigation or remedial action will [not] suffice to shield a school from liability," *S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016).

First, CFA's contention that its deliberate indifference must cause or subject Natalie to "further" discrimination is misguided. (D.E. 23, p. 22). The Fourth Circuit has already held that "Title IX liability based on student-on-student harassment is not necessarily limited to cases where such harassment 'occurs after the school receives notice' and is 'caused' by the school's own post-notice conduct." *Doe v. Fairfax Cty. Sch. Bd.*, 1 F.4th 257, 273 (4th Cir. 2021) (citations omitted). "A single instance of pre-notice, student-on-student harassment could form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity." *Id.* at 273-74. Accordingly, CFA can be held liable under Title IX based upon a single, pre-notice incidence of severe sexual harassment, where CFA's deliberate indifference to that incident denied Natalie access to educational benefits and opportunities.

Regardless, the Amended Complaint provides that Natalie was sexually assaulted during her sophomore year, at another school, and by the Fall of 2020, CFA was aware of the same. (D.E. 20 ¶¶42-45). Despite CFA's knowledge of the sexual assault, and Natalie's triggering concerns, she was still subjected to sexual harassment, by certain male students, during the 2020-21 academic year (*Id.* at ¶¶43-44, 60-82, 84-97), which again CFA was made aware. (*Id.* at ¶¶71, 74, 90, 112). Natalie contends that in the 2020-21 academic year, the sexual harassment and unwelcome conduct occurred at least on a weekly basis, for months and months, class in and class out (*Id.* at ¶¶60-66, 77) given CFA's failure to promptly investigate or take any reasonable measures. (*Id.* at ¶¶215, 217-18, 237).

If an institution either fails to act, or acts in a way which could not have reasonably been expected to remedy the violation, then the institution is liable for what amounts to an official decision not to end discrimination. *Doe A. v. Green*, 298 F. Supp. 2d 1025, 1035 (D. Nev. 2004) citing *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290, 118 S.Ct. 1989

(1998). Natalie has alleged *ad nauseam* CFA's deliberate indifference, which subjected her to further discrimination, for months and months, resulting from its failure to take timely and reasonable measures to end the harassment. (*Id.* at ¶238). Ultimately, CFA's inaction subjected Natalie to further harassment, thereby forcing her, along with other students, to stand up for themselves, which resulted in Elizabeth and C.K. being retaliated against. Given CFA's failure to act, or at least their "half-hearted" efforts, and the ongoing sexual harassment which Natalie contends she was subjected due to CFA's inaction, Natalie has sufficiently alleged that CFA's response was clearly unreasonable in light of the known circumstances.

On these allegations alone, and in reading the Amended Complaint in the light most favorable to the non-moving Plaintiffs, the Court respectfully cannot find "beyond doubt that [Natalie] can prove no set of facts in support of [her] claim which would entitle [her] to relief." *See Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). Accordingly, Natalie has adequately alleged that the bullying and sexual harassment she suffered was severe, pervasive, and objectively offensive, and that CFA was deliberately indifferent based upon its inaction.

## IV. C.K. and Elizabeth have sufficiently alleged a Title IX retaliation claim.

CFA next contends that C.K.'s Title IX retaliation claim should be dismissed because there is no allegation that she submitted a Title IX complaint to CFA or otherwise engaged in Title IX-protected behavior. (D.E. 23, p. 25). However, as the Amended Complaint makes clear, C.K. engaged in protected activity and is a member of a protected class (D.E. 20, ¶¶248, 250), which was based upon her signing the petition, supporting her family, and speaking out against the sexual harassment. (D.E. 20, ¶41, 178, 250).

CFA fails to also recognize the "zone of interest theory" espoused in *Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 866 (9th Cir. 2014), which in turn cites to the Supreme Court case *Thompson v. North American Stainless, LP*, 562 U.S. 170, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011). *Sweetwater* and *Thompson* permit zone-of-interest recovery for plaintiffs who are so closely associated with the person who in fact engaged in the protected activity such that the court could find that the protected activity was the plaintiff's own or that the retaliation against the plaintiff was intended to actually harm that person. *Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 758 (M.D. Tenn. 2019), *case dismissed,* No. 19-5369, 2019 WL 5079251 (6th Cir. Sept. 18, 2019) (citations omitted). Furthermore, a student can bring a Title IX claim for retaliation directed at her based on the protected complaint made by her parent because she is within the "zone of interests that Title IX's implicit antiretaliation provisions seek to protect." *See T.L. ex rel. Lowry v. Sherwood Charter School*, 68 F.Supp.3d 1295, 1314-15 (D. Or. 2014).

