IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:21-CV-169-D

ELIZABETH KARANIK, CHARLOTTE )
KARANIK, by her parents and next friends, )
JOHN KARANIK and KIMBERLY )
KARANIK, and NATALIE PRESSLEY, )
)
           Plaintiffs, )
)
        v. )         **ORDER**
)
CAPE FEAR ACADEMY, INC., )
)
           Defendant. )

On December 27, 2021, Elizabeth Karanik ("Elizabeth"), Charlotte Karanik ("Charlotte")

by and through her parents John and Kimberly Karanik ("John" and "Kimberly," respectively), and

Natalie Pressley ("Natalie") (collectively, "plaintiffs") filed an amended complaint against Cape Fear

Academy, Inc. ("CFA" or "defendant") alleging sex discrimination and retaliation in violation of

Title IX, 20 U.S.C. §§ 1681, et seq., intentional infliction of emotional distress ("IIED"), negligent

infliction of emotional distress ("NIED"), breach of contract, and violations of the covenant of good

faith and fair dealing [D.E. 20]. On January 10, 2022, CFA moved to dismiss for failure to state a

claim under Federal Rule of Civil Procedure 12(b)(6) and filed a memorandum in support [D.E. 22,

23]. On January 31, 2022, plaintiffs responded in opposition [D.E. 24]. On February 14, 2022, CFA

replied [D.E. 25]. As explained below, the court grants in part and denies in part defendant's motion

to dismiss.

I.

Plaintiffs' allegations concern two sets of facts. The first set of facts concerns plaintiffs'

experiences at CFA during the 2020–21 academic year and the summer of 2021. The second set of

facts concerns CFA seeking and obtaining a loan through the Paycheck Protection Program ("PPP"),

which the Small Business Administration ("SBA") administers under the CARES Act, Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286 (2020) (codified at 15 U.S.C. § 636).

## A.

During the 2020–21 academic year, Elizabeth, Charlotte, and Natalie were high-school students at CFA, a private school in Wilmington, North Carolina, that is organized as a non-profit corporation under North Carolina law. See Am. Compl. [D.E. 20] ¶¶ 1–3, 5, 10. Elizabeth and Natalie were seniors, and Charlotte was a sophomore. See id. ¶ 38. Students attend CFA pursuant to enrollment contracts between the school and the students' parents or guardian. See id. ¶¶ 47, 50. During the 2020–21 academic year, Natalie enrolled in an Advanced Placement ("AP") Literature course. See id. ¶ 62. Plaintiffs allege that throughout the school year, during the AP Literature class, male students made dismissive, inappropriate, or offensive remarks and jokes about women, sexual assault on women, and violence toward women. See, e.g., id. ¶¶ 63–65, 69, 77, 88, 91–96. They allegedly did so despite knowing Natalie was sexually assaulted while attending a boarding school, suffered from post-traumatic stress disorder, and risked experiencing serious emotional responses to materials in the course that depicted violence or sexual assault toward women. See id. ¶¶ 42–44, 69. Plaintiffs allege that after some time, this group of male students in Natalie's AP Literature class continued making offensive remarks and jokes in part because they "had become quite aware of the things that they could do or say to create a reaction from Natalie." Id. ¶ 81. The male students' behavior made Natalie dread attending class and caused emotional distress, including panic attacks. See id. ¶¶ 74, 81, 89, 97. Natalie also attended counseling due to the negative effects the male students' behavior had on her. See id. ¶ 90.

During the Fall 2020 semester, Natalie attempted to discuss her concerns about the male students' behavior during AP Literature class sessions with faculty and administrators at CFA with almost no success. Natalie's AP Literature teacher suggested Natalie talk to CFA's counselor and AP Psychology teacher, Tobi Ragon ("Ragon"). See id. ¶ 66. Natalie discussed her concerns several

2

times with Ragon, who "left Natalie with the impression" Ragon had no authority to address Natalie's concerns. Id. ¶¶ 69–71, 86, 97. Ragon instead encouraged Natalie to "do a better job 'advocating for herself'" in class and to "take it upon herself" to "use her own 'pain' and challenge the male students in the class." Id. ¶ 69. Even though "Natalie was fully capable of reading and analyzing the material," CFA's other attempted solution was to have Natalie self-study different reading materials than the rest of the students in the AP Literature course for two weeks rather than participate with the rest of the class. Id. ¶ 81; see id. ¶ 78.

At the beginning of the Spring 2021 semester, the school reassigned Natalie into a new statistics class with some of the same male students involved in the AP Literature class harassment. See id. ¶ 84. Natalie was the only female student in that statistics class. See id. Natalie told Ragon she was uncomfortable with the new statistics class but the school refused to allow her to transfer to a different statistics class, and Ragon told Natalie that receiving accommodations would hurt Natalie over time because the "real world doesn't accommodate mental illness." Id. ¶ 86. After several days of the new class and another conversation with Ragon, CFA allowed Natalie to attend her statistics class via Zoom. See id. ¶ 87. The male students in the AP Literature class continued with the same behavior in the Spring 2021 semester. See id. ¶ 88.

In the Spring 2021 semester, Natalie went to Ragon again after she had a panic attack in class after an AP Literature class discussion in which the male students joked about rape. See id. ¶¶ 90–97. Ragon also had individual and group conversations with Natalie, other female students, and some male students who told Ragon about experiences they had at CFA similar to those Natalie had experienced. See id. ¶¶ 98–100. Ragon again "left the impression" she had no authority to do anything about the male students' conduct but suggested talking to Jamison Fee ("Fee"), CFA's dean of students. See id. ¶ 100.

Over the span of a week, Elizabeth and other students took concerns about "sexual harassment and unwelcome conduct" by "certain male students" to Fee in meetings and via email.

Id. ¶¶ 101–05. Fee asked Elizabeth to provide specific examples of misconduct. See id. ¶ 102. In an email, Elizabeth recounted to Fee that her former boyfriend called her a "hoe" and a "slut" and that other male students had asked her or encouraged her to have sex with another CFA student. Id. Fee never met with Natalie, even though she attempted to meet with him several times to discuss her experiences in the AP Literature class. See id. ¶ 106. Plaintiffs allege that based on their meetings with Fee, they and other students "were assured and therefore reasonably believed that CFA would undertake an investigation into these male students' conduct, and appropriate action would be taken." Id. ¶ 104. Besides asking students to send Fee information and evidence to support their concerns, plaintiffs do not know whether CFA conducted an investigation. See id. ¶ 105; cf. id. ¶ 113.

In May 2021, CFA administrators announced the student graduation speakers. The CFA administration chose some of the male students that Natalie, Elizabeth, and others had alleged engaged in sexual harassment or unwelcome conduct toward them to be graduation speakers. See id. ¶ 107. Natalie, Elizabeth, and other students objected to these male students speaking at graduation and voiced their concerns to CFA faculty members. See id. ¶ 108. When the school took no action, Natalie, Elizabeth, and other students proposed to Ragon the idea of a petition to have the objectionable graduation speakers removed. Ragon "endorsed" the idea, and a different faculty member said a petition was a "smart" idea. Id. ¶ 114. Thereafter, more than 20 students collaborated to write a petition, which Elizabeth posted online at Change.org. See id. ¶¶ 116–17. The posted petition stated:

> The senior class feels that those chosen to speak at graduation and commencement do not accurately represent the class of 2021. The senior class feels [certain identified male students] do not deserve speaking roles in these events. The group feels these students have caused harm to fellow CFA students and would be setting a bad example for our school community. The class feels the speakers chosen for these events should be people who care about their fellow peers and be people who support their classmates. The class would like to remove their speaking roles and replace them with either elected peers or teachers. We ask that they be removed from these roles or step down from them knowing their classmates will not respect their speeches due to their own lack of respect in the CFA community.

4

Id. ¶ 117. The petition garnered 27 student signatures before the CFA administration had the petition taken down a few hours later. See id. ¶¶ 118, 120. Charlotte was among the students who signed the petition. See id. ¶¶ 118–19.

