IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO.: 7:21-cv-00169-D

| | | |
|---|---|---|
| ELIZABETH KARANIK, and CHARLOTTE KARANICK, by her parents andnext friends, JOHN KARANIK and wife, KIMBERLY KARANIK | : : : : : | |
| Plaintiffs, | : : | **SECOND AMENDED AND RESTATED COMPLAINT** (Jury Trial Demanded) |
| vs. | : : | |
| CAPE FEAR ACADEMY, INC. | : : : | |
| Defendant. | : : | |

**NOW COME** the Plaintiffs, by and through their attorneys, pursuant to the provision of Rule 15(a)(2) of the Federal Rules of Civil Procedure, and hereby amend their Amended Complaint (D.E. 20) as follows:

Plaintiffs, complaining of the Defendant, allege and say:

## THE PARTIES

1.    The Plaintiff Elizabeth  Karanik (herein "B"), at all times herein mentioned was a citizen and resident of New Hanover County, North Carolina, and a senior at Cape Fear Academy, Inc. ("CFA") during the 2020-21 academic year.

2.    The Plaintiff Charlotte Karanik (herein "Charlotte"), B's sister, is a 16-year-old female who resides with her parents, John Karanik and wife, Kimberly Karanik ("John and Kim"), and at all times herein mentioned, Charlotte was a student at CFA and at the time of the unlawful action taken by CFA, having successfully completed, both academically and behaviorally, her sophomore year and

was a rising junior at CFA for the 2021-22 academic year. Charlotte brings this action against CFA through her next friends and parents, John and Kim, who are both citizens and residents of New Hanover County, North Carolina.

3.     When this action was filed on October 6, 2021, the Plaintiffs sought to litigate the issues in this case under a pseudonym, in order to preserve the substantial privacy rights of B, and Charlotte in a matter of a sensitive and highly personal nature, namely, the sexual harassment, unwelcome conduct, and bullying, on the basis of their sex, to which B was subjected, and the retaliation to which both B and Charlotte were subjected to after B, Charlotte and other students at CFA engaged in protected activity by complaining about conduct from certain male students at CFA to which they had been subjected and then posting a petition contending that those male students' values did not conform to those at CFA. However, on December 3, 2021, the Defendant filed a Motion to Dismiss (D.E. 18) which contended that the Plaintiffs' Complaint should be dismissed because the Plaintiffs were proceeding under a pseudonym, even though the Defendant knew each of their true identities. In order to avoid the delays attendant to litigating the Defendant's Motion, the Plaintiffs instead chose to proceed with this action in their given names.

4.     Defendant Cape Fear Academy, Inc. (herein "CFA"), is upon information and belief, a non-profit corporation organized and existing under the laws of the State of North Carolina with its principal place of business located in New Hanover County, North Carolina.

5.      Ed Ellison (herein "Ellison") has at all times relevant to this action been an employee and agent of CFA, serving as "Head of School".

6.      Tobi Ragon has at all times relevant to this action been an employee and agent of CFA, serving as Upper School Guidance Counselor and Psychology Teacher.

7.      Jamison Fee has at all times relevant to this action been an employee and agent of CFA, serving as "Dean of Student Life" for the Upper School.

8.      Lynne Kenney has at all times relevant to this action been an employee and agent of CFA, serving as "Upper School Director".

## JURISDICTION AND VENUE

9.      This matter is properly before this Court because it involves issues of federal questions relating to Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 anti-discrimination laws and their application; the Coronavirus Aid, Relief and Economic Security Act (the "CARES Act"); the United States Code of Federal Regulations pertaining to financial assistance provided through the United States Small Business Administration ("SBA").

10.     This Court has federal question jurisdiction, as well as supplemental jurisdiction, pursuant to 28 U.S.C. § 1367 and 28 U.S.C. § 1331 because: (a) the Plaintiffs' primary claims are federal questions; and (b) the state law claims are closely related thereto, thereby forming the same "case or controversy", under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over the parties hereto because all either reside or conduct business primarily in New Hanover County, North Carolina.

12.    Venue properly lies in the Southern District of the Eastern District of North Carolina, pursuant to 28 U.S.C. § 1391, because all or a substantial part of the events or omissions giving rise to this action occurred in this District, specifically, in Wilmington, New Hanover County, North Carolina.

## FACTUAL ALLEGATIONS

13.    CFA is a private, non-denominational school (K-12) located in Wilmington, North Carolina, with a Lower School, Middle School and Upper School. At all times material to the allegations contained herein for the 2020-21 academic year, CFA was a recipient of Federal financial assistance, namely, a "PPP" loan provided for under the CARES Act, and administered by the SBA, in the amount of $1,253,949 in April, 2020.  Upon information and belief, CFA's PPP loan has been "forgiven" pursuant to the provisions of the CARES Act.

14.    The declared public policy of the United States Congress is that the United States Government, in part, through the SBA, "….should aid, counsel, assist and protect, insofar as possible, the interests of small-business concerns in order to preserve free competitive enterprise…..and to maintain and strengthen the overall economy of the Nation." 15 U.S.C.A. § 631(a).

15.    In response to the COVID-19 pandemic, and pursuant to Congress' declared public policy, the United States Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), which was signed into law on March 27, 2020.  *See* 15 U.S.C.A. § 636(36)

– Paycheck Protection Program. Section 1102 of the CARES Act temporarily created the "Paycheck Protection Program" ("PPP"), a new loan program to be administered by the SBA.

16. The CARES Act provided that PPP loans would be forgiven, under certain circumstances (15 U.S.C. § 636m) and that the SBA would pay the lender the amount forgiven, to the extent the borrower used the funds for certain purposes, including for payroll expenses. *See* 15 U.S.C. § 9005.

17. CFA is a "recipient" as that term is defined under 34 C.F.R. § 106.2(i) and 13 C.F.R. § 113.105.

18. CFA is an "educational institution" under 13 C.F.R. § 113.105.

19. The regulations that govern the SBA provide that any "grant or loan of financial assistance" constitutes "federal financial assistance." 13 C.F.R. § 113.105. Any guaranty agreement for the repayment of a PPP loan is between the SBA and an approved SBA lender, but a borrower, like CFA, under the PPP loan program is the recipient of federal financial assistance.

20. The SBA itself makes clear on its website that "[t]he Small Business Administration works with different organizations to provide *federal financial assistance programs*" which the SBA notes to include the "Paycheck Protection Program." (www.sba.gov/funding-programs/loans/covid-19-relief-options)

21. As a condition of CFA's application for the PPP loan that it obtained, and pursuant to the SBA regulations governing CFA's PPP loan, CFA was required to provide, and upon information and belief in fact, did provide, an assurance in its

loan application "….that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations." 13 C.F.R. § 113.115.

22.     In order to obtain its PPP loan, CFA was required to complete, and upon information and belief, did complete, a loan application (SBA Form 2483), which contains a statement ("Civil Rights (13 C.F.R. 112, 113 and 117 of SBA Regulations)") that "[a]ll businesses receiving SBA financial assistance must agree not to discriminate in any business practice….on the basis of categories cited in 13 C.F.R., Parts…113…of SBA Regulations…," Part 113 being the provisions of Title IX.

23.     Further, CFA's application for the PPP loan it obtained made it clear that it would be submitted to "your SBA participating lender" and that submission of the application "is required to make a determination regarding eligibility for *financial assistance.*"

24.     Thus, not only did the application that CFA completed to obtain its PPP loan affirmatively provide that CFA would be receiving "financial assistance," CFA specifically agreed that it would not discriminate on the basis of categories cited in Title IX.

25.     Separately, the lender through whom CFA obtained its PPP Loan completed its own application with SBA in order to ensure that SBA would guaranty to the lender payment of the PPP Loan, and the lender's application also contained assurances that CFA agreed not to discriminate on the basis of categories cited in Title IX.

26. Pursuant to the SBA regulations governing CFA's PPP loan, CFA was required to designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the Title IX regulations, including any investigation of any complaint communicated to such recipient alleging its noncompliance with these Title IX regulations or alleging any actions that would be prohibited by these Title IX regulations. 13 C.F.R. § 113.135.

27. Upon information and belief, CFA did not consider, during the 2020-21 academic year, that it was the recipient of federal financial assistance, and therefore, did not believe that the provisions of Title IX applied to its activities. Accordingly, during the 2020-21 academic year, CFA made no efforts to comply with the provisions of Title IX.

28. Further, pursuant to Title IX, CFA was required to notify all its students and employees the name, office address, and telephone number of the employee or employees appointed, and to adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by Title IX regulations.

29. Upon information and belief, during the 2020-21 academic year at CFA, and prior to CFA's PPP loan being forgiven, CFA did not designate at least one employee to coordinate its efforts to comply with and carry out responsibilities under Title IX regulations, and therefore, did not notify students at CFA of any such employee appointed, and did not adopt and publish grievance procedures providing

for prompt and equitable resolution of student complaints alleging any action that would be prohibited by Title IX regulations.

30.     Pursuant to the SBA regulations governing CFA's PPP loan, neither B, nor any other student at CFA, during the 2020-21 academic year, on the basis of sex, could be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupations, training or other education programs or activities operated by CFA, which would include graduation exercises and the activities associated therewith. 13 C.F.R. § 113.400.

31.     During the 2020-21 academic year, and prior to the forgiveness of CFA's PPP loan, CFA was prohibited, on the basis of sex: (a) from treating one student differently from another; (b) from providing different aid, benefits or services or providing aid, benefits, or services in a different manner; (c) denying any student any such aid, benefit or service; (d) subjecting any student to separate or different rules of behavior, sanctions, or other treatment; or (e) otherwise limiting any student in the enjoyment of any right, privilege, advantage or opportunity. 13 C.F.R. § 113.400.

32.     During the 2020-21 academic year, and prior to the forgiveness of CFA's PPP loan, CFA was prohibited from intimidating, threatening, coercing, or discriminating against B and other students at CFA for the purpose of interfering with any right or privilege secured by Title IX, or from retaliating against B and any other students at CFA because they made a report or complaint about sexual harassment.

33.     Retaliation, intimidation, threats, coercion or discrimination include charges against a student at CFA for alleged "code of conduct violations" that do not involve sexual discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX.

34.     During the 2020-21 academic year, and prior to the forgiveness of CFA's PPP loan, CFA was required to take actions to affirmatively respond to any allegations of sexual harassment by a student by offering supportive measures designed to restore or preserve a student's equal educational access.

35.     On May 19, 2020, to become effective August 14, 2020, the United States Department of Education, Office of Civil Rights, after receiving comments from various Federal agencies, including the SBA, adopted a "final common rule" amending the "regulations implementing Title IX….The final regulations specify how recipients of Federal financial assistance covered by Title IX, including elementary and secondary schools…..must respond to allegations of sexual harassment consistent with Title IX's prohibition against sex discrimination." *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*", 85 FR 30026-01, 2020 WL 2525707 (herein "2020 Final Title IX Rule").

36.     During the 2020-21 academic year, and prior to the forgiveness of CFA's PPP loan, CFA was required to comply with and enforce the provisions of the 2020 Final Title IX Rule.

37. Pursuant to Title IX, "sexual harassment" is a form of discrimination.

38. "Sexual harassment" under Title IX means, among other things, "unwelcome conduct determined by a reasonable person to be so severe, pervasive and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30

39. The 2020 Final Title IX Rule makes clear that "[t]o the extent that conduct understood as 'bullying' is also conduct on the basis of sex" that meets the definition of "sexual harassment," then "bullying" is also "Title IX sexual harassment." 85 FR 30026-01, 30497.

40. During the 2020-21 academic year, CFA had approximately 700 students in grades pre-K through 12. CFA's class size is small (for instance, it's 2021 graduating Senior Class was approximately 63 students, including B) and for that reason, students in CFA's Upper School know each other well and interacted with each other frequently, both inside and outside of school.

41. At all times herein mentioned, during the 2020-21 academic year, B was a senior at CFA, and Charlotte was a sophomore. At all times herein mentioned, CFA had a duty to protect B, Charlotte and other students at CFA from sexual harassment, unwelcome conduct, and therefore, bullying, on the basis of their sex, to avoid retaliating against any CFA student for participating in "protected activity," like complaining of sexual discrimination and/or harassment, to avoid subjecting B, and other students at CFA to different rules of behavior, sanctions or other treatment and to otherwise enforce the provisions of Title IX. Furthermore, at all times herein

mentioned, CFA had a duty to respond appropriately and reasonably to any acts of sexual harassment that have been alleged or complained of by B, Charlotte and/or any other student at CFA.