Importantly, in *Sweetwater*, the court cited *Thompson* in recognizing that students fall "within the 'zone of interests' that Title IX's implicit antiretaliation provisions seek to protect." *See Sweetwater*, 768 F.3d at 866. In *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005), the Supreme Court further held that with respect to a Title IX retaliation claim, plaintiff can be an "indirect victim" of sex discrimination. The Fourth Circuit Court of Appeals has applied Title VII retaliation concepts to the requirements of a Title IX retaliation claim. *See Preston v. Commonwealth of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994) (recognizing that "Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which we may look in shaping the contours of a private right of action under Title IX"); *see also Feminist Majority Found. v. Hurley*, 911 F.3d 674, 689 (4th Cir. 2018). In the Title VII context, our district courts have emphasized our Supreme Court's holding that "Title VII's antiretaliation

provision prohibits any employer action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Lemon v. Myers Bigel, P.A.*, No. 5:18-CV-200-FL, 2019 WL 1117911, at \*10 (E.D.N.C. Mar. 11, 2019), <u>aff'd</u>, 985 F.3d 392 (4th Cir. 2021), *cert. denied sub nom. Lemon v. Bigel*, 142 S. Ct. 225, 211 L. Ed. 2d 99 (2021) *citing* <u>Thompson</u>, 562 U.S. at 174 (citations omitted). Furthermore, our district courts have recognized the holding in *Thompson* that with respect to antiretaliation provisions, "third-party reprisals must be considered based upon the particular circumstances." *See Jarvis v. Bank of Am. Corp.,* No. 1:10CV896, 2012 WL 6568791, at \*6 (M.D.N.C. Dec. 17, 2012), *report and recommendation adopted,* No. 1:10CV896, 2013 WL 423133 (M.D.N.C. Jan. 31, 2013).

In *Thompson*, 562 U.S. at 171-77, 131 S.Ct. 863, plaintiff brought a Title VII action against his employer for retaliation, alleging that he was terminated after his fiancée, who worked for the same employer, filed a gender discrimination charge with the EEOC. The Supreme Court held that plaintiff fell within the zone of interests protected by Title VII, and therefore allowed the plaintiff's retaliation claim premised upon plaintiff being fired because his fiancée, who was also a co-worker, engaged in protected activity and his firing was intended to harm her. The Supreme Court therefore rejected the categorical view that only the person who engages in the protected activity (the fiancée) may sue. *See Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 667 (5th Cir. 2020), *cert. denied,* 141 S. Ct. 1382, 209 L. Ed. 2d 125 (2021) *citing Thompson*, 562 U.S. at 177, 131 S.Ct. 863.

Applying that test to the case at bar, there is no question that C.K. falls within the zone of interests protected by Title IX even if the Court finds that she did not participate in a protected activity by signing the petition and supporting her family. Like *Thompson,* C.K. was not an "accidental" victim of the retaliation—collateral damage, so to speak, of CFA's unlawful acts. To the contrary, injuring C.K. was CFA's intended means of not only harming C.K., but also Elizabeth and C.K.'s parents for engaging in protected activity. Similarly,

C.K.'s parents are likewise within the zone of interests that CFA was prohibited from retaliating against by terminating C.K.'s enrollment contract. But for Elizabeth's participation in protected activity; specifically, speaking out against sexual harassment and attempting to hold those who participated accountable, and their parents continued support and vocal complaints, CFA would have never retaliated against C.K. by terminating her enrollment contract. Furthermore, because of CFA's deliberate acts in punishing Elizabeth for her attempts at holding the male students accountable for their actions, C.K. was discouraged from vehemently supporting and advocating for her sister and the other female students that were victims of sexual harassment in fear CFA's retaliation against her. Nevertheless, she was still retaliated against. C.K. and her parents are the individuals the zone of interest test has been established to protect. Accordingly, even if C.K. did not engage in protected activity by signing the petition or C.K.'s parents, by supporting Elizabeth, they fall within Title IX's zone of interest, thereby sufficiently alleging a retaliation claim against CFA.

Despite CFA's arbitrary contention that the adverse action taken against Elizabeth was because she used CFA's logo to post a petition containing derogatory statements about specific male student, and refused to apologize, that certainly is not what Elizabeth has alleged in the Amended Complaint, which must be taken as true. Elizabeth was never informed before her Honor Council appearance that she had violated any CFA rules by using its logo. Elizabeth's parents were informed that she had engaged in "reckless endangerment, false accusations" "retaliating, intimidation, threats, reprisal, false accusations and/or making false charges." (D.E. 20, ¶¶129, 135). Elizabeth has alleged that she was retaliated against for having engaged in protected activity, complaining of sexual harassment and unwelcome conduct towards Natalie by certain male students at CFA and other female