In response to the petition, Fee met with Elizabeth. See id. ¶¶ 121–26. During the meeting, Elizabeth recounted to Fee the events leading to the petition. See id. ¶¶ 122–24. Elizabeth refused to tell Fee who collaborated with her to write the petition. See id. ¶¶ 125, 130. Fee told Elizabeth that because she posted the petition, she would have to "take the rap for it" and that the petition constituted "reckless endangerment [and] false accusations." Id. ¶¶ 126, 129. Natalie and other students also attempted to meet with Fee about the petition, but he refused to meet with them. See id. ¶¶ 131, 134. Fee told Elizabeth's parents she would appear before CFA's Honor Council, stating that posting the petition constituted a "major infraction," that if found true would be reported to any colleges or universities to which Elizabeth had applied. See id. ¶¶ 135–47. According to Fee, Elizabeth violated a rule against "publish[ing] material intended to harm or slander another person." Id. ¶ 142. The school excluded Elizabeth's parents from attending the Honor Council proceeding, even though the school had communicated exclusively with John and Kimberly, not Elizabeth, about the proceeding. See id. ¶¶ 135, 139–42, 152. After the Honor Council hearing, no one told Elizabeth the outcome of the council's deliberations. See id. ¶ 166. Elizabeth believes the student members of the Honor Council determined "that no action should be taken against [her] and that the male students . . . should be disciplined." Id. ¶ 161; see id. ¶ 176. After deliberating, "the student members of the Honor Council were excused." Id. ¶ 162.

The day after the Honor Council hearing, and despite what Elizabeth believes the student members of the Honor Council concluded, the director of CFA's upper school emailed Kimberly (not Elizabeth) requiring Elizabeth to write an apology note to every male student mentioned in the petition or be excluded from CFA's "Salute to Seniors" and commencement ceremonies. See id. ¶¶ 165, 170, 174. This punishment surprised plaintiffs because Fee had told Kimberly that regardless

5

of the Honor Council's decision, CFA would not exclude Elizabeth from these graduation activities. See id. ¶¶ 136, 172. Elizabeth refused to write the apology letters, and CFA refused to allow Elizabeth to participate in the Salute to Seniors and commencement ceremonies. See id. ¶¶ 177, 181–82. During these ceremonies, the school omitted all references that Elizabeth was a graduating student. See id. ¶¶ 183, 188. Before the commencement ceremony, Natalie and other students announced that they intended to turn their chairs around when the male students they had objected to spoke. See id. ¶ 189. Fee told them they could do so to exercise their freedom of speech but if they did so they would not be able to receive their diplomas at graduation. See id. Natalie and other students did turn their chairs around. See id. The amended complaint does not state whether these students received their diplomas during the commencement ceremony.

Plaintiffs allege that although CFA generally allows graduating seniors to keep their CFA email accounts through the July following their graduation, the school suspended Elizabeth's account immediately after the May 25, 2021 graduation ceremonies. See id. ¶¶ 182, 192.

In February 2021, John and Kimberly executed an enrollment contract to enroll Charlotte at CFA for the 2021–22 school year and paid a deposit of one-half of tuition. See id. ¶ 194. On June 4, 2021, CFA terminated Charlotte's re-enrollment, stating in a letter to John and Kimberly that the school was exercising its discretion to deny Charlotte's enrollment because of Kimberly's involvement in Elizabeth's decision not to write the apology letters. See id. ¶ 196. The school also suspended Charlotte's access to her email account. See id. ¶ 201. Because of the timing of CFA's decision to deny Charlotte re-enrollment, John and Kimberly missed the deadlines to enroll Charlotte in a comparable private school or any "honors" or "Advanced Placement" classes in any public high school that Charlotte could attend in New Hanover County. See id. ¶¶ 202, 206.

## B.

Plaintiffs allege that before the 2020–21 academic year, CFA received a PPP loan which was forgiven after the end of that academic year. On April 30, 2020, CFA's assistant head of school for

finance and operations applied for a PPP loan of $1,253,949. See [D.E. 23-2] 2–3; Am. Compl. ¶ 10. One section of the application form reads: "All businesses receiving SBA financial assistance must agree not to discriminate in any business practice, including employment practices and services to the public on the basis of categories cited in 13 C.F.R., Parts 112, 113, and 117 of SBA Regulations." [D.E. 23-2] 5; cf. Am. Compl. ¶¶ 18–19. On May 4, 2020, First Carolina Bank issued a PPP loan to CFA for the full amount CFA had requested. See [D.E. 23-1] 2. In the loan agreement, CFA promised to "comply in all material respects with all laws, rules, regulations and requirements of any Governmental Authority, including the SBA, applicable to its business" and to "cause all representations, warranties and certifications contained [in the loan agreement] and in the Application to remain true and correct at all times while any portion of the Loan remains outstanding." Id. at 9. Also on May 4, 2020, First Carolina Bank submitted an application to the SBA for a guaranty of its loan to CFA. See id. at 20–21; cf. Am. Compl. ¶ 22. On June 15, 2021, the SBA forgave CFA's entire PPP loan and repaid First National Bank. See [D.E. 23-2] 6. Thus, CFA had the loan from May 4, 2020, to June 15, 2021.

Plaintiffs allege that CFA (1) discriminated against Natalie on the basis of sex in violation of Title IX, (2) retaliated against Elizabeth and Charlotte in violation of Title IX, (3) intentionally inflicted emotional distress on Elizabeth and Charlotte, (4) negligently inflicted emotional distress on Elizabeth and Charlotte, and (5) breached its enrollment contracts with John and Kimberly, of which Elizabeth and Charlotte were beneficiaries, including by breaching the covenant of good faith and fair dealing. See id. ¶¶ 209–326. Plaintiffs bring their state-law claims under North Carolina law. Plaintiffs seek damages in excess of $75,000. See id. at 80–81.

## II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566

U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a party's factual allegations must nudge its claims beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79; see Twombly, 550 U.S. at 570.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court may also consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines, 822 F.3d at 166. Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

## III.

Plaintiffs allege that CFA (1) discriminated against Natalie on the basis of sex in violation of Title IX, and (2) retaliated against Elizabeth and Charlotte in violation of Title IX. See Am. Compl. ¶¶ 209–256. CFA responds that its PPP loan was not federal financial assistance under Title

**8**

IX and therefore Title IX did not apply to CFA during the relevant period. CFA also argues that even if required to comply with Title IX, plaintiffs fail to plausibly state a claim under Title IX or state law. See [D.E. 23] 5–30.

## A.

CFA argues plaintiffs fail to state a claim because CFA never received federal financial assistance and thus is not subject to Title IX. See [D.E. 23] 5. Plaintiffs respond that CFA's PPP loan was federal financial assistance that required CFA to comply with Title IX during the life of the loan. See [D.E. 24] 4–11. CFA replies that the PPP loan falls within an exclusion in the definition of "federal financial assistance" for contracts of guaranty. See [D.E. 23] 5–14; [D.E. 25] 2. Whether CFA received "federal financial assistance" is an essential element of plaintiffs' Title IX claims. See Feminist Majority Found. v. Hurley, 911 F.3d 674, 686 (4th Cir. 2018); Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc).[1]

### 1.

Under Section 7(a) of the Small Business Act, Congress empowered the SBA to make loans to support small businesses. See 15 U.S.C. § 636(a); United States v. Kimbell Foods, Inc., 440 U.S. 715, 719 n.3 (1979); Small Bus. Admin. v. McClellan, 364 U.S. 446, 447 (1960); In re Gateway Radiology Consultants, P.A., 983 F.3d 1239, 1247–48 (11th Cir. 2020). The SBA makes section 7(a) loans to support "general business purposes," and the loans may take one of three forms. 13 C.F.R. § 120.2(a)(1). A section 7(a) loan may be "(i) [a] direct loan by SBA; (ii) [a]n immediate participation loan by a Lender and SBA; or (iii) [a] guaranteed loan (deferred participation) by which SBA guarantees a portion of a loan made by a Lender." Id. Although all three types of loans are available, "[t]he SBA prefers to guarantee private loans rather than to disburse funds directly." Kimbell Foods, 440 U.S. at 719 n.3; In re Gateway Radiology, 983 F.3d at 1248. The SBA's broad

---

[1] Because the receipt of "federal financial assistance" is an element of a Title IX claim, the parties properly frame the issue under Rule 12(b)(6) rather than under Rule 12(b)(1). See Arbaugh v. Y & H Corp., 546 U.S. 500, 510–16 (2006).

lending authority allows the SBA to "lend[] money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders." McClellan, 364 U.S. at 447.