42.     Prior to the 2020-21 academic year, B, who had attended CFA since her 9th grade year, had suffered from a number of medical issues, and during her 10th grade year on into her 11th grade year had been the victim of unwelcome conduct, including bullying, on the basis of her sex, from specific male students at CFA, including her former boyfriend (who is also one of the male students in the third-party, Natalie Pressley's (herein "Natalie"), AP Literature class, set forth below). This unwelcome conduct on the basis of B's sex was sexual in nature and was conduct that referenced or was aimed at females generally and B specifically, and was both verbal and nonverbal, including her former boyfriend calling her a "slut" and a "whore"; seeing her at parties and referring to her as a "whore" to others; starting rumors about B, including that she was crazy; B being pushed into a pool by her former boyfriend, not in a "funny" or "friendly" way, but in a mean, malicious way; based on what had been started by her former boyfriend, other male students teasing B about or challenging her to have sex with other male students, and these specific male students would thereafter laugh or make gestures towards her. These incidents of sexual harassment were open and notorious and often took place on school grounds or at school activities. Most everyone at CFA either witnessed or heard about these incidents, including faculty and staff at CFA.

43.     Given the size of CFA, it was virtually impossible for B to escape these specific male students, who she saw on almost a daily basis, and by the 2020-21 academic year B had actively sought professional therapy for both anxiety and depression related to the sexual harassment, unwelcome conduct and bullying on the basis of her sex to which she was being subjected by specific male students at CFA.

44.     The unwelcome conduct to which B had been subjected prior to the 2020-21 academic year was severe, pervasive and/or objectively offensive, and a reasonable person would have found that unwelcome conduct to be hostile and/or abusive, and that B herself subjectively perceived to be hostile and/or abusive.   In order to attend CFA, B was forced to be around these male students almost daily and given that her circle of friends at CFA was relatively small, B was forced to be around and interact with these certain male students outside of CFA.   However, B's claims, as contained herein, are not based upon any conduct that occurred prior to the 2020-21 academic year (because she did not believe that there was anything that she could do about it), but are premised upon the retaliation by CFA against B and Charlotte for B having engaged in protected activity, complaining of sexual harassment by certain male students at CFA, and supporting her friend Natalie who had been the victim of sexual harassment, unwelcome conduct and bullying on the basis of her sex.

45.     Natalie had attended CFA since Pre-K through 9th grade, and returned to CFA the 2020-21 academic year for her senior year, after attending boarding school for several years.   However, during her sophomore year at her boarding school, Natalie was sexually assaulted, and by the time she returned to CFA for her senior

year, Natalie had been diagnosed with and was suffering from "Post Traumatic Stress Disorder" ("PTSD") associated with her sexual assault. By the Fall of 2020, CFA was specifically aware of Natalie's diagnosis and the sexual assault that was the basis of that diagnosis.

46.     Natalie was open with those at CFA regarding her PTSD diagnosis, and by the Fall of 2020, staff members and teachers at CFA and most every member of the Senior Class at CFA, including B, and upon information and belief, the specific male students that subjected Natalie to sexual harassment and unwelcome conduct on the basis of her sex in the AP Literature Class, knew about Natalie's sexual assault and the related PTSD from which she suffered.

47.     During the 2020-21 academic year, Natalie was enrolled in an AP Literature class, and during the Fall of 2020, Natalie shared with her AP Literature teacher the sexual assault that she had experienced, and the related PTSD diagnosis, as Natalie was concerned that some of the material to which she could be subjected in this class would "trigger" emotional responses, including panic attacks, most especially any materials that depicted violence, sexual assault or other degrading behavior towards women.

48.     Natalie also brought her concerns to the attention of Tobi Ragon, a counselor at CFA, and together with Natalie's AP Literature teacher, certain accommodations were made for Natalie, including permitting her to leave the room when certain scenes were depicted in movies or literature. Therefore, even though Natalie's circle of friends knew the sexual assault that she had been subjected to and

the related PTSD from which she was suffering, so did those in the AP Literature class, as again, Natalie was not trying to hide this from anyone.

49. Charlotte, B's sister, had attended CFA since Middle School, and, like B, is an incredibly bright, high-achieving high school student that chose to attend CFA to help prepare her for college, believing that CFA offered her a more significant academic challenge than any other public or private high schools located in New Hanover County, North Carolina.

50. For the 2020-21 academic year, B and Charlotte attended CFA pursuant to separate enrollment contracts with CFA, with B and Charlotte the intended beneficiaries of those enrollment contracts.

51. By February, 2021, Charlotte had developed a tight circle of trusted friends and faculty members at CFA, and was on her way to achieving great things, both academically and socially, at CFA, and but for the unlawful actions of CFA, would have done so.

52. On or about February 12, 2021, John and Kim executed, on Charlotte's behalf, an "Enrollment Contract 2021-22 Academic Year" (herein collectively "Enrollment Contract" or "B's Enrollment Contract" or "Charlotte's Enrollment Contract").

53. B and Charlotte were the intended beneficiaries of these Enrollment Contracts, each of which provided, in part:

  a. That "enrollment is on a first-come, first-served basis and that a space will not be reserved for the child named herein until…..the School…receives

this signed Enrollment Contract....along with the non-refundable/non-transferable deposit..."

     b.     That the "School's performance of its obligation under this Contract is conditioned upon my/our child's successful completion of his or her current school year in good standing, both academically and behaviorally."

     c.     That "[i]f after completion of the current school year, the School determines in its sole discretion that my/our child has not met this requirement, the School has the right to unilaterally cancel this Contract by refunding to me/us all tuition paid under this Contract, exclusive of the Deposit."

     d.     That "it is understood that in signing this Contract *for the upcoming year*, I/we am/are agreeing to accept and support the School in its mission, philosophy and policies including moral, academic, behavioral, dress, conduct and disciplinary standards, and rules and regulations of the School as stated in the applicable parent/student handbook ('Handbook')."

     e.     That the "School believes that a positive and constructive working relationship between the school and a student's parents/guardians is essential to the accomplishment of the school's educational mission. The School accordingly reserves the right to immediately terminate or not renew a student's Enrollment Contract if the School, in its sole discretion, concludes that the actions of a parent or guardian unreasonably impedes a constructive relationship or otherwise materially interferes with the School's accomplishment of its mission."

54.     Prior to and during the 2020-21 academic year, John and Kim had a constructive relationship with CFA, and Kim was a substitute teacher at CFA for several years.  At no time prior to or during the 2020-21 academic year, or after the execution of either B or Charlotte's Enrollment Contract, did John or Kim "materially interfere" with CFA's accomplishment of its mission, and but for the unlawful conduct and retaliation to which B was subjected, John and Kim fully supported that mission.

55.     Neither B, Charlotte, and upon information and belief, any other student at CFA, ever received, during the 2020-21 academic year (or for that matter, prior thereto) any notice or training on what a student could or should do if they felt they were subjected to sexual harassment or other unwelcome conduct on the basis of their sex, and most certainly were never told that during the 2020-21 academic year.

56.     CFA did have, however, during the 2020-21 academic year an "Upper School Student Handbook (herein, the "CFA Handbook") which is incorporated into and part of the Enrollment Contracts that John and Kim executed with CFA on behalf of both B and Charlotte.

57.     The CFA Handbook makes no reference to Title IX, but contains various "Bullying, Harassment, and Hazing Policies (hereinafter "Policies")" and provides that "Cape Fear Academy is dedicated to fostering an environment that promotes kindness and  acceptance and embraces differences among individuals.  Therefore, CFA will not tolerate any type of bullying, harassment or hazing."  The Policies separately define "bullying" and "harassment" (to include "sexual harassment").  The

Policies provide "types of bullying." including "verbal bullying," "social bullying," sometimes referred to as "relational bullying," and "Cyber bullying". The Policies provide "Examples of Bullying Behavior" and "Examples of Harassment Behavior."

58. The Policies provide "[w]hat a student should do if s/he feels bullied, harassed or hazed," which includes, *inter alia*, "[l]ook at the person bullying you and tell him or her to stop in a calm, clear voice;" "[p]romptly talk to an adult you trust. Don't keep your feelings inside. Telling someone can help you feel less alone. The adult, especially an adult you trust at school, can help you make a plan to stop the bullying." These Policies encourage students to "stand up for others," to "talk to a parent, teacher or another adult you trust." "Adults need to know when bad things happen so they can help." Those Policies further provide that "[n]ot saying anything could make it worse. The student who is bullying will think it is ok to keep treating others that way." As it pertains to the bullying and sex-based conduct to which B and Natalie and other female students at CFA were subjected, CFA would simply ignore these Policies.

59. The Policies provide "[w]hat parents should do if they think their child may be being bullied, harassed or hazed," and includes "[t]alk to the school counselor, CFA teacher, and/or Division Director right away. We CAN help." The Policies provide that "[t]hose who know about bullying and do not report it are unintentionally sending messages that adults don't know how to help or that it isn't important." As it pertains to the Policies' provision regarding talking to a school counselor, a CFA teacher, and the promise "We CAN help."

60. CFA would ultimately ignore those Policies, *intentionally* sending B (against whom CFA retaliated against for doing the very thing that its Policies promote), and Charlotte (who signed the Petition which spoke out against what Charlotte believed to be sexual harassment and unwelcome conduct that certain male students at CFA had engaged in), and other female students at CFA the message that "adults don't care," and even worse, that if a CFA student dared to complain and speak out about students being the victim of sexual harassment, unwelcome conduct and/or bullying, it would be the victims or students that voiced their complaints that would face consequences.

61. The Policies also contain a provision on "reporting" concerns relating to bullying, harassment, or hazing, which provides in pertinent part:

> All concerns relating to bullying, harassment, or hazing should be reported immediately to school officials. We also expect that anyone, whether students, faculty, staff or **family member** who witnesses, or has knowledge of an incident of bullying, harassment, or hazing, will report the incident to administration immediately. When the school administration becomes aware of bullying, harassment, or hazing, the situation will be promptly investigated. Any student found to have violated this policy will be subject to disciplinary action, up to and including dismissal from school for serious violations. No adverse action will be taken against **any person** who makes a good faith report of bullying, harassment or, hazing. Retaliation in any form against **anyone** for making a good faith complaint under this policy or for participating in an investigation is strictly prohibited . . . .

> CFA is committed to investigating all instances of reported harassment and bullying. If reports are confirmed, consequences will be given to the perpetrator so that the victim is protected and safe. CFA faculty and staff will work carefully with students who have been victims of bullying and harassment so they are emotionally supported. Perpetrators will receive disciplinary consequences up to dismissal and depending on the offense may

be given a limited chance to change behaviors and receive counseling and support to do so.

62.    As set forth with more particularity below, CFA simply ignored its own Handbook and the provisions of Title IX, knowing that B and other female students at CFA had complained of bullying and sexual harassment, knowing that they were each protected from retaliation for simply speaking up and for having engaged in protected activity.

63.    CFA generally, and the Senior Class at CFA specifically, is small, and this conduct by these certain male students towards B and Natalie (as set forth below) was severe, pervasive, or objectively offensive that it effectively denied her equal access to education at CFA.  Sometimes on a daily basis, but certainly on a weekly basis, female students were subjected to this conduct on the basis of their sex that a reasonable person would have found to be hostile and/or abusive, and that B herself subjectively perceived to be hostile and/or abusive.

64.    During the 2020-21 academic year, Natalie, a victim of sexual assault, was subjected to sexual harassment, unwelcome conduct and bullying, on the basis of her sex, from certain male students at CFA that a reasonable person would find hostile or abusive, and that Natalie herself subjectively perceived to be hostile and/or abusive,  and that denied and/or interfered with Natalie's access to an equal educational opportunity, as set forth below.

65.    Natalie was placed in an AP Literature class in which there were nine (9) male students during the Fall of 2020, and she remained in that class during the entirety of the 2020-21 year.

66. Very soon after the start of this AP Literature class in the Fall of 2020, certain male students subjected Natalie, who they and the classroom teacher knew to be a victim of sexual assault with related PTSD, to sexual harassment, unwelcome conduct and bullying on the basis of her sex, that a reasonable person would find hostile or abusive, and that Natalie herself subjectively perceived to be hostile and/or abusive, and that denied and/or interfered, in an effective and material way, with Natalie's access to an equal educational opportunity. Certain male students would tease her when she "pushed back" against their unwelcome conduct and behavior; make inappropriate sexual comments and lewd and offensive comments about women, including that women "invite" rape; make jokes about rape; laughing and joke when class content depicted physical and/or sexual violence towards women, as well as other "off-color," unwelcome comments and conduct.

67. These same male students, when analyzing characters from books that the class was assigned to read, would make assumptions about a female character's sexuality, and perpetrated the idea that a female character cared more about their makeup, hair and general appearance than anything. Further, these male students consistently referred to ideas of maternity and caretaking about female characters when those themes were not supported by any text within the books or stories that the class was assigned to read. Natalie attempted to rebuff these stereotypes of women while she was in class, but neither these certain male students nor the AP Literature teacher appeared to take Natalie's concerns seriously.