students who had been victims of sexual harassment, unwelcome conduct and bullying on the basis of their sex. (*Id.* at ¶41). Any allegations of a "major infraction" allegedly committed by Elizabeth that caused her to be brought before CFA's Honor Council included nothing about using CFA's logo. (*Id.* at ¶144). The retaliation against Elizabeth achieved the intended effect—to frighten and intimidate female CFA students who experienced "student on student" sexual harassment and bullying to not report it. (*Id.* at ¶145). Next, she contends that instituting a proceeding before CFA's Honor Council for speaking out against sexual harassment constitutes retaliation, all for the purpose of interfering with the rights or privileges secured by Title IX. (*Id.* at ¶146). CFA additionally retaliated against Elizabeth and C.K. by terminating C.K.'s enrollment contract (*Id.* at ¶¶196, 255) and by banning Elizabeth from "Salute to Seniors" and CFA's graduation. (*Id.* at ¶218). All of these adverse actions by CFA were a direct result of Elizabeth advocating against sexual harassment, which constitutes a protected activity.

For these reasons, CFA's Motion to Dismiss C.K and Elizabeth's Title IX retaliation claim should be denied.

## V. Plaintiffs' have stated a claim for intentional infliction of emotional distress and negligent infliction of emotional distress.

Whether conduct may "*reasonably* be regarded as extreme and outrageous is initially a question of law for the court…then it is for the jury to decide whether…defendant's conduct…was in fact extreme and outrageous." *Briggs v. Rosenthal,* 73 N.C. App. 672, 676, 327 S.E.2d 308, 311 (1985). Courts have found school officials' responses to allegations of sexual assault to be extreme and outrageous conduct. *See M.B. v. Chapel Hill-Carrboro City Sch. Bd. of Educ.,* No. 1:20-CV-796, 2021 WL 4412406, *4 (M.D.N.C. Sept. 27, 2021); *Rouse v. Duke Univ.*, 869 F. Supp. 2d 674, 681–82 (M.D.N.C. 2012); *Mandsager v. Univ. of N.C. at Greensboro*, 269 F. Supp.2d 662, 683 (M.D.N.C. 2003).

Failing to conduct a reasonable investigation or discipline the accusers, and instead, retaliating against Elizabeth simply because she engaged in protected activity by speaking up against male students who had engaged in conduct that they reasonably believed to be in violation of their rights and then denying her the educational opportunity to participate in her graduation exercises unless she apologized to these male students cannot possibly be seen by this Court, in all due respect, as not being "reasonably" regarded as extreme and/or outrageous or indicate a reckless indifference to the likelihood that this conduct would cause Elizabeth severe emotional distress. Similarly, CFA's actions in terminating C.K.'s enrollment contract for the 2021-22 academic year and forcing her to find another school, with new teachers and friends, cannot be seen by this Court as not being "reasonably" regarded as extreme and/or outrageous or indicate a reckless indifference to the likelihood that this conduct would cause C.K. severe emotional distress and Elizabeth further emotional distress. It will ultimately be for a jury to determine whether that conduct is indeed sufficiently extreme and outrageous, but at this juncture, Plaintiffs' allegations are sufficient to establish extreme and outrageous conduct on the part of CFA, and as a result of this conduct, both Elizabeth and C.K. suffered severe emotional distress.

Next, CFA attacks Plaintiffs' negligent infliction of emotional distress (NIED) claim on the basis that Plaintiffs' Amended Complaint does nothing more than allege intentional conduct. (D.E. 23, p. 28). Of course, Plaintiffs' complaint sets forth both intentional and negligent conduct, based upon duties which Plaintiffs allege that CFA owed to them. Even if the Defendant was correct, a plaintiff may plead alternative theories of recovery based on the same conduct or transaction. *See* N.C. Gen. Stat. § 1A-1, Rule 8(e)(2). "[T]he statement of the same cause of action in different ways or forms, each in a separate count, so as to meet different possible phases of evidence as it may be developed at the trial, or different possible

legal views, is permissible… [t]he plaintiff can unite two causes of action relating to the same transaction and have alternative relief." *Jenkins v. Duckworth & Shelton, Inc.*, 242 N.C. 758, 759, 89 S.E.2d 471, 472 (1955). Accordingly, the same factual allegations that support a retaliation claim can also be the basis of a NIED claim, in the alternative, and based upon the evidence as it develops at trial.

Aside from that point, Elizabeth and C.K. clearly allege more than just the retaliation as the basis of their NIED claims, including CFA's duties and failures to protect its students; enforce its own policies; and reasonably respond to acts of sexual harassment; (D.E. 20, ¶258, 320). Plaintiffs' have alleged additional breaches of CFA's duties by requiring Elizabeth to "take the fall" for the petition; bringing her before the Honor Council unreasonably and with no basis; failing to adopt the Honor Council's decision; requiring that she apologize; imposing disciplinary action against her; banning her from graduation; cutting her off from her email account; failing to preserve her right to equal educational access; terminating C.K.'s Enrollment Contract (*Id.* at 261, 310); blaming the victims, including Elizabeth; and failing to discipline/reprimand the male students; failing to hold students accountable for their actions; failing to uphold its policies pertaining to bullying, harassment or hazing. (*Id.* at 278,304,320).