When Congress created the Paycheck Protection Program, it placed the program under section 7(a) of the Small Business Act. See 15 U.S.C. § 636(a)(36); Springfield Hosp., Inc. v. Guzman, 28 F.4th 403, 409–10 (2d Cir. 2022); Pharaohs GC, Inc. v. U.S. Small Bus. Admin., 990 F.3d 217, 224 (2d Cir. 2021); In re Gateway Radiology, 983 F.3d at 1249. The CARES Act authorizes the SBA to guarantee PPP loans "under the same terms, conditions, and processes" as other section 7(a) loans, except that for PPP loans, Congress relaxed some of the eligibility requirements. 15 U.S.C. § 636(a)(36)(B); see Springfield Hosp., 28 F.4th at 410. PPP loans receive a 100% guarantee from the SBA. See 15 U.S.C. § 636(a)(2)(F). Unlike other section 7(a) loans, however, which borrowers may use for general business purposes, borrowers may use PPP loans only for certain enumerated uses. See id. § 636(a)(36)(F)(i); Lucius v. Fort Taco, LLC, No. 21-22397-CIV-WILLIAMS/MCALILEY, 2022 WL 335491, at *2–6 (S.D. Fla. Jan. 5, 2022) (unpublished). PPP loan forgiveness is subject to certain conditions, such as a borrower using the funds only for those enumerated uses. See 15 U.S.C. § 636m(d), (f). For example, a borrower qualifies for loan forgiveness when the borrower has used at least 60% of the loan to cover payroll costs and has used the remaining funds to cover payroll, mortgage interest, rent, utilities, covered operations expenditures, covered property damage costs, covered supplier costs, or covered worker protection costs. See 15 U.S.C. § 636m(b), (d)(8); Springfield Hosp., 28 F.4th at 409, 424; Lucius, 2022 WL 335491, at *3.

Like other section 7(a) loans, "PPP loans are made through private lenders and participants sign promissory notes, subject to SBA guarantees." Springfield Hosp., 28 F.4th at 423 (quotation omitted). The process to obtain a PPP loan is similar to that for other section 7(a) guaranteed loans. An applicant "seeking a PPP loan submits an application to an authorized lender, which then determines the borrower's eligibility. If the lender wishes to make the loan, it submits a guarantee

application to the SBA, and then disburses the loan proceeds if the guarantee application is approved." Mem. Supp. Defs.' Mot. Dismiss at 7, Carmen's Corner Store v. Small Bus. Admin., 520 F. Supp. 3d 726 (D. Md. 2021) (No. CCB-20-1736), 2020 WL 7480256; see 13 C.F.R. § 120.2(a)(2). Loans financed by lenders in SBA's Preferred Lenders Program are not subject to the same prior approval requirements. See 13 C.F.R. § 120.450. In short, "the PPP is a loan guaranty program." Springfield Hosp., 28 F.4th at 415.

2.

Title IX prohibits discrimination, exclusion from participation in, and denial of the benefits of any education program or activity[2] that receives "Federal financial assistance." 20 U.S.C. §§ 1681(a), 1687; see Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005); Cannon v. Univ. of Chi., 441 U.S. 677, 695 n.17 (1979); Peltier v. Charter Day School, Inc., No. 20-1001, 2022 WL 2128579, at *15 (4th Cir. June 14, 2022) (en banc). Title IX's implementing regulations, drawing from language in 20 U.S.C. § 1682, define "federal financial assistance," in relevant part, to include "[a] grant or loan of Federal financial assistance" and "[a]ny other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty." 34 C.F.R. § 106.2(g).

An entity is a recipient of federal financial assistance regardless of whether it receives the federal financial assistance directly or indirectly. See Grove City Coll. v. Bell, 465 U.S. 555, 564 (1984); see also 34 C.F.R. § 106.2(i) (defining "recipient"). Indirectly receiving federal financial assistance includes receiving it "through an intermediary." NCAA v. Smith, 525 U.S. 459, 468 (1999); see Peltier, 2022 WL 2128579, at *14. An entity is not a recipient of federal financial

---

[2] Covered education institutions include "any public or private preschool, elementary, or secondary school." 20 U.S.C. § 1681(c). And "[a]n entire corporation, partnership, or other private organization . . . [w]hich is principally engaged in the business of providing education" qualifies as an "education program." 20 U.S.C. § 1687(3)(A)(ii); see 34 C.F.R. § 106.2(h)(3)(i)(B). As a private K–12 school, CFA meets these definitions. See Am. Compl. ¶ 10; [D.E. 23] 2.

11

assistance, however, when the entity merely benefits economically from a different entity receiving federal assistance. See id. Put differently, "Title IX coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly," but it does not "follow[] the aid past the recipient to those who merely benefit from the aid." U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 607 (1986).

At least three parts of the regulatory definition of "federal financial assistance" are relevant here. First, "federal financial assistance" encompasses loans or grants to support an education program or activity. See 34 C.F.R. § 106.2(g)(1). Second, "federal financial assistance" encompasses "any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity." Id. § 106.2(g)(5). An "arrangement" is "[t]he action of arranging or disposing in order," an "[a]rranged condition, orderly disposition, order," "[a] settlement of mutual relations or claims between parties; an adjustment of disputed or debatable matters; a settlement by agreement," or a "[d]isposition of measures for the accomplishment of a purpose; preparations for successful performance." Arrangement, Oxford English Dictionary (online ed.). Third, "federal financial assistance" excludes contracts of guaranty. See 34 C.F.R. § 106.2(g)(5). A "guaranty" is "[a] promise to answer for the payment of some debt, or the performance of some duty, in case of the failure of another who is liable in the first instance; a collateral undertaking by one person to be answerable for the payment of some debt or performance of some duty or contract for another person who stands first bound to pay or perform." Guaranty, Black's Law Dictionary (11th ed. 2019) (noting a guaranty, as defined here, could also be termed a "contract of guaranty").

A PPP loan is "federal financial assistance" subject to Title IX because it is "[a] grant or loan of Federal financial assistance." 34 C.F.R. § 106.2(g)(1). After all, "the PPP is, in substance and in form, a loan program." Springfield Hosp., 28 F.4th at 423. The CARES Act itself uses the word "loan" about 75 times to describe the PPP. See id.; Tradeways, Ltd. v. U.S. Dep't of Treasury, Civil

Action No. ELH-20-1324, 2020 WL 3447767, at *17 (D. Md. June 24, 2020) (unpublished).

Borrowers receive money under a loan that is registered with and guaranteed by the SBA. See Springfield Hosp., 28 F.4th at 423; Tradeways, Ltd., 2020 WL 3447767, at *17. And Congress placed the PPP under section 7(a), which "concerns the [SBA] Administrator's authority [] to make loans to any qualified small business concern, either directly or through a lender on a guaranteed basis." Tradeways, Ltd., 2020 WL 3447767, at *17 (quotation omitted); see 13 C.F.R. § 120.2(a)(1) (discussing the three ways the SBA can structure section 7(a) loans). In turn, "a lender approved to make loans under [the PPP] shall be deemed to have been delegated authority by the [SBA] Administrator to make and approve covered loans." 15 U.S.C. § 636(a)(36)(F)(ii)(I). Thus, PPP loans are loans of federal financial assistance made through private lenders. See NCAA, 525 U.S. at 468 (stating a party may receive federal financial assistance through intermediaries); Peltier, 2022 WL 2128579, at *14 (same).