68.     This AP Literature class met three (3) times per week, and to be clear, the comments from these certain male students were not intended, Natalie and any objective person would have believed, to contribute, in any meaningful way, to an "academic" discussion of the material.  These comments were severe, pervasive and objectively offensive and interfered, in an effective and material way, with Natalie's equal access to education and created a hostile environment in this classroom.  Unless Natalie simply chose not to go to class, she was forced to deal with these male students and their comments.

69.     As Natalie attempted to work through the unwelcome conduct to which she had been subjected, in the Fall of 2020, Natalie first took her concerns, at the suggestion of her AP Literature teacher, to CFA's Counselor (who was also Natalie's AP Psychology teacher), Tobi Ragon, who at all times herein mentioned not only had actual knowledge of the sexual harassment, unwelcome conduct and bullying to which B, Natalie and other female students at CFA had been subjected, but provided this knowledge to others at CFA, all of whom, either individually or collectively, not only had the authority to undertake reasonable measures to protect Natalie, but had a duty and obligation to protect the students and respond promptly, including offering supportive measures to Natalie designed to restore or preserve B, Natalie and other female students' at CFA's equal educational access.

70.     Natalie, and upon information and belief, no other female student at CFA, was ever informed that they could file any kind of "formal complaint" against the male students that subjected her to sexual harassment and other unwelcome

conduct on the basis of their sex. However, had she been told that she could file a "formal complaint" she would have done so.

71. Natalie was not required to file a "formal complaint" against any of these male students in order for CFA to have had actual knowledge of the sexual harassment, unwelcome conduct and bullying to which she had been subjected.

72. Natalie informed Ms. Ragon (who knew of Natalie's sexual assault and the related PTSD diagnosis) that male students in her AP Literature Class were engaging in sexual harassment, unwelcome conduct, bullying and other inappropriate conduct that Natalie felt was offensive. Specifically, Natalie informed Ms. Ragon that certain male students made lewd and offensive comments about women, including stating that women "invite" rape; mading jokes about rape; laughter and jokes when class content depicted physical and/or sexual violence towards women, as well as other "off-color," unwelcome comments and conduct. Natalie informed Ms. Ragon that these certain male students in this class, in discussing various literature assignments, would openly engage in class in misogynistic behavior towards female characters, including expressions of prejudice and contempt towards women, laughter and jokes when literature or movies depicted physical and/or sexual violence towards women. At all times mentioned herein, the male students knew Natalie had been a victim of sexual assault and suffered from PTSD.

73. Given her own experiences, the conduct and demeanor of these certain male students caused Natalie incredible anxiety, and Ms. Ragon left Natalie with the

impression that she (Ms. Ragon) had no authority to do anything about this, and instead Ms. Ragon made comments like "that sucks, but that's the way the real world is," or "Cape Fear is actually a lot better with this stuff (addressing misogyny) than the schools around us" and "I'm sure your old school wasn't perfect."

74.     After having brought these issues to the attention of those at CFA who had the authority to address the behavior to which Natalie was subjected, CFA had a duty to protect Natalie, respond reasonably, and undertake an investigation of Natalie's concerns, both under the CFA Handbook and Policies and Title IX, and to protect her by taking appropriate action against the male students that had engaged in this behavior and to protect her educational environment.

75.     Natalie did not believe CFA, nor anyone at CFA, would ever address her concerns about the conduct of those certain male students, and those that had the authority to take appropriate action against these male students knew how Natalie felt.

76.     Natalie's counselor/therapist requested that CFA allow Natalie certain accommodations to deal with her recurring episodes of anxiety, which by then had escalated to almost daily panic attacks due to the male students' constant sexual harassment and unwelcome conduct.   In fact, during her AP Literature class's viewing of Hamlet, Natalie experienced a panic attack in the classroom during one particular scene depicting violence towards women and was therefore forced to leave the classroom.   Other students around CFA, including Natalie's friend B, given especially CFA's small size generally and the Senior Class specifically, began to

"hear" of what was going on in Natalie's AP Literature Class, either because they were in the class or heard from others about what was going on with respect to the male students' sexual harassment and unwelcome conduct directed at Natalie.

77. Natalie struggled to maintain her course load while meeting the expectations of completing college entry requirements for performing arts, concerns which CFA was well aware, as those concerns were brought to the attention of Natalie's teacher and Ms. Ragon.

78. Again, Natalie was open about her personal struggles with PTSD, but Natalie began to hear from her friends at CFA that these male students in her AP Literature class were beginning to talk about her, and while she tried to stay away from these male students, given again the size of CFA generally and the Senior Class specifically, Natalie was forced to interact with these male students if she was going to be a student at CFA.

79. For months and months, class in and class out, this conduct continued, despite CFA being aware of what Natalie was being subjected to, and upon information and belief, nothing was done to admonish these male students or to otherwise cause them to cease their sexual harassment and unwelcome conduct on the basis of her sex to which Natalie was being subjected, because that conduct did not change.

80. A proposed solution for Natalie, in response to the recurring teasing, inappropriate sexual comments, and unwelcome conduct directed towards her by male students in her class, was for her to be assigned different materials than those

assigned to the rest of the class, for her to read and analyze those materials on her own. Another proposed solution for Natalie was that she do a better job "advocating for herself" in this classroom, and to "take it upon herself" to use her own "pain" and challenge the male students in the class.

81. So, once again, rather than dealing with the inappropriate and unwelcome conduct of the male students that interfered with Natalie's equal educational opportunities, Natalie, as a female, was forced to work alone and review other materials than those being reviewed by the rest of her class.

82. When Natalie was required to attend class, she was filled with dread from start to finish, wondering what would trigger a potential emotional reaction on her part to the conduct of these male students, who had become quite aware of the things that they could do or say to create a reaction from Natalie. Natalie was fully capable of reading and analyzing the material, as graphic as some of it may have been. What Natalie was not capable of dealing with, nor did anyone at CFA deal with, was the sexual harassment, unwelcome conduct and bullying to which she was subjected by certain male students in this class.

83. During the Christmas Holiday break from school, Natalie was informed by one of her best friends that she had been sexually assaulted by one of the male students in her AP Literature Class, one of the same male students that had subjected Natalie to sexual harassment and other unwelcome conduct on the basis of her sex in that class. This certain male student was well known to everyone at CFA, including both B and Charlotte, and some of his closest friends were some of the same

other male students in Natalie's AP Literature Class that had also engaged in sexual harassment and unwelcome conduct towards Natalie in that class.

84.     Upon information and belief, Natalie's friend told others of this sexual assault by this male student at CFA, such that by the resumption of school and into the Spring Semester of 2021, Natalie believed, on the basis of what she had been told, and B believed, on the basis of what she had heard and been told, that this sexual assault had taken place.

85.     The conduct of these certain male students in Natalie's AP Literature class did not change during the Spring Semester of 2021, and Natalie felt no more protected or respected on the basis of her prior history of sexual assault and related PTSD than she had when she first reported the issues to those at CFA.

86.     The last unit for the 2020-21 academic year in Natalie's AP Literature class was a series of short stories, one of which details the stalking, manipulation, kidnapping and eventual rape and murder of a 15-year-old girl.

87.     Natalie's AP Literature teacher informed her that despite her being a victim of sexual assault with related PTSD, she believed it important that Natalie read the story and participate in a discussion of the story in class.   Again, Natalie had been encouraged to "advocate" for herself as against these male students, and Natalie therefore agreed to do so.

88.     In hindsight, this setting only provided further fodder for these certain male students continued sexual harassment, unwelcome conduct and bullying towards Natalie, herself a victim of sexual assault.  When it came to the discussion

of a "character analysis" of certain characters, Natalie was shocked at the amount of "blaming" that these male students demonstrated towards a young girl that had been raped and murdered, calling the girl "trashy and loose."

89.    When it came to the discussion of an older man following this young girl to her house before eventually kidnapping, raping and murdering her, the male student that had allegedly sexually assaulted Natalie's best friend made comments to the effect of "women getting raped and murdered, what's wrong with that . . . tale as old as time," and other completely inappropriate jokes, which met with thunderous laughter from other male students in the class, and no intervention by the teacher of this class.

90.    Natalie, as she had been counseled to do, "pushed back," stating that these male students were sympathizing with a rapist, and one male student said that "no, I don't think that any of us here would rape anyone," to which another male student responded and said "don't speak for all of us!!!," to thunderous laughter by other male students.

91.    This resulted in Natalie experiencing symptoms consistent with a panic attack, and she had a loud and emotional reaction, directed some comments at certain male students, and stormed out of the classroom, followed by her teacher, who recommended that Natalie speak with Ms. Ragon.  Once again, Natalie was deprived of her equal educational opportunity.

92.    Natalie went to see Ms. Ragon and once again informed her about how hard it was for her to even get up each morning to come to school, knowing that she

would be forced to continue to interact with certain male students who had already, by that time, created an incredibly hostile environment for Natalie and other female students at CFA and prevented them from enjoying the educational experience to which they were entitled, free of this pervasive and hostile conduct by male students.

93.     Very quickly, students in the Upper School began to learn of what had happened with Natalie in her AP Literature Class, including both B and Charlotte. Female students (and some male students) began to gather in the hall, discussing what Natalie had experienced, and then some of them began to share experiences that they had with these same male students, and through their collective interaction with each other, these female students gained the courage and made the decision to step forward and speak out, both on behalf of Natalie and themselves and to push back against the sexual harassment and unwelcome conduct, on the basis of their sex, to which they had been subjected at CFA.

94.     Thereafter, there were group and individual meetings between these female students, some male students and Ms. Ragon, during which these female students, including B, shared the sexual harassment and unwelcome conduct to which they had been subjected, prior to the 2020-21 academic year, and made it clear to Ms. Ragon that this type of conduct was of a long-standing and pervasive nature.

95.     During these meetings, Ms. Ragon shed tears at what she was being told from these female students, but left the impression with them, including B, that because of her position, she couldn't do anything about this conduct, but that CFA's Dean of Students, Jamison Fee, could.

96.     Accordingly, over a period of a week or so, B and other students at CFA met with Mr. Fee and shared with him the sexual harassment and unwelcome conduct to which they and other students at CFA had been subjected by certain male students.  One of these meetings was between B, her friend who had allegedly been sexually assaulted and Mr. Fee, during which B's friend provided a "hypothetical" about the sexual assault by one of these male students of another student at CFA, without telling Mr. Fee that she was the student.

97.     B was asked to provide Mr. Fee with examples of incidents with these certain male students, and on May 3, 2021, Mr. Fee and B communicated via email, and B detailed the sexual harassment, and unwelcome conduct, simply because of her sex, to which she had been subjected while at CFA, including her former boyfriend calling her a "hoe" and "slut," male students, in a "quid pro quo" fashion, asking her if she would have sex with another CFA student and encouraging her to do so, telling her that her medical condition was "fake," and displays of other acts of aggressive verbal and physical behavior towards her.

98.     During meetings with some of these students, Mr. Fee also shed tears about what he was hearing, telling these female students that he had a daughter, and sympathizing with them that this was an environment that he would not want his daughter to be exposed to.

99.     On the basis of these meetings, these female and male students, including B, were assured and therefore reasonably believed that CFA would

undertake an investigation into these male students' conduct, and appropriate action would be taken against these male students so as to ensure that this conduct ceased.

100.   These female and male students were each requested to document their concerns and to send all the "evidence" they had to support it, and that Mr. Fee would then meet with these female students to discuss the issues.

101.   CFA's graduation was scheduled for May 24, 2021, and in early May, after B and others had voiced their concerns about the sexual harassment, unwelcome conduct and bullying to which they had been subjected, administrators at CFA chose certain students, including these same male students, to speak at graduation, that not only had engaged in sexual harassment, unwelcome conduct towards Natalie, B and other female students at CFA on the basis of their sex, and  that during the years at CFA, had also made racially derogatory and insensitive comments to other students and on their social media pages.

102.   That decision instantly caused controversy among CFA students, including B, and the other female students that had stepped forward to complain to both Ms. Ragon and Mr. Fee about some of these male student's conduct.  These students began to talk among themselves, and then to teachers and Ms. Ragon, about how permitting some of these male students at CFA to speak at graduation was completely inconsistent with their own values and the students at CFA, and that CFA's action would only reward these male students' completely inappropriate conduct, and that they should not be permitted to do so.

103.    Ms. Ragon told these students that she had no authority to make that decision, and that not speaking at graduation was not a punishment provided for under CFA's Handbook, but informed B and these other female and male students that she (Ms. Ragon) would not attend graduation if these male students were permitted to speak.