It is without dispute that schools "may be held responsible under state law for their failure to protect students from the tortious acts of third parties." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 644, 143 L. Ed. 2d 839 (1999) (citations omitted). In fact, state courts routinely uphold claims alleging that schools have been negligent in failing to protect their students from the torts of their peers. *Id.* (citations omitted).

Taking the factual allegations provided in the Amended Complaint as true, a jury could certainly conclude that CFA's actions were extreme and outrageous. CFA's Motion to Dismiss Plaintiffs' IIED and NIED claims should therefore be denied.

**VI.    Plaintiffs' have stated a claim for breach of contract and the implied covenant of good faith and fair dealing.**

CFA challenges Plaintiffs' breach of contract and breach of the implied covenant of good faith and fair dealing claims based upon the alleged failure to identify specific contractual provisions of the contract that were breached. However, "[u]nder the notice theory of pleading[,] a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of *res judicata*, and to show the type of case brought[.]" *Sutton v. Duke*, 277 N.C. 94, 102, 176 S.E.2d 161 (1970). For a breach of contract claim, it is enough to plead the "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838 (2000). When these elements are alleged, "it is error to dismiss a breach of contract claim under Rule 12(b)(6)," and our appellate courts routinely reverse trial court orders that require anything more. *Woolard v. Davenport*, 166 N.C. App. 129, 134, 601 S.E.2d 319, 322 (2004). In *Polygenex Int'l, Inc. v. Polyzen, Inc.*, 133 N.C. App. 245, 252, 515 S.E.2d 457 (1999), which CFA relies upon, the court found allegations that the defendant's conduct violated the "letter, intent, and spirit" of an agreement between the parties did not support plaintiff's claim for breach of contract. *Owens v. Dixie Motor Co.*, No. 5:12-CV-389-FL, 2014 WL 12703392, at *18 (E.D.N.C. Mar. 31, 2014) *citing Polygenix*, 133 N.C. App. at 252-53.

Here, the Plaintiffs' Amended Complaint is far more detailed than *Polygenix*, where Plaintiffs have alleged a valid and enforceable enrollment contract (D.E. 20, ¶¶287-88, 299-

300), that Plaintiffs fulfilled all of their obligations under the Enrollment Contract (*Id.* at ¶¶293, 301), and that CFA breached the Enrollment Contract and the implied covenant of good faith and fair dealing contained therein (*Id.* at ¶¶259, 261, 275, 291-92, 294, 304, 313, 317). The Amended Complaint details the various policies, duties and prohibitions provided in the Enrollment Contract, which incorporates CFA's Handbook, and the substantial breaches of the same (D.E. 20, ¶¶50, 53-59, 72, 128, 138-39, 159, 163, 168-69, 175-76, 186, 199, 249, 258-59, 275, 288-92, 294, 299, 300-01, 303-04, 313). The Plaintiffs have clearly provided "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Defendant's motion to dismiss Plaintiffs' breach of contract and breach of the implied covenant of good faith and fair dealing claims should respectfully be denied.

## CONCLUSION

For the reasons above, the Court should deny the Defendant's Motion to Dismiss.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.2(f)(2), the undersigned certifies that this memorandum in opposition complies with the applicable word limit. According to Microsoft Word, the memorandum in opposition contains 8,382 words.

Respectfully submitted this the 31st day of January, 2022.

SHIPMAN & WRIGHT, LLP
*Attorneys for Plaintiffs*

By:    /s/ Gary K. Shipman
       **GARY K. SHIPMAN**
       N.C. State Bar No.: 9464
       575 Military Cutoff Road, Suite 106
       Wilmington, NC  28405
       Telephone: (910) 762-1990
       Facsimile: (910) 762-6752
       Email: gshipman@shipmanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 31st day of January, 2022, I electronically filed the foregoing *MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS* with the Clerk of the Court using CM/ECF system, which will automatically send notification of such filing to the following CM/ECF participants:

Stephen J. Bell
Patrick M. Mincey
Zachary C. Bolitho
CRANFILL SUMNER, LLP
101 N. 3rd Street, Suite 400
Wilmington, NC 28401
Email: sbell@cshlaw.com
Email: pmincey@cshlaw.com
Email: zbolitho@cshlaw.com
*Attorneys for Defendant*

This the 31st day of January, 2022.

SHIPMAN & WRIGHT, LLP
*Attorneys for Plaintiffs*

By:    /s/ Gary K. Shipman
**GARY K. SHIPMAN**
N.C. State Bar No.: 9464
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6752
Email: gshipman@shipmanlaw.com