CFA's loan documents bolster this conclusion. The note First Carolina Bank issued to CFA has the SBA's logo at the top of the first page and prominently states on the first page that the note is part of the PPP. See [D.E. 23-1] 2. The loan agreement confirms that CFA applied to First Carolina Bank "for a SBA 7(a) Paycheck Protection Program loan." Id. at 7. And the loan agreement states that First Carolina Bank made the loan "subject to the terms and conditions herein set forth and in accordance with the CARES Act, PPP Regulations and the Application." Id. at 8. Moreover, the borrower's certification states that First Carolina Bank was making a "U. S. Small Business Administration ('SBA') guaranteed loan." Id. at 17. The note, loan agreement, and borrower's certification also contain an SBA loan number and loan name. See id. at 2, 7, 17. The interest rate on the loan was subject to change only "in accordance with SBA Standard Operating Procedures." Id. at 2. When First Carolina Bank disbursed the funds to CFA, First Carolina Bank and CFA executed an SBA Form 1050 to confirm that "the loan proceeds were disbursed and received and will be used in accordance with the Use of Proceeds section of the Authorization,

13

including any and all SBA/Lender approved modifications." Id. at 16. Thus, although First Carolina Bank, a private lender, issued the loan, CFA's loan documents indicate First Carolina Bank did so pursuant to and as a result of the SBA's lending authority under the CARES Act, making CFA's PPP loan a "loan of Federal financial assistance." 34 C.F.R. § 106.2(g)(1); see 15 U.S.C. § 636(a)(36)(F)(ii)(I).

Even if PPP loans are not "loan[s] of Federal financial assistance" because the loans are issued by private lenders, they still are federal financial assistance because they are the result of an "arrangement which has as one of its purposes the provision of assistance to any education program or activity." 34 C.F.R. § 106.2(g)(1), (5). The PPP's structure—i.e., private lenders making loans to borrowers with a guaranty from the SBA—fits the definition of "arrangement." The PPP is a "disposition of measures for the accomplishment of" Congress's purpose to "help[] businesses make payroll and pay operating expenses in order to help keep people employed through the economic downturn" caused by COVID-19. In re Gateway Radiology, 983 F.3d at 1247; Arrangement, Oxford English Dictionary (online ed.). In this arrangement, the private lender is the intermediary through which Congress's intended recipients (i.e., businesses, organizations, and other entities hurt by the COVID-19 pandemic) receive access to capital for which they might not otherwise have qualified without the federal government's guarantee to the lender to ensure repayment. Thus, a borrower receiving a PPP loan receives federal financial assistance indirectly through an intermediary (i.e., the private lender) under an arrangement created by Congress and is a recipient of federal financial assistance for the duration of the loan. See NCAA, 525 U.S. at 468; Paralyzed Veterans, 477 U.S. at 607; Grove City, 465 U.S. at 564; Peltier, 2022 WL 2128579, at *14. And because PPP borrowers are Congress's intended recipients, they are not merely economic beneficiaries of someone else's receipt of federal financial assistance. See NCAA, 525 U.S. at 468; Paralyzed Veterans, 477 U.S. at 607.

Although the SBA guarantees PPP loans, that alone does not make the PPP loan a contract

14

of guaranty. A guaranty is a "promise to answer for the payment of some debt . . . in case of the failure of another who is liable in the first instance." Guaranty, Black's Law Dictionary (11th ed. 2019). The PPP loan itself is not such a promise but is instead the instrument that creates the debt to be guaranteed. And the PPP loan recipient is the party "liable in the first instance" for the debt. Id. The contract of guaranty under Congress's arrangement in the PPP is the SBA's promise to the lender to repay the lender if the borrower defaults or the SBA forgives the loan. Cf. 15 U.S.C. § 636(a)(2)(F). That promise is between the lender and the SBA and is one piece of the larger arrangement Congress created. For example, CFA's borrower's certification states First Carolina Bank was "mak[ing] a U. S. Small Business Administration ("SBA") guaranteed Loan." [D.E. 23-1] 17. The SBA guaranteed the loan, but the loan itself was not the guaranty. First Carolina Bank applied separately to the SBA for a guaranty of its loan to CFA, and CFA was not a party to that application. See id. at 20–21.

In opposition, CFA cites Gallagher v. Croghan Colonial Bank, 89 F.3d 275 (6th Cir. 1996), and Moore v. Sun Bank of North Florida, N.A., 923 F.2d 1423 (11th Cir. 1991). See [D.E. 23] 9–10. In Gallagher, the Sixth Circuit considered whether the defendant, a bank, received federal financial assistance that would make it liable for disability discrimination under section 504 of the Rehabilitation Act. See Gallagher, 89 F.3d at 277. The plaintiff argued that the defendant bank received federal financial assistance because the bank made loans to students that the federal government subsidized and guaranteed. See id. The Sixth Circuit held that the defendant bank did not receive federal financial assistance because the guarantees on the student loans were contracts of guaranty, which the regulations implementing the Rehabilitation Act excluded from the definition of federal financial assistance. See id. The court held the subsidies also were not federal financial assistance but were compensation for making student loans at below-market rates. See id. Moreover, relying on Paralyzed Veterans, the Sixth Circuit noted that the defendant bank was not the intended recipient of the federal aid. See id. at 278. Rather, the students receiving the loans were

the intended recipients. The Sixth Circuit concluded that the defendant bank "did not receive federal financial assistance for purposes of the Rehabilitation Act by disbursing loans to students pursuant to federal student loan legislation." Id.

In Moore, the Eleventh Circuit also considered whether a defendant bank received federal financial assistance under section 504 of the Rehabilitation Act. See Moore, 923 F.2d at 1424. In Moore, the defendant bank made section 7(a) loans guaranteed by the SBA. See id. at 1431–32. The defendant bank argued that the guarantees it received from the SBA fell within the exclusion for contracts of guaranty in the regulations implementing the Rehabilitation Act. See id. at 1430. The Eleventh Circuit rejected this argument, holding that the regulations' exclusion of contracts of guaranty conflicted with the statutory text, which contained no such exclusion. See id. at 1425–32. The Eleventh Circuit distinguished Title VI and Title IX because those statutes contain express exclusions for contracts of guaranty. See id. at 1425–27.

Gallagher and Moore do not help CFA. Gallagher and Moore reached opposite conclusions concerning essentially the same question. Notably, however, both cases involved whether the lender had received federal financial assistance that would expose it to liability for disability discrimination under the Rehabilitation Act. The defendant banks received loan guarantees (and in Gallagher, subsidies) from the federal government and were issuing guaranteed loans to borrowers. The question in Gallagher and Moore was whether the intermediaries in the funding arrangement at issue received federal financial assistance and were subject to the Rehabilitation Act. Neither case addressed the question here, which is whether a borrower receiving money from an intermediary lender via an SBA-guaranteed loan receives federal financial assistance.

CFA received "federal financial assistance" and had to comply with Title IX for the life of its loan. By plausibly alleging that CFA had a PPP loan during the 2020–21 academic year, plaintiffs plausibly alleged the first element of their Title IX claims. See Hurley, 911 F.3d at 686; Jennings,

482 F.3d at 695.[3] And under Title IX, as both parties recognize, plaintiffs may proceed under an implied cause of action. See Cannon, 441 U.S. at 717.

## B.

CFA argues that even if it is subject to Title IX, plaintiffs fail to state a plausible Title IX claim. See [D.E. 23] 18–26. Plaintiffs allege that (1) CFA discriminated against Natalie through deliberate indifference to the student-on-student sexual harassment she suffered and (2) retaliated against Elizabeth and Charlotte for engaging in protected activity under Title IX.