104.    As the days went by and graduation was approaching, it was evident to B and others at CFA that no action was going to be taken to address the sexual harassment, wrongful conduct and bullying to which B, Natalie and other female students at CFA had been subjected.

105.    As B's anxiety mounted, B shared with her counselor continued anxiety over the bullying, sexual harassment and other unwelcome conduct to which she had been subjected by certain male students at CFA, and B was encouraged by her counselor to speak with representatives of CFA, because of the significant impact these issues were having on B's mental health and the experience of "validation" she would feel by speaking out, and hoping for positive change.

106.    As the days and weeks went by, B's anxiety and depression mounted over the fact that nothing was ever going to happen to these male students and CFA's failure to reasonably investigate or take appropriate action with respect to the complaints made.

107.    Because it was apparent by May 13, 2021, that no action would be taken against any of the male students, B, Natalie and other female and male students met

with Ms. Ragon to express their concerns about CFA's failure to address this extremely serious situation.

108.    During this meeting with Ms. Ragon, B, Natalie ,and the other female and male students discussed with her the idea of preparing and posting a petition for the purpose of protesting CFA permitting these male students to speak at graduation, an idea which Ms. Ragon endorsed, and that separately, another CFA faculty member expressed, in writing (in the form of an email) that the "idea of a petition is smart."

109.    In fact, B and the other students at CFA had a right to voice their disapproval of these male students' bullying, sexual harassment and other unwelcome conduct to which female students, including B, had been subjected, simply because of their sex.

110.    On that same day, after having discussed the idea of a petition with Ms. Ragon and the other CFA faculty member, who both supported the idea, more than twenty (20) CFA students, females and males, spent several hours collaborating to prepare and finalize the Petition.  Ms. Ragon had made clear to these female and male students that CFA was not going to take any action against these certain male students and that the only way for anything else to happen was if it was "student-led."

111.    Later during the afternoon of May 13, 2021, after the female and male students completed and finalized the Petition, it was sent to B who posted the Petition to Change.org.  The posted Petition stated:

> The senior class feels that those chosen to speak at graduation and commencement do not accurately represent the class of 2021. The

senior class feels [certain identified male students] do not deserve speaking roles in these events. The group feels these students have caused harm to fellow CFA students and would be setting a bad example for our school community. The class feels the speakers chosen for these events should be people who care about their fellow peers and be people who support their classmates. The class would like to remove their speaking roles and replace them with either elected peers or teachers. We ask that they be removed from these roles or step down from them knowing their classmates will not respect their speeches due to their own lack of respect in the CFA community.

112. Within two hours of the Petition being posted, it had been signed by approximately twenty-seven (27) CFA students, both male and female, including Charlotte and several of her friends, and upon information and belief, had it not been taken down, would have been signed by many others.

113. By the time that Charlotte signed the Petition, she was fully aware of everything that had occurred in Natalie's AP Literature class, and that a number of students had spoken with Ms. Ragon and/or Mr. Fee and believed that some action was going to be taken against these male students, but certainly knew that as of the date that she signed the Petition, that no action had been taken against them.

114. B received a call, in Charlotte's presence, from one of her friends who indicated that Lynn Kenny, Head of CFA's Upper School, was demanding that the Petition be taken down because of threats to sue CFA and within a matter of hours from the time the Petition had been posted, it had been taken down, but the retaliation against B immediately ensued.

115. On May 14, 2021, Mr. Fee told B he wanted to meet with her "about the petition," and they did.

116.    During this meeting, B told Mr. Fee about the meeting she and other girls had with Ms. Ragon to express their concerns about CFA's lack of action taken against the male students and their being permitted to speak at graduation.

117.    B also informed Mr. Fee that during the meeting with Ms. Ragon, one of the girls mentioned the idea of a petition to her, and Ms. Ragon said she thought it was a "good idea."

118.    B further informed Mr. Fee that a "group chat" was created with other female students about the idea of a petition, and that she had also discussed the idea with a CFA Faculty Member, who also agreed that a petition would be a good idea.

119.    B informed Mr. Fee that she had not written the Petition, and when she was pressed to provide the identity of those that did, she refused to do so, telling him that the "group" wrote the Petition.  B was not required to inform Mr. Fee those that had written the Petition, although, later, others offered to provide Mr. Fee with this information.

120.    Mr. Fee informed B that since she was the person who "uploaded" the Petition, she was "going to have to take the rap for it."

121.    The posting of the Petition was protected activity, as it was intended to speak out against sexual harassment and wrongful conduct prohibited under Title IX.

122.    CFA was prohibited from retaliating against B and the other students at CFA that had reported bullying, sexual harassment and other unwelcome conduct

of certain male students at CFA, or that had drafted and/or signed the Petition that B posted, both under Title IX and CFA's own policies.

123.    B explained to Mr. Fee  that she and the other female students only did what CFA's Counselor and a Faculty Member thought to be appropriate and Mr. Fee told B  that while that would be "taken into consideration", the posting of the Petition had become a "social thing that's reckless endangerment, false accusations, whenever you put someone's name out in the public domain, that's bad."

124.    B was informed by Mr. Fee that while he "appreciated" her not wanting to tell him the other female students that were involved, that it was time for B to "share the pain", and again, B refused to provide him with the identity of the other girls who had contributed to the content of the Petition.

125.    When other students later tried to provide that information to Mr. Fee after disciplinary action had been instituted against B, he refused to take it, contending that it was "too late."

126.    B was asked to provide, and did provide, the identity of the Faculty Member who agreed that the Petition was a good idea.  B was informed that this was merely at the "inquiry stage" and that Mr. Fee was going to "follow up" to see if the things she had told him were true.

127.    What was particularly disturbing about B being summoned to Mr. Fee's Office less than twenty-four (24) hours after the Petition was posted is that Mr. Fee and others at CFA were in possession of the allegations of the sexual harassment, unwelcome conduct and bullying by certain male students at CFA for more than three

(3) weeks, yet other than "talking to them," CFA undertook no action to cause that conduct to stop, never even interviewed Natalie, and upon information and belief, took no action against any of the male students that had engaged in this conduct (or at least no one ever informed B, and the other complaining students that any corrective action had been taken).

128.   After hearing about the meeting between B and Mr. Fee other female CFA students immediately attempted to schedule their own meeting with him, to make certain he knew there were several female CFA students involved in the preparation and posting of the Petition, but Mr. Fee repeatedly refused to meet with them.

129.   Midday on May 15, 2021, Mr. Fee informed B's mother, Kim, that B would be brought before CFA's Honor Council "in relation to . . . posting the petition on a social site with the names of the students included" for a "major infraction," namely "retaliating, intimidation, threats, reprisal, false accusations and/or making false charges."

130.   Mr. Fee further informed Kim that, "in regard to the Handbook, even if [B] were to receive a suspension for the infraction it does not state that she would miss either Salute to Seniors or Commencement." Noticeably absent from any "charge" was a contention that there was anything inappropriate about the use of CFA's logo on the Petition.

131.   The Handbook defines a major infraction "as an action that significantly disrupts the learning environment *and* possibly jeopardizes the safety of self and/or

others." The Handbook further states that "[t]he Honor Council will determine student culpability."

132.    Nothing B did or failed to do constitutes a "major infraction" as that term is defined in the Handbook, as nothing she or the other students that prepared and signed the Petition did significantly disrupted the "learning environment" or "possibly" jeopardized the "safety of self and/or others."  In fact, what B, and the other female and male students at CFA that drafted and then posted the Petition did was attempt to *restore* the learning environment at CFA for the benefit of B, and other female students at CFA and to stop the continued jeopardy to their "safety of self and/or others" that the conduct of these male students posed.

133.    By May 13, 2021, B was eighteen (18), and communications regarding any proposed action against her, under CFA's Policies, should have been submitted to her, but they were not.

134.    Between May 14 and May 18, 2021, John and Kim engaged in written communications with Mr. Fee, expressing concerns regarding why B was being brought before the Honor Council, and requested specific details as to why the posting of the Petition violated any provisions of CFA's Handbook, and specifically, why the content of the Petition constituted "retaliation, intimidation, threats, reprisal, false accusations, and/or making false charges."

135.    John and Kim attempted to personally meet with the administration at CFA to determine if there could be a resolution, being that bringing B before the Honor Council was simply not warranted.  John and Kim were assured by both CFA's

Counselor, Tobi Ragon, and CFA's Head of Upper School, Lynne Kenny, to "trust in the system."

136.   No further details were ever provided to B, in writing or otherwise. However, on May 17, 2021, Mr. Fee informed John and Kim that "the appropriate disciplinary violation under the major infraction in the Handbook is 'who publishes material intended to harm or slander another person."

137.   Nothing B did or failed to do was "material intended to harm or slander another person." To the contrary, everything contained within the Petition was true or simply an effort to object to the sexual harassment and unwelcome conduct to which some female students and other students at CFA had been subjected, and simply designed to provide a mechanism for male and female students at CFA to speak out about the sexual harassment, unwelcome conduct and bullying to which they had been subjected by certain male students at CFA, and to which CFA had done nothing about.

138.   By this point, word had spread among many of the female students at CFA, that B was going to be brought before CFA's Honor Council for a "major infraction" for B simply having participated, together with other CFA female students, in bringing the repeated and pervasive sexual harassment and bullying which they had experienced from certain male students selected to speak at graduation to the attention of faculty, staff, and other students at CFA.

139.   This retaliation against B had achieved the intended effect—to frighten and intimidate female CFA students who experienced "student on student" sexual harassment and bullying to not report it. Upon information and belief, but for the

retaliation against B, other students at CFA would have stepped forward to further complain about the conduct of these certain male students and the retaliation against B.

140.    Instituting a proceeding against B before CFA's Honor Council for a "major infraction" including charges against her for alleged "code of conduct" violations that do not involve sex discrimination or sexual harassment but arise out of the same facts or circumstances as a report or complaint or sex discrimination or sexual harassment, constitutes retaliation, all for the purpose of interfering with the rights or privileges secured by Title IX.

141.    CFA's Policies provide that "major infractions" are reported to prospective colleges and universities to which CFA's students apply, and some of the CFA students who had authored the Petition were therefore frightened about coming forward to complain, fearing that they would also be hauled before the Honor Council and a report of a "major infraction" made to the college and universities to which they had applied.

142.    By May 18, 2021, the date B was scheduled to appear before CFA's Honor Council, B was a complete emotional wreck.  B has suffered from a number of medical issues during her tenure at CFA, and those at CFA were well aware of her medical condition.

143.    Specifically, B (and Charlotte) suffer from Postural Orthostatic Tachycardia Syndrome (POTS), a form of dysautonomia, a disorder of the autonomic nervous system (ANS), which controls heart rate and blood pressure, and which can

cause a normal heart associated with activities and stress to be doubled. When patients like B and Charlotte with POTS are exposed to anxiety and stress, the body releases a chemical in the blood stream called norepinephrine, which patients with POTS are extra-sensitive to, and which causes symptoms like anxiety, nausea, and dizziness to be exacerbated. In addition, B also has Mast Cell Activation Syndrome (MCASD), a condition in which the patient experiences allergic symptoms such as hives, swelling, low blood pressure, wheezing, shortness of breath, and gastro-intestinal (GI) issues, triggers for which are unpredictable, but include stress. As those at CFA well knew, by reason of their medical conditions, B and Charlotte have received extensive medical treatment, and both have suffered from associated depression and anxiety for which they both have also received treatment.

144. B is both tachycardic and orthostatic, and because of the stress brought on by the actions, or inactions, of those at CFA, B was too ill to attend school in the several days leading up to May 18, 2021, and deprived therefore of the educational opportunities associated therewith.

145. As a result, B missed CFA's "Ringing of the Bell," an event during which students and family attend and announce where the student will be going to college. While not all students attended that event, upon information and belief, B was the *only* name not mentioned, while students who were currently out of the country were.

146. Prior to the day B was scheduled to appear before the Honor Council, Kim was told she would not be permitted to attend B's appearance before the Honor

Council, but that someone would meet B outside CFA to accompany her into the meeting room.

147. On May 18th, however, that did not happen, and B was forced to walk into CFA *alone*.

148. That morning, Kim measured her daughter's heart rate at 139 (again, consistent with her POTS), for which Kim was obviously concerned, and therefore, after Kim parked her car, a fully vaccinated and masked Kim walked into CFA to check on her daughter, but was told by CFA's counselor, Ms. Ragon, to leave, and Kim did so.

149. Therefore, accompanied by Ms. Ragon, the same CFA Counselor who encouraged B, and the other female students to post the Petition, B appeared before CFA's Honor Council, made up of CFA's students, with certain CFA staff and administrators also in attendance.