### 1.

CFA argues Natalie fails to plausibly allege a student-on-student sexual harassment claim. Under Title IX, a school may be liable for student-on-student sexual harassment that is "sufficiently severe." Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 650 (1999). To state a Title IX claim for student-on-student sexual harassment, a plaintiff must plausibly allege "(1) that they were a student at an education institution receiving federal funds; (2) they suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived them of equal access to the educational opportunities or benefits provided by their school; (3) the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment; and (4) the school acted with deliberate indifference to the alleged harassment." Doe v. Fairfax Cnty. Sch. Bd., 1 F.4th 257, 263–64 (4th Cir.), reh'g denied, 10 F.4th 406 (4th Cir. 2021), petition for cert. docketed, No. 21-968 (U.S. Jan. 6, 2022); see Hurley,

---

[3] In light of this conclusion, the court need not address plaintiffs' weaker alternative argument that its Title IX claims can proceed because CFA agreed in its loan application to follow Title IX and the SBA's regulations implementing Title IX. Cf. 13 C.F.R. §§ 112.11, 113.605 (discussing SBA's enforcement procedures); Matternes v. City of Winston-Salem, 286 N.C. 1, 12, 209 S.E.2d 481, 487 (1974) (stating "[t]he general rule is that one who is not a party to a contract may not maintain an action for its breach" and describing types of third-party beneficiaries, including incidental beneficiaries who have "no right against the promisor or the promisee" (quotation omitted)); Davis & Taft Architecture, P.A. v. DDR-Shadowline, LLC, 268 N.C. App. 327, 332, 835 S.E.2d 473, 477–78 (2019) (discussing third-party beneficiaries).

Case 7:21-cv-00169-D    Document 30    Filed 06/17/22    Page 17 of 32

911 F.3d at 686; Jennings, 482 F.3d at 695. Plaintiffs plausibly allege that CFA is an educational institution that received federal financial assistance during the time period in which plaintiffs' claims arose. Moreover, CFA does not contest that Natalie plausibly alleges the school, through an official who has authority to address the alleged harassment and to institute corrective measures, had actual notice or knowledge of the alleged harassment. See [D.E. 23] 18. CFA argues, however, that Natalie failed to plausibly allege the second and fourth elements. See id.

As for the second element, a plaintiff must plausibly allege that she "suffered sexual harassment that was so severe, pervasive, and objectively offensive that it deprived [her] of equal access to the educational opportunities or benefits provided by" the school. Fairfax Cnty. Sch. Bd., 1 F.4th at 263. A court evaluates this element by considering "a constellation of surrounding circumstances, expectations, and relationships." Davis, 526 U.S. at 651 (quotation omitted); see Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998); Jennings, 482 F.3d at 696. Students may "engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to students subjected to it" without exposing a school to liability under Title IX. Davis, 526 U.S. at 651–52; see Jennings, 482 F.3d at 696. However, the question is whether the harassing conduct "is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect." Davis, 526 U.S. at 652; see Fairfax Cnty. Sch. Bd., 1 F.4th at 263; Jennings, 482 U.S. at 696. A student is denied equal access to the school's educational opportunities and benefits if the harassment "(1) results in the physical exclusion of the victim from an educational program or activity; (2) so undermines and detracts from the victim's educational experience as to effectively deny her equal access to an institution's resources and opportunities; or (3) has a concrete, negative effect on the victim's ability to participate in an educational program or activity." Fairfax Cnty. Sch. Bd., 1 F.4th at 275 (cleaned up); see Jennings, 482 F.3d at 699; Doe ex rel. Pullen-Smith v. Qually, No. 5:20-CV-523-FL, 2021 WL 2546456, at *4–5 (E.D.N.C. June 21, 2021) (unpublished).

As for the fourth element, a plaintiff must plausibly allege that "the school acted with deliberate indifference to the alleged harassment." Fairfax Cnty. Sch. Bd., 1 F.4th at 264. A plaintiff must allege more than mere negligence, but a "half-hearted investigation or remedial action will [not] suffice to shield a school from liability." Id. at 271 (alteration in original; quotation omitted); see S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cnty., 819 F.3d 69, 77 (4th Cir. 2016). Although a school need not "cede to a harassment victim's specific remedial demands," the school must have undertaken "efforts that were reasonably calculated to end the harassment." Hurley, 911 F.3d at 686, 689 (quotation and alterations omitted); see Davis, 526 U.S. at 648; S.B. ex rel. A.L., 819 F.3d at 76–77; Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 669 (2d Cir. 2012). Stated differently, a school acts with deliberate indifference when its response to student-on-student harassment "is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648; see Fairfax Cnty. Sch. Bd., 1 F.4th at 271. Merely listening to students' complaints does not suffice. See Hurley, 911 F.3d at 690. When a school takes only "limited steps in response to the harassing and threatening [conduct], those actions do not preclude Title IX liability." Id.

Taking the allegations in the amended complaint and all reasonable inferences drawn therefrom as true, Natalie's Title IX claim crosses the plausibility line. As discussed, Natalie has plausibly alleged the first element, and CFA does not contest that Natalie has plausibly alleged the third element. As for the second element, Natalie alleges that male students in her AP Literature class made offensive jokes and comments about sexual violence against women, such as stating that women "invite rape" and joking about rape. See Am. Compl. ¶¶ 62–64. For example, during one class session, Natalie alleges that a male student stated, "[W]omen getting raped and murdered, what's wrong with that . . . tale as old as time." Id. ¶ 94. When Natalie objected to this comment, another male student stated, "[N]o, I don't think that any of us here would rape anyone." Id. ¶ 95. A third male student replied, "[D]on't speak for all of us!!!" Id. Natalie alleges the AP Literature teacher did not intervene or respond to comments like these in the classroom. See id. ¶¶ 64, 94.

19

Natalie alleges this conduct was not isolated to one or two class sessions but was repeated and on-going throughout the year-long course and occurred at least on a weekly basis. See id. ¶ 60. Natalie also alleges the male students engaged in this conduct knowing Natalie had been sexually assaulted at a different school and suffered from post-traumatic stress disorder due to the assault. See id. ¶¶ 42–43, 45. And Natalie alleges that the male students specifically directed at least some of this conduct at her after she contested the male students' behavior. See id. ¶ 63; cf. id. ¶ 81.

Natalie also plausibly alleges that the harassment deprived her of equal access to the educational opportunities at CFA. Natalie alleges she experienced anxiety and dread about attending AP Literature class sessions. See Jennings, 482 F.3d at 699 (noting the defendant's harassment affected the plaintiff by making "her feel humiliated, anxious, and uncomfortable," which then affected her athletic participation and academic performance); Am. Compl. ¶ 81. She alleges she experienced frequent panic attacks because of the comments, including at least one such panic attack during class. See Am. Compl. ¶¶ 74, 96. Although she "was fully capable of reading and analyzing the materials" assigned in the course, Natalie studied different materials than other students, and at one point, she self-studied alone for two weeks instead of participating in class because of the male students' conduct. Id. ¶¶ 78, 81. In Spring 2021, when CFA transferred Natalie to a new statistics class, in which some of the same male students from her AP Literature class were also enrolled, Natalie took the class on Zoom, rather than in person, after the school refused to allow her to attend a different statistics class. See id. ¶¶ 84–87. Natalie was the only female student in the statistics class. See id. ¶ 84. Natalie sought counseling because of the male students' in-class behavior. See id. ¶¶ 74, 90. Finally, Natalie also alleges she "struggled to maintain her course load while meeting the expectations of completing college entry requirements for performing arts." Id. ¶ 75. Thus, Natalie has plausibly alleged the second element of her Title IX claim.