150. During her presentation, B read a letter to those present from her private counselor with whom she had been in therapy since January, 2021 "due to symptoms of anxiety and depression  Elizabeth has experienced a difficult journey both mentally and physically with one goal of therapy focusing on mental health directly related to bullying and maltreatment by peers" at CFA, including Ms. Ragon's awareness (prior to the posting of the Petition) of B and other CFA female students' concerns regarding "abuse and inappropriate student behaviors" of certain male students, and that this counselor had encouraged B to speak to CFA's Counselor to voice her concerns.

151. In this letter, B's counselor confirmed that "speaking out" as a victim of sexual abuse/assault/harassment" is so important to B's overall mental health, and that her "mental and physical state" had deteriorated as a result of what she was experiencing with being brought before the Honor Council because of the Petition.

152. This letter made clear that in the counselor's "professional opinion, B and others are at risk of being revictimized by a school system that has made it clear that insensitive and inappropriate behavior is acceptable thus further creating a culture that protects those who abuse and silent victims."

153. CFA's Handbook provides the protocol by which proceedings before the Honor Council are to be conducted. Among other provisions, CFA's Handbook provides that the "Honor Council's deliberations and decision will be made in private . . . A decision will be made by the Council on the day of the hearing. The Honor Council will present its findings and a recommendation for consequences to the Upper School Director and the Dean of Students within 24 hours of the hearing."

154. After B's presentation, Ms. Ragon informed the Honor Council that she did not believe B should be punished and believed she (Ms. Ragon) could have given better direction about the Petition.

155. After B and Ms. Ragon left, upon information and belief, the student members of the Honor Council deliberated, and upon information and belief, determined B's "culpability", namely, that no action should be taken against B and that the male students who were the subject matter of B and the other students' concerns should be disciplined.

156.   Upon information and belief, immediately following the deliberation, the student members of the Honor Council were excused.

157.   CFA's Handbook further provides that if "it is found that the student violated CFA Code of Conduct, the Honor Council will consider the Consequence Guidelines and make its recommendations to the Dean of Students and Upper School Director.  The Upper School Director will make the final decision."

158.   Upon information and belief, the Honor Council did not determine that B violated the CFA Code of Conduct and did not therefore consider the Consequence Guidelines and make its recommendations to the Dean of Students and Upper School Director on this issue.

159.   On May 19, 2021, Kim received an email from CFA's Upper School Director, informing her that B's "decision to publish the petition on a public platform, use the CFA logo without permission, and use the full names of CFA students was a poor one, and although B may not fully understand the ramifications of her actions on the people she names, the petition may have unintended harmful consequences. In an effort to bring reconciliation between the members of the senior class, [B] is required to write a note to each mentioned student apologizing for not understanding the ramifications of her actions and the potential harm she caused by 8:00 pm Sunday, May 23rd."

160.   Notably absent from this email was any notification of what the Honor Council had determined.

161.  Additionally, this is the first time the use of the CFA logo had been mentioned in accordance with any issues with the petition.

162.  As those at CFA well knew by this point, requiring B to write a letter of apology was not necessary to bring "reconciliation" between the members of the senior class, many of whom had already either signed the Petition or personally voiced their concerns regarding the bullying, sexual harassment, and other inappropriate conduct in which certain male students, including some chosen to speak at graduation, had engaged.

163.  No information was provided to Kim, nor to B that B had any right to appeal any decision, but CFA's Handbook makes clear that "students, and/or parents have 24 hours to appeal the decision to the Head of School."  Neither B, John or Kim knew that there existed any right of appeal, and had they known of such right, they would have exercised it.

164.  CFA's Handbook contains a "Statement of Policy" regarding "Student Conduct and Disciplinary Consequences", and provides, in part, that:

> The principle that students can learn from their mistakes and should be given the opportunity to do so forms the framework of consequences for social misconduct. Discipline at Cape Fear Academy is based on our school values of Integrity, Respect, Resilience, Accountability. Students will be disciplined with compassion, appropriate speed, and the intent to restore both the offender and offended to a place of justice. Disciplinary action will be fair and effective based on clearly stated behavioral expectations and consequences. The school's rules, consequences and procedures for a violation will be disseminated and applied consistently to ensure that consequences are predictable. The Dean of Students and the Upper School Director are in charge of administering the discipline policy of the school. In making decisions concerning discipline, the individual student and their

problems will be given full consideration in terms of their action on the total school environment. Students will be handled in an equitable and unbiased manner. Cape Fear Academy is an independent school and not subject to the same rules as public schools. Students who violate expectations for upper school conduct can expect a prompt, firm, and fair response. Our clearly defined expectations are designed to be educational rather than purely punitive and it is the aim of the school to develop in our students a higher degree of personal responsibility for their actions. Thus, while we acknowledge and reward positive contributions to the school community, there are also consequences for improper behavior that require an organized and prompt response . . .

165.    B's punishment, being banned from Salute to Seniors and CFA's commencement unless she provided a written apology (to male students to whom she owed no apology) was not compassionate, nor intended to "restore both the offender and the offended to a place of justice."

166.    B's punishment was neither fair nor effective, and was not based upon clearly stated behavioral expectations and consequences.

167.    Given that B's parents were told that regardless of what occurred, CFA's Handbook would not permit B from being banned from Salute to Seniors or CFA's commencement, B's punishment was not predictable by her or anyone else.

168.    B's punishment was indeed punitive, as she, her parents, Charlotte, and the rest of B's family, including her grandparents, were deprived of seeing B achieve one of life's milestones, graduation from high school, given especially her physical and mental health struggles.

169.    On May 20 and 21, 2021, John and Kim communicated with CFA's Upper School Director about the directive to their daughter, and during these

conversations, B's parents were informed that if she did not apologize by May 23, she would not be permitted to attend CFA's "Salute to Seniors" on May 24 and CFA's commencement exercises on May 25.

170. No provision of CFA's Policies permitted it to exclude B from CFA's "Salute to Seniors" on May 24 or CFA's commencement exercises on May 25, 2021.

171. Contrary to CFA's policies, the Honor Council did not determine that B should apologize to anyone or that she should not be permitted to attend "Salute to Seniors" on May 24 or CFA's commencement exercises on May 25, 2021.

172. By May 23, 2021, B, an 18-year-old adult, bravely made the decision that she would not apologize, as she had done nothing to apologize for, and Kim informed CFA's Dean of Students and Upper School Director of her daughter's decision, one that they were told that John and Kim were "supporting."

173. Given that Charlotte had signed the Petition that B posted and that other CFA students had prepared, Charlotte fully supported B's decision, but because of the retaliation to which B had already been subjected, both Charlotte and some of her friends, who were fully supportive of B, tried to stay out of what was occurring.

174. B will only graduate from high school once in her life.

175. B will only have the opportunity to participate in a "Salute to Seniors" once in her life.

176. CFA refused to permit B to participate in CFA's "Salute to Seniors" event on May 24, 2021.

177. CFA refused to permit B to participate in CFA's commencement exercises on May 25, 2021.

178. At both of these events, the names and images of CFA's graduating Seniors were displayed, but nothing whatsoever was said or displayed about B, as if she never existed at CFA.

179. During the 2020-21 academic year, CFA employed a Director of Security, a career law enforcement officer with more than 26 years of law enforcement and school resource officer experience.

180. CFA's Director of Security knew nothing about the sexual harassment, unwelcome conduct and bullying to which B, Natalie and other students at CFA had been subjected, but upon information and belief, had these issues been brought to his attention, he would have investigated them.

181. The actions of prohibiting B from attending "Salute to Seniors," CFA's commencement exercises, and in failing to recognize B in any way for her accomplishments at CFA, like other graduating Seniors at CFA, was completely unwarranted and disproportionate to anything that B had allegedly done or failed to do, in that:

a.     B had no prior history of disciplinary action at CFA.

b.     B was an excellent student at CFA.

c.     B, Natalie and the other female students at CFA who participated in the drafting and posting of any petition did so only after consulting with members of the faculty and staff at CFA, who thought the Petition was a "good idea;" and

d.      no provision of CFA's policies, as John and Kim were told, permitted CFA to refuse to permit B to participate in "Salute to Seniors" or CFA's commencement exercises.

182.    Immediately, rumors began to circulate among students, faculty, and staff at CFA about what B could have possibly "done" to have been excluded from CFA's "Salute to Seniors" and its commencement exercises.

183.    No mention was made at either event of B, as if she never existed at CFA.

184.    The small size of the CFA community meant that almost everyone in attendance at the commencement activities knew about the petition and B's subsequent appearance before the Honor Council, her later exclusion from these events, and the complete removal of any mention of her, which sent a clear and unmistakable message from CFA to the school community that B had apparently committed an offense serious enough to warrant her banishment from graduation and/or that students could speak up at their own risk.

185.    Upon information and belief, at CFA's commencement exercises, some graduating Seniors at CFA announced they were going to "turn their chairs" when these male students spoke, and upon information and belief, Mr. Fee informed some of them that they could do so in exercise of their rights to "freedom of speech" but some were later told that if they did so, they would not be permitted to receive their diplomas at graduation.  However, some graduating Seniors did in fact turn their

chairs when the male students who had sexually harassed and/or assaulted and/or bullied B, Natalie, and other CFA female students at CFA spoke.

186.  Graduating Seniors at CFA are permitted continued access to their CFA email accounts (containing valuable information) through July after their May graduation.  However, B's access to her CFA email account was immediately suspended.

187.  B has already been asked, and for future college or graduate school opportunities, will be asked whether she has ever been "kicked out" of any school that she has ever attended, and given that B was denied equal educational opportunities at CFA by being retaliated against and prohibited from attending "Salute to Seniors" and CFA commencement exercises, where her name was never mentioned, she believes (despite any assurances to the contrary) that a truthful answer would be "yes," understanding that her record, therefore, is irrevocably and irreversibly tarnished, and her path to admission to future college or graduate school opportunities compromised.  B (and others) simply believe that she was "kicked out" of CFA on the eve of her graduation because she and others did the thing that those at CFA told them would be appropriate, and thereby engaged in protected activity.

188.  Prior to CFA's graduation, John and Kim, on behalf of Charlotte, had executed the Enrollment Contract for Charlotte for the 2021-22 academic year, and in reliance upon that, John and Kim paid, and CFA accepted, the required deposit and one-half (1/2) of the required tuition.

189.   On May 24th, 2021, after B notified CFA that she would not issue the apology, Kim notified upper school Lynne Kenney that she was bringing a check to cover Charlotte's tuition and wanted to pick up B's diploma and tassel as she had been previously told she could do; Ms. Kenney informed Kim that she was too busy to provide the diploma and tassel. However, the school did accept the check for Charlotte's tuition.

190.   Per the discussions between CFA's Upper School Director and B's parents, her diploma was mailed to her.

191.   Given that Charlotte had successfully completed her sophomore year at CFA, and was in good standing, both academically and behaviorally, this Enrollment Contract created a legitimate expectation on the part of Charlotte and her parents that Charlotte would be enrolled at CFA during the 2021-22 academic year, and therefore, Charlotte planned her academic courses for the 2021-22 academic year accordingly.

192.   In further retaliation against B for not apologizing, in retaliation against John and Kim for having engaged in protected activity in the support of their daughter, and in direct and apparent retaliation against Charlotte for her having engaged in protected activity by signing the Petition and simply being the daughter of John and Kim and the sister of B, on June 4, 2021, CFA after accepting payment of tuition 11 days previously, through its agent, Ed Ellison, submitted a letter to John and Kim informing them that the Enrollment Contract for Charlotte, as a rising 11th

grader, for the 2021-22 academic year, was being terminated. Specifically, the letter

stated, in pertinent part:

> the [e]nrollment [c]ontract may be terminated if [CFA] concludes
> in its *sole discretion* that the actions of a parent impede a
> constructive relationship or otherwise materially interfere with
> its accomplishment of its mission . . . [t]he culminating event
> relates to [Kim's] recent involvement with respect to matters
> related to your daughter [B's] recent interaction with the Honor
> Council . . . [f]urther you failed to support and cooperate with the
> outcome of the school's disciplinary process, as evidenced by your
> support for [B's] decision not to write apologies to any of the three
> students named in the on-line petition which co-opted the [CFA]
> logo.

193. Interestingly, additional events that allegedly contributed to CFA and

Ed Ellison's decision to terminate Charlotte's enrollment contract was Kim calling

CFA to report allegations of sexual assault; Kim calling CFA to ascertain whether

other students received any sort of punishment in addition to B; Kim's failure to

notify CFA of B's emotional conditions; and her failure to report to the school that B

had been sexually harassed by a fellow student.

194. B, Charlotte, and their parents, John and Kim, were stunned by this

retaliatory action. Prior to this letter, no one had ever mentioned that B had "co-

opted the Cape Fear Academy logo" or that Charlotte's Enrollment Contract was in

danger of being terminated if John and Kim supported B's decision not to apologize.