As for the fourth element, taking the allegations in the amended complaint and all reasonable inferences drawn therefrom as true, Natalie plausibly alleges that CFA acted with deliberate

20

indifference toward the unwelcome conduct Natalie experienced. Even though "school administrators are entitled to substantial deference when they calibrate a disciplinary response," S.B. ex rel. A.L., 819 F.3d at 77, taking only "limited steps in response to the harassing and threatening [conduct] . . . do[es] not preclude Title IX liability." Hurley, 911 F.3d at 690. Natalie alleges that CFA's response to her concerns was to ask Natalie to alter her own conduct and learning experience. See, e.g., Am. Compl. ¶¶ 78–79, 92. And during one class, one of CFA's proposed remedies—namely, that Natalie advocate better for herself during class sessions—apparently resulted in additional unwelcome conduct. See id. ¶¶ 92–96; cf. Willey v. Bd. of Educ. of St. Mary's Cnty., 557 F. Supp. 3d 645, 662 (D. Md. 2021) ("[A] school can be liable not only where its deliberate indifference effectively causes the harassment, but also where a school's deliberate indifference made a plaintiff more vulnerable to future harassment."). Moreover, where "a school has knowledge that a series of 'verbal reprimands' is leaving student-on-student harassment unchecked, then its failure to do more may amount to deliberate indifference." S.B. ex rel. A.L., 819 F.3d at 77. If failing to follow-up after verbal reprimands prove unsuccessful may indicate deliberate indifference, then issuing no reprimand at all does too. Viewing the amended complaint in the light most favorable to Natalie, CFA teachers and administrators did not intervene or instruct the male students to change their conduct, despite knowing the effects it had on Natalie. See, e.g., Am. Compl. ¶¶ 66, 71–73, 77, 86, 88, 94. Although CFA apparently investigated the misconduct late in the school year, it is unclear how CFA resolved the investigation, and administrators refused to meet with Natalie as a part of the investigation. See id. ¶¶ 104–06, 110, 113, 190. Accordingly, Natalie has plausibly alleged the fourth element of her claim.

Natalie plausibly states a Title IX claim against CFA. Thus, the court denies CFA's motion to dismiss Natalie's Title IX claim.

2.

CFA argues that Elizabeth and Charlotte fail to state retaliation claims under Title IX.

Plaintiffs may bring a private action for retaliation under Title IX. Jackson, 544 U.S. at 171. In order to state a Title IX retaliation claim, a plaintiff must plausibly allege that she (1) "engaged in protected activity under Title IX," and (2) that as a result of engaging in protected activity, she "suffered an adverse action attributable to the defendant educational institution." Hurley, 911 F.3d at 694; cf. Coleman, 626 F.3d at 190. In evaluating Title IX retaliation claims, courts may rely on Title VII retaliation concepts. See Hurley, 911 F.3d at 694 (stating "Title VII retaliation concepts" are relevant in the Title IX context); Preston v. Virginia ex rel. New River Cmty. Coll., 31 F.3d 203, 207 (4th Cir. 1994); cf. Peltier, 2022 WL 2128579, at *16 n.22.

As for the first prong, protected activity includes "oppositional conduct that is prompted by a reasonable belief that [a school] is not in compliance with its Title IX obligations." Lamb v. Liberty Univ., Inc., No. 6:21-cv-00055, 2022 WL 731526, at *3 (W.D. Va. Mar. 10, 2022) (unpublished); cf. DeMasters v. Carilion Clinic, 796 F.3d 409, 417 (4th Cir. 2015); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 282 (4th Cir. 2015) (en banc). For example, protected activity includes "advocating against and reporting sexual harassment." Hurley, 911 F.3d at 694. As for the second prong, the retaliatory action must be a materially adverse action; "that is, it must suffice to dissuade a reasonable person from making or supporting a charge of discrimination." Id. (cleaned up); see Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006).

CFA argues that Charlotte never engaged in protected activity and that even though Elizabeth did engage in protected activity, CFA never retaliated against her for doing so. See [D.E. 23] 25–26. Viewing the amended complaint in the light most favorable to Charlotte and Elizabeth, CFA's arguments fail. CFA does not dispute that Elizabeth engaged in protected activity. According to the amended complaint, Elizabeth engaged in protected activity by talking to the school counselor and an administrator, Fee, about harassment she experienced at CFA. See Am. Compl. ¶¶ 99, 101–02. Moreover, Elizabeth helped prepare and post online a petition advocating against certain male students speaking at graduation. See id. ¶¶ 117–18. These male students were some of the same

22

students that allegedly made unwelcome comments during Natalie's AP Literature class and allegedly harassed Elizabeth. See id. ¶¶ 102, 107. Although the petition itself makes no direct reference to harassment, Elizabeth and other students discussed the petition with the school's counselor and another teacher during conversations about Elizabeth and the other students' opposition to the objectionable graduation speakers because the graduation speakers had allegedly harassed them. See id. ¶¶ 111–18. Thus, the petition was plausibly protected activity because it advocated against sexual harassment. See Hurley, 911 F.3d at 694.

In response to the petition, CFA brought Elizabeth before the school's Honor Council, arguing the petition constituted "retaliation, intimidation, threats, reprisal, false accusations, and/or making false charges." Id. ¶¶ 140, 142. Viewing the amended complaint in the light most favorable to Elizabeth, CFA's charge against Elizabeth suggests CFA did not take seriously the concerns voiced to administrators and then made public in the petition and instead immediately sided with the male students. CFA's ultimatum to John and Kimberly that it would bar Elizabeth from participating in graduation ceremonies if she did not apologize to the male students named in the petition bolsters this conclusion. See id. ¶¶ 165, 170, 174. When Elizabeth did not apologize, CFA excluded Elizabeth and her family from the school's graduation events. See id. ¶¶ 173, 181–83. The Honor Council proceedings and CFA's sanctions against Elizabeth are plausibly retaliatory because Elizabeth had no prior disciplinary history at CFA, she was an excellent student, Ragon and another teacher told Elizabeth the petition was a good idea, and the sanctions CFA levied against Elizabeth were atypical at CFA. See id. ¶¶ 136, 169, 172, 175, 186. Moreover, Elizabeth alleges that CFA imposed these sanctions despite the Honor Council not finding any code of conduct violations or recommending consequences. See id. ¶¶ 161–65, 176. The sanctions also are plausibly retaliatory because CFA omitted all references to Elizabeth during the graduation events. See id. ¶¶ 183, 188. Thus, Elizabeth plausibly alleges CFA retaliated against her for participating in protected conduct.

Charlotte's retaliation claim also crosses the plausibility line. Regardless of whether

Charlotte engaged in protected activity, CFA's decision to forbid Charlotte to re-enroll for the 2021–22 academic year was plausibly a third-party reprisal for Elizabeth's protected activity and John and Kimberly's support of Elizabeth. Notably, the letter from CFA to John and Kimberly expressly cited Elizabeth's conduct and John and Kimberly's "fail[ure] to support and cooperate with the outcome of the school's disciplinary process" as the reasons Charlotte could not re-enroll. Id. ¶ 196.

In Thompson v. North American Stainless, LP, the plaintiff's fiancée engaged in protected activity under Title VII. See 562 U.S. 170, 172 (2011). In retaliation for the fiancée's protected activity, the defendant fired the plaintiff, who sued for retaliation under Title VII. See id. The defendant argued that Title VII does not allow retaliation claims brought by third parties. See id. at 172–74. The Supreme Court rejected that argument and "ha[d] little difficulty" concluding that if the plaintiff's allegations were true, the plaintiff's firing violated Title VII. Id. at 173. The Court concluded that third-party reprisals can constitute unlawful retaliation under Title VII when the third party has a close relationship to the person who engaged in protected activity. See id. at 173–75. Thus, "firing a close family member will almost always meet the" standard for unlawful retaliation under Title VII. Id. at 175. Moreover, in Thompson, the Court concluded that a third party who is fired in retaliation for another's protected activity "falls within the zone of interests protected by Title VII" and can maintain a lawsuit for Title VII retaliation, at least when the third party "is not an accidental victim of the retaliation" or "collateral damage" but instead was "the employer's intended means of harming" the person who engaged in protected activity. Id. at 177–78; see Jarvis v. Bank of Am. Corp., No. 1:10CV896, 2012 WL 6568791, at *6–7 (M.D.N.C. Dec. 17, 2012) (unpublished), report and recommendation adopted, 2013 WL 423133 (M.D.N.C. Jan. 31, 2013) (unpublished).

Because "familiar Title VII retaliation concepts [apply] to the requirements of a Title IX retaliation claim," the court applies Thompson to the facts alleged in plaintiffs' amended complaint.