195. Both John and Kim have been big supporters of CFA, and Kim has been

a substitute teacher there for several years.

196. But for an incredibly rude "dressing down" of Kim by Ed Ellison because

of a gathering of CFA students at John and Kim's house in January, 2021 (contrary

to CFA's policies during the COVID pandemic), there had been no problems whatsoever between anyone at CFA and John and Kim. Kim apologized to Mr. Ellison and from and after that date, had fully supported Mr. Ellison and the mission of CFA, and did not believe that any further action would be taken against Charlotte.

197. As CFA knew, Charlotte also has been diagnosed with POTS, and therefore, the same issues, physically and mentally, as her sister B, including anxiety and depression. As both B, Charlotte, John and Kim have learned, POTS is not an easy condition to deal with, and lifestyle changes are often necessary for patients with POTS, including both B and Charlotte.

198. Not only had B, Charlotte, John and Kim all been deprived of the joys associated with B's graduation and recognition, but now, after an enrollment contract had been executed for the 2021-22 academic year, for the direct benefit of Charlotte, at the insistence of those at CFA, Charlotte was now being punished for and retaliated against because of her engagement in a protected activity by signing the petition and for the supportive actions of her parents for B.

199. Charlotte's access to her CFA email account was also suspended.

200. By June 4, 2021, Charlotte and her parents had already missed crucial deadlines to apply to and be accepted by other private schools that would offer the same degree of academic, college prep courses offered by CFA, a fact well known to those at CFA. Similarly, by that date, Charlotte and her parents had already missed crucial deadlines to apply for "honors" and "Advanced Placement" classes in any public high school that Charlotte could attend in New Hanover County.

201. John and Kim, through counsel, demanded that CFA rescind its termination of Charlotte's enrollment contract for the 2021-22 Academic Year, and CFA refused.

202. John and Kim, through counsel, demanded that B and Charlotte's access to their CFA email accounts (which contained valuable information stored thereon) be restored, and that access was in fact restored for a brief period of time so that both B and Charlotte could retrieve valuable information.

203. With B having been banished from "Salute to Seniors" and not even mentioned at CFA's commencement exercises, despite having successfully graduated, rumors began to circulate among Charlotte's friends that Charlotte had also been "kicked out" of CFA, and when the 2021-22 academic year started, those rumors were even more rampant when Charlotte was not in class.

204. Eventually, Charlotte was forced to enroll in a public high school where she has few friends; knows none of the teachers or staff; and could only enroll in the only remaining academic courses that were available, and different than the curriculum in which she would have been enrolled at CFA but for CFA's actions in having terminated Charlotte's Enrollment Contract.

205. As a direct and proximate result of her enrollment contract at CFA being unilaterally terminated, Charlotte experienced anxiety and depression on a daily basis, for which she was required to receive counseling, as the life that she knew prior to June 4, 2021, had been completely disrupted, and she had been alienated from her friends at CFA.

206.    Charlotte has already been asked, and for future college or graduate school opportunities, will be asked whether she has ever been "kicked out" of any school that she has ever attended, and given that Charlotte's Enrollment Contract was terminated from CFA that she had every intention of graduating from, she believes that a truthful answer would be "yes", understanding that her record, therefore, is irrevocably and irreversibly tarnished, and her path to admission to future college or graduate school opportunities compromised, as no one, when the "facts" set forth above are explained, can possibly understand why Charlotte's Enrollment Contract was terminated.

207.    At all times mentioned herein, CFA's agents, servants and employees, including Ed Ellison, Toby Ragen, Jamison Fee, and Lynne Kenney were acting within their course and scope of work, employment and/or authority within CFA at the time these intentional acts and/or reckless conduct occurred, and knew, or reasonably should have known, the anxiety and depression from which both B and Charlotte suffered prior to these intentional acts and/or reckless conduct occurring, and knew, or reasonably should have known, that their anxiety and depression would be exacerbated.

208.    CFA, at all times mentioned herein, retained the right to control and direct the manner in which its agents, servants and employees performed their job duties and work.

209. By reason thereof, the conducts and/or acts of CFA's agents, servants and employees, as provided herein, are imputable to CFA under the doctrine of respondeat superior.

## FIRST CLAIM FOR RELIEF
### (B and Charlotte:  Retaliation—34 C.F.R. § 106.71)

210. Plaintiffs incorporate herein by reference each of the allegations contained in Paragraphs 1 through 209 as if fully set forth herein.

211. B and Charlotte are females and members of a protected class.

212. During the 2020-21 academic year at CFA, CFA retaliated against B for having engaged in protected activity in support of Natalie and the sexual harassment, unwelcome conduct and/or bullying on the basis of her sex to which Natalie had been subjected.

213. CFA's response to the sexual harassment, unwelcome conduct of a sexual nature, and/or other unwelcome conduct on the basis of their sex to which B and Natalie were subjected was clearly unreasonable in light of the known circumstances.  CFA's response did not restore or preserve their right to equal educational access.

214. CFA failed to promptly and reasonably investigate the sexual harassment, unwelcome conduct of a sexual nature, retaliation and/or other unwelcome conduct on the basis of their sex to which the students were subjected, and instead retaliated against B for speaking out regarding the aforementioned conduct to which Natalie and other female students had been subjected, and by being banned

from "Salute to Seniors" and CFA's graduation unless she apologized to the certain male students for posting the Petition.

215. But for B's membership in the protected class, these adverse actions would not have occurred.

216. Title IX of the Education Amendments of 1972 provides, in relevant part, that no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

217. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

218. CFA was a recipient of Federal financial assistance during the 2020-21 Academic Year.

219. During the 2020-21 academic year, CFA had a duty to designate and authorize one employee to coordinate its efforts to comply with its responsibilities under Title IX, which was to be referred to as the "Title IX Coordinator", and a duty to notify B, Natalie, other students at CFA, and CFA parents with the identity of the Title IX Coordinator.

220. During the 2020-21 academic year, CFA had a duty to prominently display the contact information for its Title IX Coordinator on its website, and in each handbook or catalog that it made available to students or parents.

221. CFA failed to designate and authorize any employee, for the 2020-212 academic year, as its "Title IX Coordinator."

222. During the 2020-21 academic year, CFA did not prominently display the contact information for its Title IX Coordinator on its website, or in each handbook or catalog that it made available to students or parents.

223. During the 2020-21 academic year, CFA had a duty to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment.

224. During the 2020-21 academic year, CFA did not adopt and publish grievance procedures providing for the prompt and equitable resolution of student complaints alleging any action that would be prohibited under Title IX.

225. During the 2020-21 academic year, CFA had a duty to provide CFA students and parents with notice of CFA's grievance procedures and grievance process, including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual harassment, and how CFA would respond.

226. During the 2020-21 academic year, CFA failed to provide CFA students and parents with notice of CFA's grievance procedures and grievance process, including how to report or file a complaint of sex discrimination, how to report or file a formal complaint of sexual harassment, and how CFA would respond.

227. During the 2020-21 academic year, CFA also had a duty under Title IX to make sure that all employees involved in the conduct of the procedures had

"adequate training as to what conduct constitutes sexual harassment, which includes alleged sexual assaults."

228. Upon information and belief, during the 2020-21 academic year, CFA nor any of its employees conducted or participated in any Title IX training, including what constitutes sexual harassment.

229. CFA had actual knowledge of the sexual harassment, unwelcome conduct, unwelcome conduct of a sexual nature, and/or other unwelcome conduct on the basis of their sex to which B and other female students had been subjected.

230. Upon information and belief, the limited investigation undertaken by CFA confirmed that the sexual harassment, unwelcome conduct, unwelcome conduct of a sexual nature, and/or other unwelcome conduct on the basis of their sex to which Natalie had been subjected created an objectively hostile environment for them, and was denying her an equal educational opportunity, yet CFA failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.

231. CFA, during the 2020-21 academic year, as a recipient of Federal financial assistance in the form of the PPP loan, was prohibited from retaliating, intimidating, threatening, coercing, or discriminating against B, Charlotte, John and Kim or any other student at CFA for exercising their rights under Title IX, or for the purpose of interfering with any right or privilege secured by Title IX, or because B, Charlotte or any other student at CFA made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding,

or because John and Kim had supported B in her refusal to apologize for something that for which she owed no apology.

232.    Charlotte was aware of the concerns expressed by B, Natalie and other female students at CFA about the sexual harassment, unwelcome conduct, unwelcome conduct of a sexual nature, and/or other unwelcome conduct on the basis of their sex to which they had been subjected, and signed the Petition, but especially after B was brought before CFA's Honor Council, chose not to assist or participate in the efforts made by others to bring further awareness to these issues or any investigation by CFA of this conduct.

233.    Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation.

234.    B engaged in protected activity, and is a member of a protected class (female).

235.    Charlotte engaged in protected activity and is a member of a protected class (female).

236.    CFA retaliated against B by subjecting her to separate or different rules of behavior, sanctions or other treatment than male students; bringing her before the Honor Council for conduct that did not violate CFA's Handbook; failing to follow CFA's

Handbook; failing to follow the directives of the Honor Council; ordering that she apologize to certain male students or forfeit her right to participate in CFA's graduation; imposing disciplinary action against her not otherwise provided for under CFA's Handbook; denying B the right to participate in her own graduation; limiting B in the enjoyment of any right, privilege, advantage or opportunity; failing to offer B supportive measures designed to restore or preserve her right to equal educational access; and failing to restore or preserve her right to equal educational access..

237. CFA retaliated against Charlotte, who also engaged in a protected activity by signing the petition, and who was also within the "zone of interest protection" against retaliation, by terminating her Enrollment Contract for the 2021-22 academic year, because John and Kim had chosen to support B and/or because Charlotte had signed the Petition and supported B in her attempts to speak out against sexual harassment and unwelcomed conduct.

238. CFA was required to keep confidential the identity of any individual who had made a report or complaint of sex discrimination, including any individual, like B, who had made a report or filed a formal complaint of sexual harassment, any complainant, any individual who had been reported to be the perpetrator of sex discrimination, any respondent, and any witness. By bringing B before the Honor Council, CFA violated B's confidentiality.

239. B made a charge and/or opposed a practice made unlawful by Title IX, and therefore, engaged in protected activity, and thereafter, CFA took a materially adverse action against her because of her protected conduct.

240.    John and Kim, and by her execution of the Petition, Charlotte, opposed a practice made unlawful by Title IX, and thereafter, CFA took a materially adverse action against Charlotte by the termination of the Enrollment Contract because of John, Kim and Charlotte's protected conduct.

241.    CFA retaliated against B by requiring that she appear before CFA's Honor Council, and then prohibited her from attending "Salute to Seniors" and CFA commencement exercises unless she apologized, after B made a report or complaint and participated in an investigation of sex-based harassment by certain male students at CFA against herself and other female students at CFA.

242.    CFA further retaliated against B, and separately, John, Kim and Charlotte, for John and Kim's support of B, by terminating Charlotte's enrollment contract with CFA for the 2021-22 Academic Year, and that retaliation constitutes intentional sex discrimination prohibited under Title IX.

243.    As a direct and proximate result of CFA's violation of B and Charlotte's rights under Title IX, and by retaliating against them, B and Charlotte have suffered and continue to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to, emotional distress, fear, anxiety, depression and trauma; and expenses for past and future medical and/or psychological care.

## SECOND CLAIM FOR RELIEF
### (B—Intentional Infliction of Emotional Distress)

244.    B incorporates herein by reference the allegations contained in paragraphs 1 through 243 as if fully set forth herein.

245. CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, knew or reasonably should have known, at all times material to this action, of B's medical condition, exacerbated by stress, and her associated anxiety and depression, and CFA and its agent, servants and employees, including Ed Ellison, made the conscious and intentional decision to expose B to the stress of being brought before the Honor Council and then, without any warning that her participation in graduation would be impacted, ignoring the decision and recommendations of the Honor Council and informing John and Kim that B would either apologize or not be permitted to participate in graduation ceremonies, and giving B a short period of time in which to make that decision.

246. CFA and its agents, servants and employees knew, or reasonably should have known, that B's diagnosed medical and emotional conditions had already been exacerbated by the stress to which she had been exposed to and complained about, including the unwelcome conduct on the basis of her sex to which she had been subjected.

247. CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, knew or reasonably should have known that the decision to institute disciplinary action against B and bring her before CFA's Honor Council for something that CFA faculty and staff had agreed was appropriate, telling her that nothing during any disciplinary action would impact her participation in graduation, but then banishing her from all CFA graduation exercises, and never mentioning her name, because B would not apologize, knew would humiliate B, and

subject her to ridicule and scorn from her classmates at CFA and others who attended these graduation exercises.