24

Hurley, 911 F.3d at 694; see A.B. v. Hawaii State Dep't of Educ., 30 F.4th 828, 840–42 (9th Cir. 2022); Ollier v. Sweetwater Union High Sch. Dist., 768 F.3d 843, 866 (9th Cir. 2014); Johnson v. Unified Sch. Dist. 507, No. 20-cv-01162-TC-GEB, 2022 WL 184325, at *3–5 (D. Kan. Jan. 20, 2022); Conviser v. DePaul Univ., 532 F. Supp. 3d 581, 594 (N.D. Ill. 2021); Bigge v. Dist. Sch. Bd., No. 5:13-cv-49-Oc-10PRL, 2015 WL 1138472, at *10 (M.D. Fla. Mar. 13, 2015) (unpublished); T.L. ex rel. Lowry v. Sherwood Charter Sch., 68 F. Supp. 3d 1295, 1314–15 (D. Or. 2014), aff'd sub nom. Lowry v. Sherwood Charter Sch., 691 F. App'x 310 (9th Cir. 2017) (unpublished); cf. Peltier, 2022 WL 2128579, at *16 n.22. Charlotte and Elizabeth are sisters (i.e., close family members). See Am. Compl. ¶ 2. Moreover, CFA's decision not to re-enroll Charlotte is analogous to firing an employee. And, as discussed, Charlotte plausibly alleges CFA's decision not to re-enroll her was retaliation for Elizabeth's protected activity and John and Kimberly's support of Elizabeth. Finally, CFA's allegedly retaliatory actions against Elizabeth and Charlotte would plausibly dissuade other students at CFA from engaging in protected Title IX activity. See Hurley, 911 F.3d at 694. Thus, the allegedly retaliatory actions were materially adverse.

Elizabeth and Charlotte plausibly allege that CFA retaliated against them in violation of Title IX. Accordingly, the court denies CFA's motion to dismiss Elizabeth's and Charlotte's Title IX retaliation claims.

IV.

In addition to their Title IX claims, Elizabeth and Charlotte also allege state-law claims for IIED, NIED, and breach of contract. The court has supplemental jurisdiction over these claims. See 28 U.S.C. § 1367; Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349 (1988); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966); ESAB Grp., Inc. v. Zurich Ins. PLC, 685 F.3d 376, 394 (4th Cir. 2012); Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995).

Plaintiffs' state-law claims arise under North Carolina law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See

Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[4] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

## A.

CFA argues that Elizabeth and Charlotte fail to plausibly allege IIED claims. See [D.E. 23] 26–27. An IIED claim requires a plaintiff to plausibly allege "(1) that the defendant engaged in extreme and outrageous conduct; (2) that the conduct was intended to cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." Sasser v. City of Whiteville, No. 7:10-CV-95-D, 2010 WL 4809039, at *2 (E.D.N.C. Nov. 18, 2010) (unpublished); see Turner v. Thomas, 369 N.C. 419, 427, 794 S.E.2d 439, 446 (2016); Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992); Dickens v. Puryear, 302 N.C. 437, 452–53, 276 S.E.2d 325, 335 (1981).

---

[4] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

To be considered "extreme and outrageous," the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493–94, 340 S.E.2d 116, 123 (1986) (quotation omitted); see Turner, 369 N.C. at 427; 794 S.E.2d at 446; West v. King's Dep't Store, Inc., 321 N.C. 698, 704, 365 S.E.2d 621, 625 (1988). "The liability clearly does not extend to mere insults, indignities, [and] threats . . . ." Wagoner v. Elkin Cnty. Schs.' Bd. of Educ., 113 N.C. App. 579, 586, 440 S.E.2d 119, 123 (1994). North Carolina "has set a high threshold to satisfy this element." Turner, 369 N.C. at 427, 794 S.E.2d at 446 (quotation omitted). Whether conduct is sufficiently outrageous is a question of law for the court. See Lenins v. K-Mart Corp., 98 N.C. App. 590, 599, 391 S.E.2d 843, 848 (1990).

Even viewing the allegations of the amended complaint in the light most favorable to Elizabeth and Charlotte, their allegations do not meet North Carolina's "high threshold" for an IIED claim. Turner, 369 N.C. at 427, 794 S.E.2d at 446 (quotation omitted). Elizabeth and Charlotte suffered insult and indignity because of CFA's allegedly retaliatory conduct, but the allegations do not plausibly allege that CFA's treatment of Elizabeth and Charlotte "was so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" or that it was intended to cause severe emotional distress. Hogan, 79 N.C. App. at 493–94, 340 S.E.2d at 123 (quotation omitted); cf. Buettner-Hartsoe v. Balt. Lutheran High School Ass'n, Civil Action No. RDB-20-3132, 2021 WL 2580385, at *3–9, 19–21 (D. Md. June 23, 2021) (unpublished); B.E. v. Mt. Hope High Sch., No. 2:11-cv-679, 2012 WL 3580190, at *1, 8–9 (S.D.W. Va. Aug. 17, 2012) (unpublished); Rouse v. Duke Univ., 869 F. Supp. 2d 674, 677–78, 681–82 (M.D.N.C. 2012); Johnson v. Thorsen, No. 7:04-CV-156-FL(3), 2005 WL 8159571, at *1–3, 9–10 (E.D.N.C. Apr. 1, 2005) (unpublished). Thus, the court dismisses Elizabeth's and Charlotte's IIED claims.

## B.

CFA argues Elizabeth and Charlotte fail to plausibly allege NIED claims. See [D.E. 23]
27–28. To state an NIED claim, a plaintiff must plausibly allege that "(i) defendant negligently
engaged in conduct; (ii) it was reasonably foreseeable the conduct would cause plaintiff severe
emotional distress; and (iii) the conduct in fact caused plaintiff to suffer such distress." Andersen
v. Baccus, 335 N.C. 526, 531, 439 S.E.2d 136, 139 (1994); Johnson v. Ruark Obstetrics &
Gynecology Assocs., P.A., 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990); Acosta v. Byrum, 180 N.C.
App. 562, 567, 638 S.E.2d 246, 250 (2006). "When the plaintiff's complaint alleges acts of
discrimination that are intentional in nature, and simply concludes that the acts were committed
negligently, [the complaint] is insufficient to state a claim for negligent infliction of emotional
distress." Barbier v. Durham Cnty. Bd. of Educ., 225 F. Supp. 2d 617, 631 (M.D.N.C. 2002);
Mitchell v. Lydall, Inc., 16 F.3d 410, 1994 WL 38703, at *3 (4th Cir. 1994) (per curiam)
(unpublished table decision); Sasser, 2010 WL 4809038, at *3. An NIED claim is "subject to
dismissal when 'the material factual allegations charge nothing but intentional acts.'" Fisher v.
Frontline Nat'l, No. 1:18-cv-00193-MOC-WCM, 2019 WL 1048848, at *4–5 (W.D.N.C. Mar. 5,
2019) (unpublished) (quoting Mitchell, 1994 WL 38703, at *3).

Elizabeth and Charlotte fail to plausibly allege NIED claims. The amended complaint's
"material factual allegations" center on CFA's allegedly retaliatory conduct toward them. Mitchell,
1994 WL 38703, at *3. "Retaliation is, by definition, an intentional act." Jackson, 544 U.S. at
173–74. Although parties may plead inconsistent claims as alternative theories of liability, see Fed.
R. Civ. P. 8(d)(3), the allegations in the complaint must support each theory. Elizabeth and
Charlotte, however, attempt to repackage CFA's intentional, retaliatory conduct toward them as
negligence. Yet where a "plaintiff's compliant alleges acts of discrimination that are intentional in
nature, and simply concludes that the acts were committed negligently, it is insufficient to state" an
NIED claim. Barbier, 225 F. Supp. 2d at 631; see Mitchell, 1994 WL 38703, at *3; Wicks v. La'Car

of N.C., Inc., No. 1:20CV934, 2021 WL 5177710, at *6 (M.D.N.C. Nov. 8, 2021) (unpublished); Barrow v. Branch Banking & Tr. Co., No. 3:16-CV-675-RJC-DCK, 2017 WL 3222660, at *6 (W.D.N.C. July 7, 2017), report and recommendation adopted, 2017 WL 4124180, at *3–5 (W.D.N.C. Sept. 18, 2017) (unpublished); Gauthier v. Shaw Grp., Inc., No. 3:12-cv-00274-GCM, 2012 WL 6043012, at *8–9 (W.D.N.C. Dec. 4, 2012) (unpublished); Riepe v. Sarstedt, Inc., No. 5:09-CV-00104, 2010 WL 3326691, at *4–5 (W.D.N.C. Aug. 23, 2010) (unpublished); Johnson, 2005 WL 8159571, at *10. Accordingly, the court dismisses Elizabeth's and Charlotte's NIED claims.