248.    CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, knew or reasonably should have known that video of CFA's 2021 graduation ceremonies would be publicly available, and that B, John, Kim, Charlotte and the rest of their family and friend's joy over B's accomplishment would never be captured.

249.    CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, made the conscious and intentional decision not to mention B's name at any of CFA's graduation ceremonies, and knew or reasonably should have known that for the rest of her life, including her life immediately after her final days at CFA and entering college, B would never be able to share with her friends and her own children her personal graduation experiences, including the social interaction after graduation; wearing that cap and gown; the formal presentation of her diploma in front of faculty, family and friends; the applause and celebration; the tossing of caps in the air; the taking of pictures with her family and friends, and knew that B would have nothing to share but severe pain and distress from her CFA graduation experiences or lack thereof.

250.    CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, knew or reasonably should have known that graduation for B, like other graduating seniors, was a formal rite of passage into adulthood for B, and a signal to her family and friends that notwithstanding the

medical and emotional challenges that she had faced, she was moving (successfully) from one chapter of her life to another.

251.    CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, knew or reasonably should have known that taking this experience away from B would therefore have a permanent severe and deleterious effect on B, and it has indeed done so.

252.    In light of CFA's knowledge about B's diagnosed medical and emotional conditions, and their knowledge about the things (stress) that exacerbate this medical condition,  CFA and its agents, servants and employees, including  Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, engaged in extreme and outrageous conduct that was intended to cause, and did cause, severe emotional distress to B.  CFA and its agents, servants and employees, desired to humiliate B and to therefore inflict serious severe emotional distress upon her or knew that such distress was certain, or substantially certain, to result from their conduct, and acted recklessly in deliberate disregard of the high degree of probability that emotional distress would follow, and serious and severe mental distress in fact followed and has continued.

253.    CFA and it's agents, servants and employees' conduct indicate a reckless indifference to the likelihood that their actions and conduct would cause severe emotional distress to B.  CFA and its agents, servants and employees' actions and conduct were outrageous in character, given the circumstances, and so extreme in degree (given especially that there was nothing contained within any of CFA's policies that permitted this kind of punishment), as to go beyond all possible bounds of

decency, and to be regarded as atrocious (or appalling, horrifying), and utterly intolerable in a civilized community, as nothing that B had done or failed to do justified depriving her of one of the most significant milestones in her life, stigmatizing her to her fellow CFA students and the CFA community and in therefore inflicting the permanent severe emotional distress upon her.

254.    During the 2020-2021 school year, CFA, through its responsible agents, servants and employees, who had the authority to address the sexual harassment, unwelcome conduct of a sexual nature, unwelcome conduct on the basis of their sex, bullying and/or retaliation, about which B and other female students complained about, failed to take any action.

255.    Because of the actions taken by those at CFA and Ellison to ban B from Salute to Senior and CFA's commencement exercises, B was "uninvited" to graduation parties which she had helped to plan and her parents had helped to fund.

256.    Upon information and belief, no other student in the history of CFA has been deprived of the right to participate in graduation ceremonies unless they apologized to students who were offended by a petition prepared by other CFA students or had otherwise engaged in activities approved of by faculty and staff at CFA.

257.    CFA and its agents, servants and employees knew the close relationship between B and Charlotte.  Not satisfied however, with intentionally subjecting B to the humiliation and severe emotional distress of to which they had already subjected her, CFA, its agents, servants and employees, including Ed Ellison,  made a conscious

and intentional decision to inflict additional extreme and severe emotional distress upon B (and Charlotte) by unilaterally terminating Charlotte's enrollment contract as a result of B's refusal to apologize for something that she had no reason to apologize for and her parents' support of that decision.

258. By this further outrageous conduct, CFA desired to inflict further severe emotional distress upon B and knew that such distress was certain, or substantially certain, to result from their conduct, and acted recklessly in deliberate disregard of the high degree of probability that emotional distress would follow, and mental distress in fact followed, as B knows that but for her decision not to apologize, Charlotte's enrollment contract would not have been terminated, and her sister (a rising junior at the time) would not have been suddenly and without notice pulled away from her teachers and friends .

259. B's own severe emotional distress was further exacerbated by watching Charlotte suffer, knowing that she was powerless to change the decision that had been made to terminate Charlotte's enrollment contract and then watching the struggles that Charlotte went through to find another school to attend with the fears associated with making an entirely new group of friends..

260. CFA and its agents, servants and employees conduct, as provided above, abused their position of authority by their retaliation against B, all the while knowing, or having reason to know that she was susceptible to anxiety, depression and emotional distress.

261.   CFA and its agents, including Ed Ellison, knew or reasonably should have known the permanent impression that would be woven into the minds of other CFA students, including graduating seniors, that B had committed the most heinous of offenses by B being banished from CFA's graduation ceremonies and her name never being mentioned, and therefore intended .

262.   CFA's conduct and that of its agents, viewed in their totality rise to a level much higher than simply bad manners and hurt feelings or mere insults, indignities, and threats. After failing to investigate behaviors readily apparent to anyone who was willing to see them and months of complaints, CFA faculty encouraged a group of young women to stand up for themselves and post a petition. Once they did so, B, the young woman who posted the petition was subjected to investigations, a tribunal hearing, punishments that were not authorized, public humiliation and shame, and finally her sister was kicked out of school, all for the simple act of speaking out for a friend and engaging in a protected activity, as she was encouraged to do.

263.   As a direct and proximate result of CFA's intentional infliction of emotional distress upon B, she has suffered severe emotional distress, including anxiety and depression, which upon information and belief is permanent, for which she has been damaged and is entitled to have and recover from CFA an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## THIRD CLAIM FOR RELIEF
### (B – Breach of Contract; Violation of Implied Covenant of Good Faith and Fair Dealing)

264.  B incorporates herein by reference the allegations contained in paragraphs 1 through 263 as if fully set forth herein.

265.  John and Kim executed an enrollment contract with CFA on behalf of their daughter, B, for the 2020-21 academic year.

266.  The Enrollment Contract for B was at all times material to this action valid and enforceable.

267.  The Enrollment Contract for B for the 2020-21 academic year was executed for the direct, and not incidental, benefit of B, as it was intended to confer a legally enforceable benefit on B.

268.  The Enrollment Contract incorporated the provisions of CFA's Handbook and Policies, and specifically, those policies pertaining to sexual harassment and bullying, and protection against retaliation by those reporting that conduct.

269.  In every contract in North Carolina, including the Enrollment Contract for B for the 2020-21 academic year, there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

270.  By bringing B before the CFA Honor Council, by retaliating against her, by failing to adopt the Honor Council's decision, in prohibiting B from participating in the "Salute to Seniors" event and CFA's commencement exercises, CFA deprived

B of her rights to receive the benefits of the Enrollment Contract for the 2020-21 academic year, and therefore, breached that Enrollment Contract.

271.    In requiring, contractually, B, John and Kim to abide by CFA's Policies, B had a legitimate expectation that CFA would also. However, CFA breached its own Policies, including its Handbook, as provided herein.

272.    B fulfilled all obligations under the Enrollment Contract which CFA imposed upon her, John and Kim.

273.    CFA breached the Enrollment Contract for B for the 2020-21 academic year, and breached the implied covenant of good faith and fair dealing attendant thereto, by the conduct set forth above, including causing B severe emotional distress and/or exacerbating her current emotional condition of which CFA was fully aware; failing to properly investigate B's allegations of sex-based harassment and bullying from certain male students at CFA and take appropriate action against these male students; demanding that B apologize for speaking the truth; retaliating against B for complaining and posting a Petition about the sexual harassment and bullying that she and other female students at CFA had experienced from certain male students at CFA; and retaliating against B and then by retaliating against her sister, Charlotte, by terminating Charlotte's Enrollment Contract for the 2021-22 academic year at CFA,; failing to provide educational opportunities to B; failing to provide an environment that is safe, inclusive and respectful; failing to hold students accountable for their actions; failing to allow B to participate in Commencement and Salute to Seniors; failing to uphold its policies pertaining to bullying, harassment or

hazing; failing to promptly investigate bullying and harassment complaints, failing to protect B and the other female students that were victims to sexual harassment and bullying; failing to carefully work with B and the other female students who were victims of bullying and harassment so they were emotionally supported; failing to discipline or reprimand the male students; failing to abide by its hearing procedures with respect to the Honor Council; failing to abide by its disciplinary process and consequences regarding major infractions; and in other ways to be shown at the trial of this matter.

274.   As a direct and proximate result of CFA's breach of contract, and as a natural and probable consequence thereof, all within the contemplation of the parties at the time that the Enrollment Contract for B for the 2020-21 Academic Year was executed, B has suffered both general, and upon information and belief, special damages, all of which CFA either did foresee or should have foreseen, for which she has been damaged and is entitled to have and recover from CFA an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

275.   The special damages suffered by B include her emotional distress, certainly within the contemplation of the parties to the 2020-21 Enrollment Contract, based upon the information communicated or the knowledge of the parties at the time and the reasonable foreseeability that B would suffer these special damages.

## FOURTH CLAIM FOR RELIEF
### (Charlotte – Breach of Contract; Violation of Implied Covenant of Good Faith and Fair Dealing)

276.    Charlotte, by and through her next friends and parents, John and Kim, incorporate by reference the allegations contained in paragraphs 1 through 275 as if fully set forth herein.

277.    John and Kim executed an Enrollment Contract with CFA on behalf of their daughter, Charlotte for the 2021-22 academic year, provisions of which are set forth above.

278.    The Enrollment Contract for Charlotte for the 2021-22 academic year was at all times material to this action valid and enforceable.

279.    The Enrollment Contract for Charlotte for the 2021-22 academic year was executed for the direct, and not incidental, benefit of Charlotte, as it was intended to confer a legally enforceable benefit on Charlotte.

280.    Charlotte successfully completed her sophomore year at CFA in good standing, both academically and behaviorally, and Charlotte, John and Kim fulfilled all the obligations imposed upon them under that Enrollment Contract.

281.    At all times material to this action, Charlotte, John and Kim accepted and supported the school in its mission, philosophy and policies (but for their support of B), including moral, academic, behavioral, dress, conduct and disciplinary standards, and rules and regulations of the school as stated in the applicable parent/student handbook at CFA.

282.  Even though the 2021-22 Enrollment Contract for Charlotte conferred upon CFA certain discretionary powers affected Charlotte's rights, CFA was under a duty to exercise this discretion in a reasonable manner based upon good faith and fair play.

283.  By terminating the Enrollment Contract for Charlotte for the 2021-22 academic year, for which it had no reasonable, good faith basis, CFA acted unreasonably, acted in bad faith, acted unfairly and therefore breached the Enrollment Contract for Charlotte for the 2021-22 academic year, and breached the implied covenant of good faith and fair dealing associated therewith, and as provided in more detail above. Furthermore, CFA breached the Enrollment Contract by failing to provide educational opportunities to Charlotte when CFA unreasonably terminated Charlotte's Enrollment Contract; failing to provide an environment that is safe, inclusive and respectful; failing to hold students accountable for their actions; failing to uphold its policies pertaining to bullying, harassment or hazing.

284.  Charlotte was forced to find another school to attend for the 2021-22 academic year, and enrolled in a public high school where she had no friends nor faculty members that knew anything about her.

285.  Charlotte is not receiving the same educational benefits that she would have received at CFA for the 2021-22 academic year, and being away from her friends at CFA and other faculty members that had supported her has caused her a great deal of emotional distress, for which she has been treated.

286.     As a direct and proximate result of CFA's breach of contract, and as a natural and probable consequence thereof, all within the contemplation of the parties at the time that the Enrollment Contract for Charlotte for the 2021-22 Academic Year was executed, Charlotte has suffered both general, and upon information and belief, special damages, all of which CFA either did foresee or should have foreseen, for which she has been damaged and is entitled to have and recover from CFA an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

287.     The special damages suffered by Charlotte include her emotional distress, certainly within the contemplation of the parties to the 2021-22 Enrollment Contract, based upon the information communicated or the knowledge of the parties at the time and  the reasonable foreseeability that Charlotte would suffer these special damages.

## FIFTH CLAIM FOR RELIEF
### (Charlotte – Intentional Infliction of Emotional Distress)

288.     Charlotte incorporates herein by reference the allegations contained in paragraphs 1 through 286 as if fully set forth herein.

289.     CFA and its agents, servants and employees, including Ed Ellison, Tobi Ragon, Jamison Fee, Lynne Kenney, knew or reasonably should have known, at all times material to this action, of Charlotte's medical condition, exacerbated by stress, and her associated anxiety and depression, and CFA and its agents, servants and employees, including Ed Ellison, make the conscious and intentional decision to

inflict severe emotional distress upon Charlotte by terminating her enrollment contract.