## C.

CFA argues Elizabeth and Charlotte fail to plausibly allege their claims for breach of contract and breach of the covenant of good faith and fair dealing. See [D.E. 23] 28–30. The elements of a breach of contract claim are "(1) the existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); see Wells Fargo Ins. Srvs. USA, Inc. v. Link, 372 N.C. 260, 276, 827 S.E.2d 458, 472 (2019) (per curiam); Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 226–28, 333 S.E.2d 299, 303–05 (1985); Moss v. N.C. Dep't of State Treasurer, 876 S.E.2d 113, 117 (N.C. Ct. App. 2022); Supplee v. Miller-Motte Bus. Coll., Inc., 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015).

Under North Carolina law, contracts implicitly contain "the basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform [its] obligations under the agreement." Maglione v. Aegis Fam. Health Ctrs., 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) (quotation omitted); see Bicycle Transit Auth., 314 N.C. at 228–29, 333 S.E.2d at 305; see also Sasso v. Tesla, Inc., No. 5:21-CV-24-D, 2022 WL 363850, at *9 (E.D.N.C. Feb. 7, 2022). Where parties have executed a written contract, an action for "breach of the covenant of good faith and fair dealing is part and parcel of a claim for breach of contract." McKinney v. Nationstar Mortg., LLC, No. 5:15-CV-637-FL, 2016 WL

29

3659898, at *8 (E.D.N.C. July 1, 2016) (unpublished) (quotation and alteration omitted); see Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996). Although breach of the implied covenant of good faith and fair dealing sometimes can be a separate claim from breach of contract,[5] North Carolina courts have held that where there was no breach of contract, "it would be illogical . . . to conclude that [the party] somehow breached implied terms of the same contracts." SunTrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C. App. 821, 833, 732 S.E.2d 594, 603 (2012); see Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 368 N.C. 440, 451, 781 S.E.2d 1, 9 (2015); see also Sasso, 2022 WL 363850, at *9; Sutherland v. Domer, No. 1:17CV769, 2018 WL 4398259, at *5 (M.D.N.C. Sept. 14, 2018) (unpublished) ("When a plaintiff's claim for breach of the implied covenant of good faith is based on an alleged breach of the express terms of the contract, these two claims are treated as a single breach of contract issue and evaluated together. . . . Where a plaintiff argues that the implied covenant was breached separate and apart from express breaches of the contract, it remains true that the implied covenant can never produce a result contrary to, or inconsistent with, the express language used in the agreement." (citation omitted)). Because Elizabeth and Charlotte allege breach of contract and breach of the covenant of good faith and fair dealing as part and parcel of the same claims, see Am. Compl. ¶¶ 285–308, the court treats them "as a single breach of contract issue" and evaluates them together. Sutherland, 2018 WL 4398259, at *5.

John and Kimberly executed enrollment contracts with CFA for the 2020–21 academic year, of which Elizabeth and Charlotte were beneficiaries. See Am. Compl. ¶ 47. John and Kimberly also executed an enrollment contract for Charlotte for the 2021–22 academic year. See id. ¶ 49. Plaintiffs allege that these enrollment contracts incorporated CFA's student handbook by reference. See id. ¶¶ 50(d), 53, 289, 292. Plaintiffs allege that the student handbook states: "No adverse action

_____

[5] See Nadendla v. WakeMed, 24 F.4th 299, 307–08 (4th Cir. 2022); Golden Corral Corp. v. Illinois Union Ins. Co., 559 F. Supp. 3d 476, 491–92 (E.D.N.C. 2021), appeal docketed, No. 21-2119 (4th Cir. Oct. 8, 2021).

will be taken against any person who makes a good faith report of bullying, harassment, or hazing. Retaliation in any form against anyone for making a good faith complaint under this policy or for participating in an investigation is strictly prohibited." Id. ¶ 58 (emphasis omitted). Moreover, according to Fee, being prohibited from attending graduation events is not listed in the student handbook as an available sanction. See id. ¶ 136. Yet the student handbook states that "[t]he school's rules, consequences and procedures for a violation will be disseminated and applied consistently to ensure that consequences are predictable." Id. ¶ 169.

Taking these allegations and all reasonable inferences drawn therefrom as true, Elizabeth has plausibly alleged a breach of contract claim. As discussed, Elizabeth plausibly alleges that CFA unlawfully retaliated against her in violation of Title IX. Elizabeth also plausibly alleges the existence of a valid enrollment contract of which she was a beneficiary, and she plausibly alleges that the contract incorporated by reference provisions in CFA's student handbook stating retaliation for claims of bullying or harassment is prohibited and that CFA would not impose disciplinary sanctions inconsistent with those in the handbook. Finally, Elizabeth plausibly alleges CFA breached these contractual terms by retaliating against her for speaking out regarding claims of sexual harassment and by imposing a punishment not listed in the handbook.

Charlotte's breach of contract claim focuses on the 2021–22 enrollment contract, not her 2020–21 enrollment contract. See Am. Compl. ¶¶ 297–308. Charlotte plausibly alleges a breach of contract claim. The contract reserved for CFA "the right to immediately terminate or not renew a student's Enrollment Contract if the school, in its sole discretion, concludes that the actions of a parent or guardian unreasonably impedes a constructive relationship or otherwise materially interferes with the School's accomplishment of its mission." Am. Compl. ¶ 50(e). Thus, CFA had unilateral authority under the contract to terminate Charlotte's re-enrollment based on its assessment that John and Kimberly acted in a way that impeded a constructive relationship with CFA or interfered with CFA's mission. However, "[w]here a contract confers on one party a discretionary

power affecting the rights of the other, this discretion must be exercised in a reasonable manner based on upon good faith and fair play." Dysart v. Cummings, 181 N.C. App. 641, 647, 640 S.E.2d 832, 836 (quotation omitted), aff'd, 361 N.C. 580, 650 S.E.2d 593 (2007) (per curiam); see Strategic Outsourcing, Inc. v. Continental Cas. Co., 274 Fed. App'x 228, 233 (4th Cir. 2008) (per curiam) (unpublished); Mezzanotte v. Freeland, 20 N.C. App. 11, 17, 200 S.E.2d 410, 414 (1973); Am. Compl. ¶ 303. This requirement applies to cancellation provisions in a contract in which the discretionary cancellation is contingent upon the existence of a specified cause. See Strategic Outsourcing, 274 Fed. App'x at 233.

A factfinder could conceivably view CFA's actions as reasonable in light of the breakdown in the relationship between CFA and John and Kimberly over Elizabeth's actions. However, it is equally plausible in light of Charlotte's good standing academically and behaviorally and her Title IX retaliation allegations that CFA's decision not to re-enroll Charlotte was unfair and made in bad faith. See Am. Compl. ¶¶ 301–02. Thus, viewing the amended complaint in the light most favorable to Charlotte, Charlotte's breach of contract claim crosses the plausibility line.

V.

In sum, the court GRANTS IN PART and DENIES IN PART defendant's motion to dismiss [D.E. 22]. The court DISMISSES WITHOUT PREJUDICE Elizabeth's and Charlotte's IIED and NIED claims. Plaintiffs may proceed with their respective Title IX and breach of contract claims. The parties SHALL confer and file a discovery plan pursuant to Federal Rule of Civil Procedure 26. The parties also SHALL engage in a court-hosted settlement conference with United States Magistrate Judge James E. Gates.

SO ORDERED. This 17 day of June, 2022.

JAMES C. DEVER III
United States District Judge