290. CFA and its agents, servants and employees knew, or reasonably should have known, ,that terminating Charlotte's enrollment contract would humiliate her, and subject her to ridicule and scorn because of the perception that Charlotte must have done something terrible to justify her being "kicked out" of CFA, an impression that Ed Ellison most certainly intended to leave.

291. CFA and its agents, servants and employees knew, or reasonably should have known, that Charlotte would be forced to explain to other schools and colleges why she had been "kicked out" of CFA, and therefore knew that Charlotte would be forced to revisit this issue and to experience the associated severe emotional distress in an attempt to explain why she did not finish her high school education at the place where she started it.

292. CFA and its agents, servants and employees knew, or reasonably should have known, and Charlotte (a high academic achiever) knew, that other schools and colleges are particularly inquisitive about a student's change of schools, and whether a change in schools was associated with any conduct of the student. So immediately upon Charlotte learning that her enrollment contract had been terminated and to this day, she suffers significant anxiety about how she will address this issue, especially when asked the standard question of whether her attendance at any school has ever been involuntarily terminated.

293.   In light of Charlotte having done nothing to justify the termination of her enrollment contract and what CFA knew or reasonably should have already known about Charlotte's diagnosed medical and emotional conditions, exacerbated by stress, CFA, its agents, servants and employees, including Ed Ellison made a conscious and intentional decision to impose severe emotional distress upon Charlotte, and in the  termination of Charlotte's Enrollment Contract for the 2021-22 academic year, engaged in extreme and outrageous conduct that was intended to cause, and did cause, severe emotional distress to Charlotte.

294.   CFA and its agents, servants and employees, including Ed Ellison, desire to humiliate Charlotte, and to therefore inflict serious severe emotional distress upon her or knew, or reasonably should have known, that such distress was certain to result from their conduct, and acted recklessly in deliberate disregard of the high degree of probability that severe emotional distress would follow, and serious and severe mental distress in fact followed and has continued.

295.   The actions of CFA and its agents, servants and employees, including Ed Ellison, indicate a reckless indifference to the likelihood that its actions and conduct would cause severe emotional distress to Charlotte, and their actions and conduct were outrageous in character, given the circumstances, and so extreme in degree (given especially of the timing of when this termination occurred) as to go beyond all possible bounds of decency, and to be regarding as atrocious (or appalling, horrifying), and utterly intolerable in a civilized community that would never have kicked Charlotte out of her high school, as nothing that Charlotte had done or failed

to do justified the termination of her enrollment contract, after she had already chosen her courses for her Junior year, the academic year had ended, and her failure to return for her junior year would stigmatize her in the eyes of others at CFA.

296.    CFA and its agents, servants and employees' conduct, as provided above, abused their position of authority by its continued retaliation against B, and now retaliation against Charlotte, all the while knowing, or having reason to known that both were susceptible to anxiety, depression and emotional distress.

297.    Given B's unwillingness to abide by and obey the Defendants' demands, the Defendants intentionally abused their position of power at CFA by humiliating and ostracizing Charlotte, in addition to B,  by also erasing any thoughts or mention of Charlotte by exiling her from the school due to no actions of her own.

298.    CFA and Defendant Ellison made the conscious, reckless, unilateral and intentional decision to terminate the enrollment contract of Charlotte, not only as retaliation against Charlotte, but as further humiliation, embarrassment, retaliation and vindictive conduct towards B. The termination of Charlotte's enrollment contract was further abuse of CFA and Ellison's position of power within CFA for the purpose of humiliating, embarrassing, ostracizing and retaliating against both B and Charlotte for B's unwillingness to simply agree with CFA and Ellison and acquiesce to their demands.  CFA and Ellison participated in this continued retaliation against B and Charlotte all the while knowing that they both suffered and were susceptible to anxiety and depression, and also understanding their expected reaction to the continued treatment and retaliation, which included further emotional distress.

299.   As a direct and proximate result of the intentional conduct of CFA and its agents, servants and employees, including Ed Ellison, Charlotte has suffered severe emotional distress, including anxiety and depression, for which she has been damaged and is entitled to recover from CFA an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00)

## SIXTH CLAIM FOR RELIEF
### (Charlotte and B – Alternative Claim for Negligence Against CFA)

300.   Plaintiffs incorporate herein by reference each of the allegations contained in paragraphs 1 through 299 as if fully set forth herein.

301.   CFA by and through its agents, servants and employees had a general duty, which CFA voluntarily undertook, to use due care, or to so govern its conduct and actions as not to harm, injure and/or endanger the health and emotional well being of B and Charlotte.

302.   CFA, its agents, servants and employees, had a specific duty to both B and Charlotte, which CFA voluntarily undertook, to use due care, or to so govern its conduct and actions as not to harm, injure and/or endanger the health and emotional well being of B and Charlotte.

303.   In addition to its general and specific duties to B and Charlotte, CFA, its agents, servants and employees duties also arose from their enrollment contracts, executed by John and Kim, as arising from those enrollment contracts is a common-law duty to perform with ordinary care the duties and obligations contained therein, but the enrollment contract also created the relationship out of which arises CFA's duty to exercise ordinary care.  However, the enrollment contract did not set forth all

of B and/or Charlotte's rights and remedies if they were subjected to the conduct complained of herein. Therefore, this is not an action based upon CFA's simple failure to properly perform the terms of the enrollment contract, as the injuries resulting to B and Charlotte were not injuries that were the subject matter of the enrollment contract which formed the duty to use reasonable care towards B and Charlotte independent of the enrollment contracts.

304.   CFA, its agents, servants and employees had a duty to protect B against sexual harassment, bullying and other unwelcome conduct on the basis of her sex and had actual and direct knowledge that she had been subjected to this conduct from certain male students at CFA.

305.   When B complained about the sexual harassment, bullying and unwelcome conduct to which she had been subjected while a student at CFA from certain male students (which those at CFA confirmed), CFA, its agents, servants and employees had a duty to investigate those complaints and to counsel B about the appropriate actions that she could take as a result thereof.

306.   Upon information and belief, CFA by and through its agents, servants and employees, failed to take reasonable steps to investigate the claims made by B and the other students and failed to conduct a reasonable and appropriate investigation or to take appropriate action against these certain males students.

307.   When faced with the complaints from B and others, CFA by and through its agents, servants and employees engaged upon an active course of conduct to properly advise B as to what she could do, and had a positive duty to exercise ordinary

care to protect B from harm and had a duty to advise her whether anything that she was informed was appropriate or could subject her to disciplinary action, including being banished from CFA's graduation exercises unless she apologized for participating in what B was informed was an appropriate response (the preparation of a petition).

308. CFA, its agents, servants and employees therefore assumed a duty to protect B from any harm associated with her doing what she was informed was an appropriate thing to do, given the extent to which that conduct was intended to affect B; the foreseeability of harm that would be done to B if she were disciplined and prohibited from attending graduation because she participated in doing the thing that she was informed was appropriate; the degree of certainty that B in fact suffered injury; the closeness of connection between the conduct of CFA, its agents, servants and employees, and the resulting injury to B; the moral blame or lack thereof attached to the conduct of both B and CFA, its agents, servants and employees; and the policy of preventing future harm..,

309. When B was forced to appear before the Honor Council, CFA by and through its agents, servants and employees, had actual, and specific knowledge of B's then existing mental and emotional condition by reason of the sexual harassment, bullying and other unwelcome conduct to which she had been subjected from some students, and knew, from the letter that she read from her health care professional, that not only was B suffering because of what she was being subjected to, but that this process risked inflicting further significant emotional harm upon B and send B

and others the message that they should simply be silent when subjected to sexual harassment, bullying and other unwelcome conduct.

310.    In undertaking to impose discipline upon B for her role in the posting of the petition, CFA, its agents, servants and employees had a duty to act reasonably, to avoid unnecessarily exposing B to a risk of harm, given especially their knowledge of B's underlying medical and emotional condition, to avoid imposing any discipline against her contrary to what she had been told (that her participation in graduation would not be affected), to avoid doing anything that would permanently stigmatize B in the eyes of her fellow CFA classmates and the CFA community, and to avoid depriving B of her right to participate in CFA's graduation ceremonies.

311.    CFA, its agents, servants and employees, breached their duties to B and acted unreasonably and unnecessarily exposed B to a risk of harm, given especially their knowledge of B's underlying medical and emotional condition, impose disciplinary action against her contrary to what she had been told, permanently stigmatized her in the eyes of her fellow CFA classmates and the CFA community, and deprived her of her well earned right to participate in CFA's graduation ceremonies.

312.    Upon information and belief, no other student in the history of CFA has been deprived of the right to participate in graduation ceremonies unless they apologized to students who were offended by a petition prepared by other CFA student or had otherwise engaged in activities approved of by faculty and staff at CFA

313.  CFA had a duty to permit B to participate in the graduation ceremonies at CFA.

314.  Separately, having voluntarily accepted Charlotte as a student for the 2021-22 academic year and having permitted Charlotte, in consultation with others at CFA, to set out her academic curriculum at CFA for her junior year, CFA had a duty to Charlotte to exercise ordinary care to protect Charlotte from harm in making any determination to unilaterally terminate Charlotte's enrollment contract because of conduct allegedly engaged in by B and/or John and Kim.

315.  CFA, its agents, servants and employees therefore assumed a duty to protect Charlotte from any harm associated with the notion of terminating her enrollment contract and therefore prohibiting her from attending CFA for her junior year given the extent to which that decision was intended to affect and did affect Charlotte; the foreseeability of harm that would be done to Charlotte if her enrollment contract was terminated just weeks before the 2021-22 academic year was to begin; the closeness of connection between the conduct of CFA, its agents, servants and employees, and the resulting injury to Charlotte; the moral blame or lack thereof attached to the conduct of both Charlotte and CFA, its agents, servants and employees; and the policy of preventing future harm to individuals like Charlotte.

316.  In undertaking to make a decision to terminate Charlotte's enrollment contract, CFA, its agents, servants and employees, had a duty to act reasonably, to avoid unnecessarily exposing Charlotte to a risk of harm, given especially their knowledge of Charlotte's underlying medical and emotional condition, to avoid taking

any action against Charlotte inconsistent with the voluntary action that they had already undertaken in helping her plan her junior year, to avoid doing anything that would stigmatize Charlotte in the eyes of her fellow (and now former) CFA classmates and the CFA community, and to avoid depriving Charlotte of her right to continue to attend CFA.

317.   In making the decision to terminate Charlotte's enrollment contract, CFA, its agents, servants and employees, breached their duties to Charlotte and acted unreasonably, unnecessarily exposed Charlotte to a risk of harm, given especially their knowledge of Charlotte's underlying medical and emotional condition, took action against Charlotte inconsistent with the voluntary action that they had already undertaken in helping her plan her junior year, stigmatized Charlotte in the eyes of her fellow (and now former) CFA classmates and the CFA community, and deprived Charlotte of her right to continue to attend CFA.

318.   Upon information and belief, no other student in the history of CFA has ever had their enrollment contract involuntarily terminated just weeks before the start of a school year for reasons unrelated to the conduct of that student.

319.   As a direct and proximate result of the negligence of CFA and its agents, servants and employees, B and Charlotte have been damaged, and the damages and injuries suffered by them were reasonably foreseeable, and B and Charlotte are therefore entitled to have and recover from CFA an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

**WHEREFORE**, the Plaintiffs pray the Court as follows:

1.      To enter judgment in favor of Plaintiffs B, and Charlotte, by her parents and next friends, John and Kim, on their claims under Title IX;

2.      To award the Plaintiffs nominal or compensatory damages in amounts to be established at trial, including damages for deprivation of equal access to the educational opportunities and benefits provided at CFA, and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and such other damages as a jury may determine to have been suffered by them;

3.      To award the Plaintiffs B and Charlotte, by her parents and next friends, John and Kim, an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) on their Second through Seventh Claims for Relief;

4.      That the Plaintiffs be awarded pre-judgment interest, their courts costs and expenses, including attorneys' fees, pursuant to 42 U.S.C. § 1988;

5.      For trial by jury on all issues so triable; and

6.      For such other and further relief as to the Court seems just and proper.


(Signature page to follow)

Respectfully submitted this the _____day of _____, 2023.

                                 **SHIPMAN & WRIGHT, L.L.P.**
*Attorneys for Plaintiffs*

By: _____

**GARY K. SHIPMAN**
N.C. State Bar No.: 9464
**JAMES T. MOORE**
N.C. State Bar No.: 38377
**THOMAS R HARVEY III**
N.C. State Bar No.: 57308
575 Military Cutoff Road, Suite 106
Wilmington, NC 28405
Telephone: (910) 762-1990
Facsimile: (910) 762-6752
Email: gshipman@shipmanlaw.com
Email: jmoore@shipmanlaw.com
Email: tharvey@shipmanlaw.com